UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 22-00060-BAH |
| | ) | |
| VINCENT GILLESPIE | ) | |

## SENTENCING MEMORANDUM

Late in the evening on January 5, 2021, Vincent Gillespie traveled overnight from his home in Massachusetts without any concrete plan except to attend the former President's rally and maybe do a little sightseeing. He returned later that day bruised and beaten after making his way up to the Lower West Terrace Tunnel, where he mimicked other rioters by engaging with officers in an admittedly half-baked plan to protest inside the Capitol. Now 61 years-old with no prior criminal record, he faces a significant sentence for what he did. For the reasons that follow, Mr. Gillespie submits that the Court should (a) find that the correct guideline sentencing range is 30-37 months' imprisonment, and (b) sentence him within that range to thirty (30) months' imprisonment with two years of supervised release to follow.

## FACTS

Having presided over the testimony and evidence at trial, including his own testimony, Mr. Gillespie assumes the Court's intimate familiarity with the with the facts of his offenses and, to a certain extent, his history and circumstances. He will not belabor them here. In brief summary, Mr. Gillespie is a man of causes that occasionally evolve into obsessions. He has long been skeptical of governmental action and was deeply suspicious of the outcome of the 2020 presidential election. By December 2020 he had, however, mostly relegated his concern about the election to the backburner in favor of other litigation projects he was engrossed in.

Mr. Gillespie learned of the former President's planned January 6 rally from a friend in

Yonkers, NY just a few days before it was to take place. Although he at first rebuffed the friend's idea that they attend the rally, he later changed his mind and the two developed a plan to meet and drive together with two others to Washington DC. Mr. Gillespie left late in the evening on January 5 with his then-housemate and met his friend and another in the New York metropolitan area before continuing the drive to a Maryland Metro station. They eventually arrived at the area of the Ellipse sometime in mid-morning. They carried no weapons, tactical gear, or other equipment. Mr. Gillespie was dressed only in a jacket and a knit cap.

The rally was largely a bust for Mr. Gillespie because he could not hear the speeches. He and the group he was with decided to leave, following the then-marching crowd down to the Capitol. They arrived well after the initial breaches of the Capitol had occurred. The group made their way up to and on temporary scaffolding where they remained for some time. Mr. Gillespie ventured on toward and into the Lower West Terrace Tunnel where, over the next 15-20 minutes, he engaged with officers by (1) running into the phalanx of officers with a riot shield held in front of him (after watching another rioter do the same), (2) ineffectually grabbing the arm of Sergeant Paul Riley, (3) shouting "traitor" and "treason" (after watching yet another rioter do the same), and finally (4) participating in a scrum of rioters pushing and being pushed toward the Lower West Terrace entrance doors to the Capitol. The rioters were expelled from the Tunnel withing a few minutes, with Gillespie taking several blows by baton to the head. He abandoned any further efforts to enter the Capitol. After answering questions posed by an AP stringer, he reunited with his friends and drove back to Massachusetts, arriving late at night.

In the following days, weeks, and months, Mr. Gillespie did not post about his participation in the January 6 events on social media or otherwise extoll the events of January 6 or laud his participation in them.

## ARGUMENT

## A SENTENCE OF THIRTY (30) MONTHS IMPRISONMENT FOR MR. GILLESPIE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY

**I.      SENTENCING GUIDELINES CALCULATION AND OBJECTIONS**

The Presentence Report (PSR) proposes a calculated guideline sentencing range of 78-97 months, which is for the most part driven by a cross-reference to a higher guideline range than would otherwise apply and then boosted by a series of specific offense enhancements. All told, the cross-reference and enhancements add a whopping fourteen (14) additional levels to Mr. Gillespie's Total Offense Level. As objected to and below, three of the proposed cross-references and enhancements constituting eight levels of increase are disputed.[1] At the end of the day, the properly calculated Total Offense Level should be **nineteen (19)** which, when considered against Mr. Gillespie's complete lack of criminal record, yields a guideline sentencing range of 30-37 months.

### a.   U.S.S.G. §2A2.2, Rather Than §2A2.4, Supplies the Base Offense Level

The PSR acknowledges that the most analogous guideline applicable to both Gillespie's assault and civil disorder convictions is U.S.S.G. §2A2.4, which provides for a Base Offense Level of **10**. The PSR, however, immediately pivots to a higher Base Offense Level of **14** pursuant to U.S.S.G. §2A2.2 because, in its view, Gillespie's assault was "aggravated" because he committed it with the intent to commit another felony (the civil disorder) or his use of a riot shield rendered it a "dangerous weapon" as defined by U.S.S.G. §1B1.1, *comment.* (n.1(E)). Neither theory suffices to convert Gillespie's actions into an aggravated assault and the proper guideline is therefore U.S.S.G. §2A2.4 and the corresponding Base Office Level is 10.

---

[1] Defendant in his objections to the Presentence Report opposed the proposed six-level enhancement for official victim motivation outlined in ¶¶45 & 53. After further review and consideration, defendant withdraws his objection to the official victim motivation enhancement.

  **i.**  **The Proposed Cross-Reference to §2A2.4 Is Unsupported Because Gillespie's Assault Was Not With the Intend to Commit a Separate Offense.**

  The crime of civil disorder itself does not require that the defendant *intend* to commit a civil disorder. Rather, it is a strict liability crime in this respect in that it only requires the government to prove that the defendant "committed, or attempted to commit, an act with the intent to obstruct, impede, or interfere with law enforcement officers who were lawfully carrying out their official duties *incident to* a civil disorder." *United States v. Reffitt*, 2022 U.S. Dist. LEXIS 81138 at 16 (May 4, 2022) (Friedrich, J.).The crux of the offense, therefore, is interference with an officer *during* a civil disorder. This is exactly what the jury found Gillespie did in Count One – he assaulted an officer by making physical contact with him during a civil disorder, thus satisfying both statutes. There is simply no evidence that Gillespie *intended* to commit a separate, distinct offense.

  Judges Berman Jackson and Hogan have questioned whether the cross-reference is inapplicable absent evidence that a defendant has a larger, felonious purpose beyond the commission of the assault itself. *See United States v. Hamner*, Criminal No. 21-0689-ABJ (ECF 43 (Sentencing Transcript)); *United States v. Riley June Williams*, Criminal No. 21-0618-ABJ (Transcript pending); *United States v. Sargent*, Criminal No. 21-0258-TFH (ECF 78 (Sentencing Transcript)). While Judge Hogan, despite his concern, ultimately determined in *Sargent* that he would employ U.S.S.G. §2A2.2, Judge Berman Jackson in *Hamner* and *Riley Williams* declined to use the cross-reference in sentencing defendants on facts similar to Mr. Gillespie's. In *Hamner* she opined:

> [T]here's no reason to believe that this is meant to be based on just the hypertechnical alignment of elements. Because when the guideline, at least in the gun context, tells you, well, you'd use the guideline for that offense instead of the firearms offense, it seems clear that it means something other

than another gun possession offense. And it seems that the government's approach strips the provision of any meaning.

It strikes me that if the Commission is asking: Did you commit the assault with the intent to commit some other offense? It didn't mean with the intent to commit that exact same assault, just charged differently. They could have easily defined "another offense" as any offense with any different elements that's a different offense, but they didn't.

It's also important to note that the cross reference says that you go to aggravated assault if the assault on the police officer involved the intent to commit another felony, not the same intent needed to satisfy the elements of another felony, not that it was committed during the commission of another felony. This suggests that the guideline is meant to cover just the situation in the cases that you cited, where the assault on the police officer is intended to facilitate or further or advance or succeed in the commission of or evasion of apprehension for a second, different crime.

*Hamner*, *supra*, September 23, 2022, Sentencing Transcript, pp. 20-21.

In sum, there is no evidence of a larger, independent felonious purpose that was intended, furthered, or advanced by Gillespie when he engaged with the officers in the Lower West Terrace Tunnel. The lack of a separate felonious purpose makes the cross-reference unsupported and therefore the proper guideline provision is U.S.S.G. §2A2.4 with its corresponding Base Offense Level of **10**.

> ii. **The Proposed Cross-Reference to §2A2.4 Is Unsupported Because Gillespie's Use of the Riot Shield Does Not Qualify it as a Dangerous Weapon As Defined in §1B1.1's Commentary.**

Likewise, Gillespie's use of a riot shield does not trigger the cross-reference because his use of it does not qualify it as a "dangerous weapon" as defined by U.S.S.G. §1B1.1, *comment.* (n.1(E)). For the cross-reference to apply to this case, the evidence must show that he used a dangerous weapon – here, a riot shield - as "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. §1B1.1, *comment.* (n.1(E)). *Cf. United States v. Chansley*, 525 F. Supp. 3d 151, 161–62 (D.D.C. 2021) ("As used in Sections 111 and 113, courts have consistently

defined "dangerous weapon" as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm). The inquiry is circumstance specific. *United States v. Klein*, 533 F.Supp.3d 1, 12 fn.6 (D.D.C. 2021).

Mr. Gillespie's two to three-second movement toward the officers with the riot shield awkwardly held above him belies any notion that Gillespie used a riot shield to cause any injury, let alone *serious* bodily injury or death. *See United States v. Joshua Hernandez*, 22-cr-042-CRC (finding, in response to joint government/defendant objection, that using a PVC flagpole to strike the top of an officer's riot shield did not constitute use of a dangerous weapon); *United States v. Duke Wilson*, 21-cr-0345-RCL (evidence of use of a several feet long PVC pipe to strike officers and then hurling at another did not support dangerous weapon enhancement). The proof of the pudding is in the eating: no officer has claimed injury from Mr. Gillespie's quickly abandoned effort to rush through the officers with the shield because the way he used it was not capable of causing injury.

To be sure, a riot shield, like any other instrument that is not inherently dangerous, can be used in such a way to be capable of inflicting injury. And Judge McFadden so concluded in connection with a riot shield in *United States v. McCaughey*, 21-cr-040-TNM. There, the defendant McCaughey committed assaults on multiple officers. In one instance he used a riot shield to pin an already helpless officer against a metal and glass doorframe and held the officer there while other rioters attacked him. *Id.*, D.E. 11 (Government's Motion for Detention) at 10-11. Once pinned, McCaughey used his own weight, as well as the weight of those behind him, to increase the pressure against the officer while the officer screamed in pain with blood running from his mouth. McCaughey continued to push. *Id.* McCaughey's use of the riot shield in this fashion resulted in injuries to the officer, including bruising. *Id.*, September 13, 2022, Oral

Ruling of Hon. Trevor McFadden After Trial (Undocketed; available upon request) at 22-23. Relying on these facts, Judge McFadden ruled that, although a riot shield was not inherently a dangerous weapon, McCaughey's use of the shield, along with the tangible resulting injury from the way he used it, rendered it a dangerous weapon in those specific circumstances.

In stark contrast, Mr. Gillespie's actions were quick and quickly ended. His rush toward officers who were armed with their own riot shields, tactical gear, and batons is not remotely was immediately repelled and no injuries were sustained. He did not target or pin any officer; instead, his was an ill-conceived and ill-defined rush to move past the officers. Importantly, Gillespie did leverage additional force, either his own or of others, to amplify the potential injury as McCaughey. In short, there is simply no support that Gillespie's use of the riot shield rendered it an instrument capable of inflicting death or serious bodily injury and the cross-reference is unsupported.

Whether based on Mr. Gillespie's nonexistent intent to commit a separate offense or the mischaracterization of the riot shield as a dangerous weapon, the cross-reference does not apply. Consequently, the correct guideline is U.S.S.G. §2A2.4(a) and therefore the Base Offense Level is **10** rather than 14**.**

### b.   Gillespie's Offenses Must Be Grouped Together Pursuant to §3D1.2

The PSR proposes to separate the count alleging Civil Disorder, 18 U.S.C. § 231(a)(3), into a group separate from the assault count charged under 18 U.S.C. § 111(a). PSR ¶¶39-40. The proposal is puzzling. Section 231(a)(3) criminalizes "any act" that obstructs, impedes, or interferes with an officer performing lawful duties "incident to and during the commission of a civil disorder." The act is the assault and the subsequent participation in the scrum pushing toward the entrance. As the PSR correctly notes, the victims of the civil disorder were the

officers guarding the tunnel when Gillespie was there. The three counts therefore all arise from the same specific acts, share the same victims, are temporally related, and therefore must be grouped pursuant to U.S.S.G. §3D1.2. *See also* U.S.S.G. Chapter 1 Pt. A (4)(a) (discussing the Sentencing Commission's resolution of the tension between Real Offense vs. Charge Offense Sentencing). Under the Probation Department's rationale, all cases where both civil disorder and assault are charged would require separate grouping of count. Yet while admittedly not a fully exhaustive search – to do so would require access to all Presentence Reports in all January 6 cases – defendant has searched for, and has been unable to find, evidence of another instance where the Probation Department, the government, or a court has determined that two charges stemming from activities at the Capitol on January 6 were not groupable.

The Court should decline the Probation Department's proposal that the Civil Disorder count be separated from the assault count, thus reducing the Total Offense Level by two levels.

### c.   The Proposed Enhancement for Perjurious Testimony Does Not Apply

Mr. Gillespie objects to the allegation that he "willfully gave false testimony" during trial and the corresponding two-level adjustment for obstruction of justice pursuant to U.S.S.G. §3C1.1. In the context of U.S.S.G §3C1.1, the government must meet its burden of proof by the "clear-and-convincing" standard, and the evidence must be evaluated "in the light most favorable to the defendant." *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994) (holding that a "preponderance of the evidence" standard is insufficient). The higher standard reflects the fact that a defendant has a constitutional right to testify, *id.* at 1254, and "not every accused who testifies at trial and is convicted will incur an enhanced sentence . . . for committing perjury." *United States v. Dunnigan*, 507 U.S. 87, 95-96 (1993). Sentencing courts must make "independent findings necessary to establish a willful impediment to or obstruction of justice, or

an attempt to do the same, under" the definition of perjury. *Id.* Thus, for this adjustment to apply, the government must prove by clear and convincing evidence that Mr. Herrera committed perjury, *id.*, and not merely that some aspects of his testimony might have come across as inconsistent or in conflict under the pressure of cross examination.

The government in its submission to the Probation Department struggles in vain to meet its burden. At the outset, it should be noted that there was little factual dispute from Mr. Gillespie while testifying – he admitted all the government needed to satisfy each of the elements of the counts of conviction and often more. Rather, the focus of trial what was going on inside Mr. Gillespie's mind, his intent in taking the actions he took.

Set against this background, none of the three bases for concluding that Gillespie willfully lied survive scrutiny under that clear and convincing standard. The video showing Gillespie ineffectually pulling on Sergeant for the few seconds speaks for itself – the crowd at that point was many feet (if not yards) behind him and supports his testimony that he had no plan other than to get through the police line; and in any event does not conclusively support that Gillespie was intending to pull Riley "into the mob." Likewise, the video, which for some minutes does not show Gillespie at all and does not contain audio for the time he was in the scrum does not conclusively belie his testimony that he did yell to other police to aid one of their own. Finally, the specific circumstances of Gillespie's time in the tunnel do not support the conclusion that he was lying when testifying that he thought he could be in the portion of the tunnel where he was. As the police officers testified, in their view the boundary where the rioters must be prevented from entering was marked by the doors in the tunnel rather than the mouth of the tunnel where Gillespie was. The fact that Gillespie simply stood in front of the line for some minutes without being forced back supported his understanding, as he testified to at trial, that he

believed (regardless of whether his belief was right or wrong) that he was permitted to be where he was.

For these reasons, none of the purported bases for perjurious testimony is supported and consequently an enhancement for obstruction of justice is unwarranted.

## II.        SECTION 3553(a) SENTENCING FACTORS

### a.   Gillespie's History and Characteristics

The Presentence Report accurately describes Mr. Gillespie's upbringing the course of his life. In summary, Mr. Gillespie is a 61-year-old man with no prior criminal history. An unusual childhood morphed into an adult life first featuring introspection and spiritual searching. He settled down in later years and has lives exceedingly modestly, choosing instead to devote time and resources to myriad projects and causes that reflected is skepticism of the role of government action an individual lives while at the same time striving for the perceived greater good of the community. *See, e.g.,* PSR ¶¶68, 107, & 108 (describing *pro se* litigation over a parking ticket, family squabbles, and against drug manufacturers). As his cousin, Kim Bonavita, described him to the Probation Department, Mr. Gillespie is "frugal, serious, brutally honest, very eccentric, fair, caring and a great sense of humor."

With no immediate family or significant other, Mr. Gillespie leads a simple, largely monastic life in rural Massachusetts. He does not own a television, and until recently did not have internet access at his home, preferring instead to engage in community by driving to coffee shops and grocery stores to log on to news and other websites for some part of his days. His clothing is from thrift stores and overstock suppliers. He drives twenty to thirty-year-old cars in dubious repair. He does not travel internationally, and what travel he does do within the United States is purpose-driven rather than for leisure.

### b. Nature and Circumstances of the Offense, Unwarranted Sentencing Disparities, and Deterrence

Actions demand consequences, and in consideration of the jury's verdict Mr. Gillespie requests a sentence that includes a significant term of thirty (30) months' incarceration. The Probation Department in contrast recommends a sentence of 78 months based on an incorrectly calculated guideline sentencing range. Even if the Court determines that some or all of the disputed enhancements apply, such a sentencing recommendation is astonishingly high for a defendant of Mr. Gillespie's level of culpability. It places him in the same league as the very worst of the January 6 actors and punishes him more harshly than persons who clearly engaged in more preplanning, had a more involved role in the attack, and who continued to extoll the virtues of the attack in its aftermath. Indeed, the facts of Mr. Gillespie's case are like several cases where January 6 attack defendants were permitted to plead guilty solely to a civil disorder (18 U.S.C. § 231(a)) charge:

- *US v. Aaron Mostofsky*, 21-cr-138 (JEB): Defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. § 231(a)(3) and § 641. Mostofsky's guideline range was 10-16 months. He was accused of forcibly engaging in confrontation with police by pushing against a barrier with all of his strength to resist officer efforts to contain the riot. Mr. Mostofsky also took a bullet proof vest that a Capitol Police officer was wearing and later wore the vest along with a riot shield he found. Like Ms. Williams, Mr. Mostofsky was in the first wave of people who entered through the breached Senate wing door.

- *US v. Jerry Ryals*, 21-cr-244 (CKK): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. § 231(a)(3). He filmed himself entering the Capitol saying, "we definitely have enough people to overthrow this bitch," and attempted to break down a locked office door with his shoulders. On January 7th, Ryals posted a statement on Facebook calling himself a "patriot" and that the country was headed for war.

- *US v. Daniel Johnson*, 21-cr-407 (DLF): Defendant sentenced to 4 months' imprisonment after pleading guilty to 18 U.S.C. § 231(a)(3). Defendant, along with his father, climbed through a broken window to enter the Capitol. Johnson was part of a mob yelling and chanting at officers and pinning them against the east Rotunda doors, as those officers were attempting to prevent the doors from being breached from rioters outside, although Johnson himself did not touch the officers.

- *US v. David Blair*, 21-cr-186 (CRC): Defendant sentenced to 5 months' incarceration after pleading guilty to 18 U.S.C. § 231(a)(3), with a resulting guideline range of 8 to 12 months. Mr. Blair brought a knife and was carrying a lacrosse stick with a large Confederate flag attached to it and used that stick to push against a police officer's chest in a provocative manner. The sentencing court considered Blair's age and that he was a first-time offender to be reasons for a downward variance.

- *US v. Cooke*, 22-cr-52 (RCL): Defendant sentenced to 12 months and a day after pleading guilty to 18 U.S.C. § 231(a)(1). Cooke joined a crowd confronting officers on the East Side of the Capitol. He grabbed and pushed the bicycle racks being used to block the crowd into officers, held up his middle finger to officers and yelled profanities such as "We're taking this motherfucker" and "this is our fucking house." Cooke encouraged other rioters to push against the police line and struggled with officers himself at the Columbus Doors. While near the doors, he asked the crowd "who's got a hammer" and encouraged others to "smash the windows." Another rioter did break a window with a hammer and Cooke, armed with a flagpole, hit the broken window several times. Cooke was only deterred from entering the Capitol after he was pepper-sprayed.

Analysis of the conduct of January 6th defendants who have assaulted officers, under 18 U.S.C. § 111(a)(1) similarly demonstrates that this group of defendants was of a magnitude significantly more physical and violent than the activities Mr. Gillespie engaged in:

- *US v. Kyle Young*, 21-cr-291(ABJ): Defendant sentenced to 86 months' incarceration for assaulting Officer Michael Fanone. Young physically restrained Officer Fanone immediately after the officer had been tased in the back of the neck by another rioter, rendering the officer helpless and unable to seek safety.

- *US v. Head*, 21-cr-291(ABJ): Defendant sentenced to 90 months' incarceration for his participation in the assault of Officer Fanone, which included dragging the officer into the violent mob. Head also used a plastic riot shield as a weapon against the police in the tunnel, specifically Officer Fanone. Head had a lengthy criminal history.

- • *US v. Languerand*, 21-cr-353 (JDB): Defendant sentenced to 44 months' imprisonment after pleading guilty to 18 U.S.C. § 111(a)(1) and (b). Defendant threw multiple objects at the police officers guarding the Capitol in the Lower West Terrace tunnel, and afterwards bragged about his role in the riot on social media.

- *US v. Devlyn Thompson*, 21-cr-461 (RCL): Defendant sentenced to 46 months' imprisonment after pleading guilty to 18 U.S.C. § 111(a)(1) and (b). Thompson fought with officers in the Lower West Terrace tunnel for approximately 13 minutes. He threw objects at officers and hit one officer in the hand with a metal baton, causing bruising.

- *US v. Creek*, 21-cr-645 (DLF): Defendant was sentenced to a 27-month term of imprisonment after pleading guilty to 18 U.S.C. § 111(a)(1). Creek came armed to the Capitol with mace, a knife, binoculars and a radio and carried first-aid supplies. He shoved one police officer back several feet before striking that officer on the face shield portion of his helmet and also pushed a second officer down and kicked him.

- *US v. Duke Wilson,* 21-cr-34 (RCL): Defendant was sentenced to a 51-month term of imprisonment after pleading guilty to violations of 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 1512(c). Wilson, over the course of 14 minutes, prevented officers from closing doors in the Lower West Terrace tunnel, allowing other rioters to pry them open and attack officers. Then, Wilson punched officers, attempted to take their shields, threw objects at them, and struck officers with a PVC pipe.

- *US v. Palmer*, 21-cr-328 (TSC): Defendant was sentenced to 63 months' imprisonment after pleading guilty to 18 U.S.C. § 111(a)(1) and (b). Palmer threw a wood plank at officers, then deployed the contents of a fire extinguisher directly into the tunnel and threw the empty extinguisher at officers. Palmer pushed and threw objects at the officers in the tunnel. Later, on the Upper West Plaza, Palmer approached a line of officers, yelling at them and threw a pole at them.

- *US v. Miller*, 21-cr-75 (RDM): Defendant was sentenced to 33 months' incarceration after pleading guilty to 18 U.S.C. § 111(a) and 1512(c). On the West Plaza, Miller threw a full beer can in the direction of police. He then scaled a wall, went to the Lower West Terrace, and threw objects and sprayed a fire extinguisher at officers in the tunnel.

- *US v. Mattice,* 21-cr-657(BAH): Defendant sentenced to 44-month term of incarceration after pleading guilty to 18 U.S.C. § 111(a)(1). Mattice deployed a chemical irritant at officers at the mouth of the Lower West Terrace tunnel. Mattice had a criminal history category of I.

The outcome in these cases show a significant, and appropriate, difference in the sentences imposed for defendants who pled to civil disorder and those who pled guilty to assault charges, either under 18 U.S.C. §111(a)(1) or (b), based on conduct more egregious than that Mr. Gillespie engaged in. Mr. Gillespie submits that an appropriate sentence in his case is somewhat above the civil disorder cases listed in the first group, but far below the more egregious physical assaults described in the second group of cases. Indeed, the nuance is reflected in sentences handed out to defendants in factual circumstances similar to Mr. Gillespie:

- *US v. Leffingwell*, 21-cr-005 (ABJ): Defendant sentenced to six months imprisonment for assault in violation of 18 U.S.C. § 111 after originally being charged with violations of

both 18 U.S.C. § 111(a) and 18 U.S.C. § 231(a)(3). Leffingwell, a disabled military veteran, flew from Seattle for the demonstration and then positioned himself at front lines of rioters entering the Capitol and encouraged other rioters to push in. He struck two officers on the head before being arrested.

- *US v. Troy Sargent*, 21-cr-258 (TFH): Defendant sentenced to 14 months' imprisonment after pleading guilty to 18 U.S.C. § 111(a) and 18 U.S.C. § 231(a). Sargent was in front of the crowd of rioters trying to enter the Capitol and hit an officer with his open hand and tried to do so again. In addition, he recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs" and later bragged that he "duffed an officer in the face."

- *US v. Joshua Lee Hernandez*, 22-cr-042 (CRC): Defendant sentenced to 24 months imprisonment after pleading guilty to 18 U.S.C. § 111(a) and 18 U.S.C. § 231(a). Hernandez entered the Capitol through a window and for the next 40 minutes roamed throughout the Capitol building. He then pushed and encouraged others to push again officers guarding an East Rotunda interior door, which eventually opened to let other rioters in. He then hit an officer on his riot helmet with a flagpole.

- *US v. Riley June Williams*, 21-cr-618 (ABJ): Defendant sentenced to 36 months imprisonment after convicted of 18 U.S.C. § 111(a) and 18 U.S.C. § 231(a). (As is the case with Mr. Gillespie, the jury deadlocked on a count alleging obstruction of Congress in violation of 18 U.S.C. § 1512(c).) Williams "acted as an accelerant" in directing and organizing violence and physical resistance against law enforcement, participated as "human battering ram" inside the Capitol, and afterwards destroyed evidence.

The cases cited above demonstrate that the recommendation urged in the PSR is plainly unfair and inappropriate given Gillespie's actions.

Moreover, the recommendation far exceeds sentences this Court has imposed for conduct similar to, and more egregious than, Mr. Gillespie's offenses:

- *US v. Rubenacker* 21-cr-0193 (BAH): Defendant sentenced to 41 months' after pleading guilty to assault, civil disorder, **and** obstruction of Congress in violation of 18 U.S.C. §§ 111(a), 231(a)(3), & 1512(c)(2). Rubenacker was one of the first people to enter the Capitol, but also left and reentered a second time. During his second reentry, he smoked Marijuana while in the Capitol rotunda, verbally confronted officers when they tried to get the group of people to leave, and physically pushed back against the officers. Also caught on camera swinging a bottle at a police officer's head and connecting with the officer.

- *US v. Mattice & Mault;* 21-cr-0657 (BAH): Defendants sentenced to 44 months' incarceration after pleading to a single count of assault in violation of 18 U.S.C. § 111(a). Mattice pulled down barricades that directly lead to the breach of police lines,

then climbed up to Lower West Terrace Tunnel where he sprayed chemical agents at officers. Mault bought pepper spray and a baton in preparation for the trip to Washington and spayed it at officers.

- *US v. Anthony Williams*, 21-cr-0377(BAH): Defendant sentenced to 60 month's incarceration after conviction at trial for obstruction of Congress. Williams plotted for months in advance, vowed suggested war and hangings would ensue, and claimed he as "MAGA til the bloody end." He entered the Capitol six minutes after the Senate Wing doors were breached, helped others over the barricades, stealing water bottles from the police, and smoked marijuana in the rotunda before resisting efforts to be cleared out of the capitol by the police. He live-posted shots of himself celebrating the takeover of the Capitol and then bragged on multiple social media accounts about his exploits up to and through his arrest.

-  *US v Decarlo & Ochs*, 21-cr-073 (BAH): Defendants sentenced to 48 months' incarceration after pleading guilty to obstruction of Congress in violation of 18 U.S.C. § 1512(c). DeCarlo and Ochs through smoke bombs and were some of the first people into the Capitol. They wrote "murder the media" on a Capitol door and stole a pair of flexcuffs from a Capitol Police duffel bag.

- *US v. Herrera*, 21-cr-619 (BAH): Defendant sentenced to 48 months' incarceration after conviction by trial of obstruction of Congress in violation of 18 U.S.C. § 1512(c). Herrera plotted his actions long before January 6 and came to the riot prepared with a bullet proof vest, goggles, and a gas mask. He stole liquor and drank it while leaving the Capitol before re-entering the building and smoking Marijuana in a Senator's office.

The inappropriateness of the high guideline and recommendation is highlighted by the Court's sentencing in *United States v. James McGrew,* 21-cr-398-BAH. McGrew came to the Capitol armed with bear mace and prepared for violence. When he first arrived at the Capitol, he instigated the crowd buy repeatedly chanting "Let's go, we need more people! Upon gaining entrance to the Capitol, he repeatedly struck and screamed at police officers within the Capitol Rotunda before leaving and circling back to confront officers in the Lower West Terrace Tunnel, ultimately launching a handrail with metal brackets directly at officers after being encouraged by other rioters to "spear him." In the aftermath of the riot, McGrew repeatedly minimized, denied, and lied about his conduct, even while preparing to plead guilty, during multiple interviews to the media while detained. Notwithstanding his dedicated planning, his sustained and long-lasting

violent behavior while in the Capitol and at the Lower West Terrace Tunnel, his continued minimization of his actions up to and through his plea, and his placement in Criminal History Category V, McGrew faced a guideline sentencing range **lower** – 70-87 months - than the 78-97 months range advocated in Mr. Gillespie's PSR. The Court sentenced McGrew to 78 months' incarceration for his conduct, precisely the sentence the PSR recommends the Court impose on Mr. Gillespie.

The cases cited above, both from this Court and other sessions of this district, highlight the unreasonableness of the guideline range as calculated by the Probation Department and its resulting recommendation. Such a sentence is especially unfair and inappropriate where, unlike with many of the worst January 6 defendants, there is no evidence that Mr. Gillespie:

- Played a lead or encouraging role in causing the crowds to breach into the Capitol building and other restricted grounds;

- Brought a firearm, zip-ties, rope, or any other equipment intended to be used against law enforcement or members of government;

- Rallied the crowd to target specific members of government;

- Conspired with others to travel to Washington, D.C., prior to January 6, with the intent to cause disruption or violence;

- Exchanged messages with others on the Capitol grounds to help advance the mayhem;

- Exploited skills learned in the military or law enforcement to advance the riot;

- Headed or belonged to any radical groups that promote violence; or,

- Intimidated potential witnesses during the course of the government's investigation.

The properly calculated guideline range of 30-37 months far better fits Mr. Gillespie's actual conduct and a within-guideline sentence of 30 months accurately balances the section 3553(a) factors in his case. Most importantly, a sentence of 30 months vindicates Congress's direction that the Court "avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Court should therefore impose it.

      c.  **Public Protection**

At age 64 (or older) when released, Mr. Gillespie presents a vanishingly low risk of recidivism. The Sentencing Commission has found that overall recidivism rates consistently drop as offenders age. United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (Key Findings) (December 2017) (available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders). For offenders like Mr. Gillespie who are over 60 with no criminal history, the re-arrest rate across all offenses was just 11.3%. *Id.* at Appendix A-44. Moreover, about a quarter of what arrests occurred were for "public order offenses," defined as "violations of conditions of federal probation, federal supervised release, or state parole and crimes such as obstruction of justice and failure to appear." *Id.* at 3 and fn.6. In addition, the Sentencing Commission's findings note that the overall re-arrest rate was skewed higher by offenders convicted of drug trafficking and firearms possession, strongly suggesting that the actual rate of re-arrest for those, like Mr. Gillespie, convicted of non-drug non-firearm offenses is far lower than even the 11.3%.

The Office of the Inspector General reached the same results in a 2015 study. Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, (May 2015) (available at https://oig.justice.gov/reports/2015/e1505.pdf). The study was based on 381 inmates over age 50 released between 2006 at 2010. Id at 39. The three-year arrest rate for inmates aged 55-59 at time of release was 16%. *Id.* For inmates aged 60-64 at time of release it dropped to 8%. *Id.* Mr. Gillespie will be outer edge of this cohort by the time of release, an age that suggests an even lower risk of recidivism. Moreover, Mr. Gillespie has been

in full compliance with his conditions of release during the pendency of this matter and has conscientiously appeared for all hearings and trial, further support for the conclusion that Mr. Gillespie's risk to reoffend will be far lower than even the Sentencing Commission and the BoP OIG studies suggest. Regardless, Mr. Gillespie when released will be subject to significant supervised release conditions which will further confirm his law-abidingness.

## III.    SUPERVISED RELEASE CONDITIONS

Mr. Gillespie does not object to the proposed conditions of release set forth in the PSR, with two exceptions. First, Mr. Gillespie requests that the Court not include Condition No. 7, which mandates fulltime employment. As noted *supra*, Mr. Gillespie will be at least 64 years-old at his release and, given his frugal habits and resulting low living costs, will be able to make ends meet without resort to illicit activities. A condition mandating full employment is unnecessary. Second, Mr. Gillespie requests that the Court suspend mandatory drug testing given that his lack of alcohol or illicit drug use strongly indicates a low risk of future substance abuse by him. 18 USC §§3563(a)(5) and 3583(d).

## **CONCLUSION**

For the foregoing reasons, Gillespie respectfully requests that the Court sentencing him to a term of imprisonment of thirty (30) months, a sentence with the sentencing guidelines range as properly calculated, with two years of supervised release with appropriate conditions to follow. The Court should issue a restitution order commensurate with that levied in similar cases. The Court should decline to impose a fine.

VINCENT GILLESPIE
By his attorneys,

*/s/ Timothy G. Watkins*
Timothy G. Watkins
Forest O'Neill-Greenberg
Aziza Hawthorne
Federal Defender Office
51 Sleeper Street, Fifth Floor
Boston, MA 02210
617-223-8061

## CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 31, 2023.

/s/ Timothy G. Watkins
Timothy G. Watkins