**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-60 (BAH)** |
| **VINCENT GILLESPIE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

"It was just fun, exciting, enjoyable.   I mean, we were all -- we were just having a relaxed, nice time."   Trial testimony of Defendant Vincent Gillespie describing his time at the Capitol on January 6, 2021 (Tr. 12/21/2021 at 43).

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Vincent Gillespie to 87 months of imprisonment, which is the midpoint of the 78-97 month advisory Guidelines range, a term of supervised release of three years, a fine of no less than $5,000, and a mandatory special assessment of $235.

## I.   INTRODUCTION

The defendant, Vincent Gillespie, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in

1

losses.[1]  Gillespie's participation in the riot was purposeful, extensive, enthusiastic, and remorseless.   Gillespie was among rioters in the Lower West Terrace of the Capitol who engaged in pushing, shoving, yelling, and fighting with law enforcement officers.   He wormed his way through the crowd, eventually maneuvering through the rioters to the line of police officers defending the Lower West Terrace's exterior door, known as the tunnel.   At two points, he gained control of police riot shields, using it to ram the police (as detailed below).   In between his control of riot shields, Gillespie used two hands to grab Metropolitan Police Department Sergeant Riley[2] by the arm for several seconds, keeping the sergeant from fending off other attacks, and yanking the sergeant towards the mob.   This assault left Sergeant Riley dazed and disoriented.[3]  Gillespie also screamed "traitor" and "treason" at the police.   While still on Capitol grounds, Gillespie gave an interview in which he proclaimed, among other things, "We were very close.   We were almost overpowering them."[4] "That's what I would hope they would do.   Take it over, take it over. Own it for a few days.   I'm not an anarchist, but you can't let this stand what happened in this election."

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] Sergeant Riley has been with MPD for 28 years, and on January 6, 2021, was charged with forming a line to protect the Capitol at the Lower West Terrace tunnel, as seen in Trial Exhibit 707, which has been provided to the Court.

[3] Gillespie can be assaulting Sergeant Riley on BWC (Trial Exhibit 702).   The assault ends at 4:12:56 p.m.   Sergeant Riley can be seen immediately turning and going into the Capitol (Trial Exhibit 403).   Sergeant Riley can be seen on CCTV, provided to the Court as Sentencing Exhibit 2, stumbling into the Capitol at 4:13:10 p.m.

[4] In context, it is clear that "them" and "they" referred to the police guarding the Capitol.

A jury convicted Gillespie of Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count One); Interfering with Police Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Two); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Five); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Seven).[5]

The government recommends that the Court sentence Gillespie to a midrange Guideline sentence of 87 months' incarceration, for his conviction of violating 18 U.S.C. § 111(a)(1), 18 U.S.C. § 231(a)(3), and the misdemeanors.   An 87 month sentence appropriate reflects the gravity of Gillespie's extreme conduct.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the Court to the Affidavit accompanying the Complaint filed in this case, ECF No. 1, as well as the evidence introduced at trial for a summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

Despite the more permanent nature of the metal fencing at the West Plaza barricade and the growing number of United States Capitol Police ("USCP") officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced

---

[5] The jury did not reach a verdict on other counts, as noted below.

with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site, as depicted in Images 1A-B and 2A-B.



**Image 1A**          **Image 1B**

*Images 1A-B are screen shots from USCP security footage showing the progression of the crowd from the outer barricades (1A) and beginning to fill the Lower West Plaza (1B).*



**Image 2A**          **Image 2B**

*Images 2A-B are stills from USCP security footage showing the breach of the West Plaza. The breach of the barricades (2A) was followed by the formation of a USCP officer wall until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (2B).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a

half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department ("MPD") officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

By 2:28 p.m., several large gaps appeared in the police defensive line at the West Front and a general retreat was called. The rioters had seized control of the West Plaza and the inauguration stage, as depicted in Image 3. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



**Image 3**
*USCP security footage showing the breach of the West Plaza at 2:34 p.m.*

5

By 4 p.m., when Gillespie was in the tunnel assaulting police, the West Front had been overrun.



**Image 4**

*Image 4 is a screen shot from Trial Exhibit 404, showing USCP security footage of the breach of the West Plaza at 4:12 p.m.*

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal.   Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers.   Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.[6]

---

[6] *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm.   to Investigate the January 6th Attack on the United States Capitol, 117 Cong.   (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.



**Image 5**

*Inauguration stage on the west side of Capitol.  The "tunnel" is the doorway circled in red. "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.*

7

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   USCP officers, assisted MPD by officers, were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you

and heard you all get back into the fight."[7]

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Fanone and the previously mentioned assault of Officer Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the results by force.   Capitol Police Sgt.   Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process.   My fellow officers and I were committed to not letting any rioters breach the Capitol.   It was a prolonged and desperate struggle.[8]

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Fanone remembers one of his colleague's

---

[7] Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm.   to Investigate the January 6th Attack on the United States Capitol, 117 Cong.   (July 27, 2021) (Statement of Rep. Stephanie Murphy)   available   at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

[8] *Id.* (Statement of Sgt. Gonell).

actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers.   "Hold the line," he shouted over the roar.   Of course, that day, the line was the seat of our American government.   Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life.   The bravery he and others showed that day are the best examples of duty, honor, and service.[9]

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021, Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy."   *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."   *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar.

---

[9] *Id.* (Statement of Officer Fanone).

10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.   This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.   The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement.   *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response   Failures   on   January   6   (June   7,   2021),   at   29,   *available   at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).   Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers.   *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety.   *See id*; *see also* Architect of the Capitol, J.   Brett Blanton, Statement before the House of Representatives Committee on House Administration   (May   19,   2021),   *available   at*   https://www.aoc.gov/sites/default/files/2021-

05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.   They caused extensive, and in some instances, incalculable, losses.   This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

MPD Commander Kyle described the events on the Lower West Terrace in a video victim impact statement, as seen in Government's Sentencing Exhibit 1.

### B.     Gillespie's Role in the January 6, 2021, Attack on the Capitol

Gillespie participated in the January 6 attack on the Capitol.   His crimes are documented through body worn cameras from the MPD, open-source video, and surveillance footage from the Capitol.

### *Gillespie's Approach to the Capitol*

Gillespie traveled from his home in Athol, Massachusetts, via New York, to attend the Stop

the Steal rally on the National Mall in Washington, D.C., on January 6, 2021.   He attended the rally with at least three other traveling companions.

After attending the rally, Gillespie and his cohorts went to the West Lawn of the U.S. Capitol.   Testimony at trial showed the West Lawn was littered with discarded "Area Closed" signs, bike rack barriers, and snow fencing (Tr. 12/20/2022 at 59).   As Gillespie testified at trial, he wanted to get closer to the building, and every time he got closer to the Capitol building, he thought of each "landmark" or "goal" (Tr. 12/21/2022 at 42).   Each time he made it to the goal it was "fun, exciting, enjoyable" (Tr. 12/21/2022 at 43).   At one point, Gillespie and his companions climbed on top of the scaffolding adjoining the Capitol building (Tr. 12/21/2022 at 44).   As he closed in on the Capitol, Gillespie's companions opted to turn back, but Gillespie was drawn to the violence and continued closer to the building.   Eventually, Gillespie forced his way into the site of the medieval battle in the Lower West Terrace doorway, known as "the tunnel."

### Gillespie's Conduct in the Tunnel

As detailed above, the tunnel has been described as the site of the worst and most sustained fighting on January 6.   Gillespie fought his way through the crowd to make it all the way to the police line at the entrance of the tunnel.   As other rioters turned away, Gillespie pressed on. Open-source video captured Gillespie's approach to the tunnel, as pictured in Image 6.



**Image 6**

*Image 6 is an open-source image of Gillespie approaching the entrance to the tunnel, admitted at trial as Exhibit 610.*

Video surveillance from Capitol CCTV and MPD body worn camera ("BWC") show Gillespie's violent conduct inside the tunnel.   Trial Exhibit 903, which has been provided to the Court, shows CCTV and BWC as side-by-side frames, with the timing synced (within tenths of a second), offering simultaneous views of Gillespie from two different angles.   While in the tunnel, Gillespie used police riot shields, controlling different police riot shields at different points in time, both offensively to push his way forward to the police line to get into the Capitol, and defensively, to prevent the police from fending him off.   Gillespie can be seen assaulting Sergeant Riley, using both hands to grab Riley to pull him out into the mob.   While restraining Sergeant Riley, he could not fend off assaults from other rioters (such as the rioter who used a crutch to hit Sergeant Riley). Images 7, 8, 9, and 10 are screen shots from Trial Exhibit 903, depicting some of Gillespie's

14

criminal conduct in the tunnel.



**Image 7**

*Image 7 is a screen shot from Trial Exhibit 903, at timestamp 1:22, time of day 4:11:45 p.m., with his hands on a riot shield.*



**Image 8**

*Image 8 is a screen shot from Trial Exhibit 903, at timestamp 2:17, time of day 4:12:40 p.m., using a riot shield to charge the police.*



**Image 9**

*Image 9 is a screen shot from Trial Exhibit 903, at timestamp 2:29, time of day 4:12:52 p.m., pulling Sergeant Riley while another rioter hits Riley with a crutch.*



**Image 10**

*Image 10 is a screen shot from Trial Exhibit 903, at timestamp 2:40, time of day 4:13:03 p.m., controlling a riot shield again.*

Trial Exhibit 403, which has been provided to the Court, is CCTV that captured Gillespie's

criminal activity inside the tunnel.   Trial Exhibit 702, which has been provided to the Court, is

16

BWC that captured Gillespie's criminal activity inside the tunnel.

Images 11 through 15 provide additional views of Gillespie committing crimes.



**Image 11**

*Image 11 is from CCTV showing Gillespie at the entrance of the tunnel controlling a police riot shield at 4:12:17 p.m., admitted at trial as Exhibit 403.1.*



**Image 12**

*Image 12 is a screen shot from Trial Exhibit 702, at timestamp 2:16, time of day is 4:12:39 p.m., showing Gillespie charging law enforcement with a police riot shield.*

Gillespie used two hands to grab Sergeant Paul Riley of the MPD by the arm, yanking him

toward the mob, as captured beginning at timestamp 16:12:47 in Trial Exhibit 702.   Sergeant

17

Riley testified that he did not want to be pulled into the crowd, he had a fear of being killed by the crowd, and this assault was "above and beyond" anything he has experienced in his entire life (Tr. 12/20/2022 at 156-157).   Sergeant Riley also described the assault as feeling like "an eternity" (Tr. 12/20/2022 at 178).



**Image 13**

*Image 13 is a screen shot from Trial Exhibit 702 (admitted at trial as Exhibit 702.4), at timestamp 2:27, time of day is 4:12:50 p.m., showing Gillespie yanking on Sergeant Riley's arm.*



**Image 14**

*Image 14 is a screen shot from Trial Exhibit 702 (admitted at trial as Exhibit 702.6), at timestamp 2:29, time of day is 4:12:52 p.m., showing Gillespie continuing to yank on Sergeant Riley's arm.*

Video exhibits and testimony showed that Gillespie restrained Sergeant Riley for at least seven seconds. While assaulting Sergeant Riley, Gillespie restrained Sergeant Riley's movements such that Sergeant Riley was unable to stop the attack on him by another rioter, who hit Sergeant Riley with a crutch as Gillespie restrained Sergeant Riley. Sergeant Riley also described in testimony his inability to move because Gillespie was pulling him so forcefully by the arm. Immediately after the assault, Sergeant Riley can be seen re-entering the Capitol appearing disoriented, as seen in Sentencing Exhibit 2, which has been provided to the Court.

After Gillespie assaulted Sergeant Riley, he gained control of a police riot shield again . Gillespie controlled the shield for nearly three minutes, and used it offensively, raising the shield high and then slamming it down.

19



**Image 15**

*Image 15 is a screen shot from Trial Exhibit 403, at timestamp 4:05, time of day is 4:14:28 p.m., showing Gillespie raising a police riot shield and slamming it down.*

Gillespie admitted during his testimony at trial that while inside the tunnel, he tried pushing against the police to gain entry to the Capitol.   He further admitted that when he realized that was an ineffective strategy, he decided to pull officers individually, with the aim of separating them from each other to break the police line (Tr. 12/21/22 at 55).

After assaulting Sergeant Riley, and while in the tunnel, Gillespie screamed "traitor" and "treason" at the police, heard at timestamp 16:14:45 in Trial Exhibit 702.   Gillespie then kept moving closer toward the doors of the Capitol and was inside the tunnel for approximately fifteen minutes.   Gillespie only left the tunnel after police physically forced him out.

### *Gillespie's Associated Press Interview*

After exiting the tunnel, and while still on Capitol grounds, Gillespie gave an interview. This interview was broadcast by the Associated Press and admitted as Trial Exhibit 601, which has been provided to the Court.   When the reporter asked what happened, Gillespie stated:

We started bursting into that room, we were going into that room, that opening. And I was with some other guys. We started pushing against them. They were beating us and pepper spraying us in our eyes. But there were a bunch of people pushing behind us. We were very close. We were almost overpowering them. If you had like another fifteen, twenty guys behind us pushing, I think we could have won it. But there were a bunch of people pushing behind us. What you guys need to know, and no one is going to listen to this, we were very [expletive] close. If more people had been behind, then there's that second set of doors, we would have just burst through it.

When asked what he and the others with him would do if they had been able to take control of the Capitol, Gillespie responded: "I would hope they would flood in, so there's nothing they can do. That's what I would hope they would do. Take it over, take it over. Own it for a few days. I'm not an anarchist, but you can't let this stand what happened in this election."

## III. THE CHARGES

On May 6, 2022, a federal grand jury returned a superseding indictment charging Gillespie with eight counts: Count One, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1); Count Two, Interfering with Police Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Three, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Four, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Five, Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4); Count Six, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Count Seven, Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F); and Count Eight, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2. (ECF No. 18.) On December 23, 2022, Gillespie was convicted of Counts One,

Two, Five, and Seven following a jury trial.   The jury did not reach a verdict on Counts Three, Four, Six, and Eight.[10]

## IV.   STATUTORY PENALTIES

Gillespie now faces sentencing on Counts One, Two, Five, and Seven.   As noted by the Presentence Report issued by the U.S. Probation Office (ECF No. 78), Gillespie faces the following maximum possible sentence on each count of conviction:

- Count One, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1): eight years of imprisonment, a term of supervised release of not more than three years, a term of probation of not more than five years, a fine up to $250,000, and a mandatory special assessment of $100.

- Count Two, Interfering with Police Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3): five years of imprisonment, a term of supervised release of not more than three years, a term of probation of not more than five years, a fine up to $250,000, and a mandatory special assessment of $100.

- Count Five, Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4): one year of imprisonment, a term of supervised release of not more than one year, a term of probation of not more than five years, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Seven, Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F): six months of imprisonment, a term of probation of not more than five years, a fine up to $5,000, and a mandatory special assessment of $10.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49

---

[10] The jury split was 11 to 1 (presumably for conviction).   *See* jury note at ECF No. 68.

(2007).   The government does not agree with all the Sentencing Guidelines calculations in the final PSR; however, the government does agree with the total offense level as calculated.[11]

The government calculated the Sentencing Guidelines as follows:

| | | | |
|---|---|---|---|
| 18 U.S.C. §111(a) | | | |
| U.S.S.G.   § 2A2.2(a) 14 | Base Offense Level: | | |
| U.S.S.G.   § 3A1.2(b) | Official Victim | +6 | |
| U.S.S.G.   § 3A1.3 | Physical Restraint | +2 | |
| U.S.S.G.   §3C1.1 | Obstruction of Justice | +2 | |
| **Adjusted Offense Level:** | | **24** | |
| | | | |
| 18 U.S.C. §231(a) | | | |
| U.S.S.G.   § 2A2.2(a) 14 | Base Offense Level: | | |
| USSG §2A2.2(b)(2)(B) | Use of Dangerous Weapon | +4 | |
| U.S.S.G.   § 3A1.2(b) | Official Victim | +6 | |
| U.S.S.G.   §3C1.1 | Obstruction of Justice | +2 | |
| **Adjusted Offense Level:** | | **26** | |
| | | | |
| USSG §3D1.4 Multiple Count Adjustment | | +2 | |
| **Final Offense Level:** | | **28** | |

---

[11] The draft PSR included the two-level enhancement for physical restraint, pursuant to U.S.S.G. § 3A1.3, to Count One.   The government had no objection to the draft PSR.   The final PSR does not include that two-level enhancement.   The government does concur with the total offense level of 28 calculated in the final PSR.   *See* PSR at ¶ 63.   The defense filed several objections, which the final PSR addressed.

### *Two-Level Upward Adjustment for Obstruction of Justice*[12]

Pursuant to U.S.S.G.   § 3C1.1 (Obstructing or Impeding the Administration of Justice), the offense level should be increased by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," including by providing "materially false testimony" during trial.   U.S.S.G.   § 3C1.1, n.4.   The government asserts that Gillespie had nearly two years to manufacture his testimony, which resulted in his answering questions on direct examination in a straightforward manner but engaged in obfuscation during cross examination; Gillespie's testimony was not credible.   Gillespie testified in his own defense at trial, and made multiple false statements, including the following:

> • Gillespie testified that he thought the Capitol was empty and he had no idea Congress was meeting that day.   (Tr. 12/21/2022 at 51).   This testimony was belied by Gillespie's own contrary testimony that he was trying to get into the Capitol to protest the stolen election (*Id.* at 48); that he paid close attention to the election and was very interested in "election fraud" (*Id.* at 62); and that he attended the "Stop the Steal" rally (he admitted that he knew that was the name of the rally, and that it referenced a stolen election) (*id.* at 83), where numerous speakers referenced the certification of votes at the Capitol. Additionally, Gillespie did not "protest" the election he believed to be stolen at any place, date or time, other than on January 6, 2021 at the United States Capitol, when Congress was scheduled to certify the election.   Indeed, Gillespie testified that he "had a sense of responsibility" to "do something about election fraud" and this was "the only chance we had" and "this was a constitutional crisis" (*id.* at 49, 94).   Moreover, that Gillespie's testimony was willfully false is further underscored by the fact that Gillespie is clearly an

---

[12]  As noted above, the jury could not reach a verdict on the counts charging violations of 18 U.S.C. §§ 1752(a)(1), 1752(a)(2), 5104(e)(2)(D), and 1512(c)(2).   Nonetheless, in determining whether to apply the U.S.S.G.   §3C1.1 adjustment for obstruction at sentencing, this Court may consider all the evidence presented by the government at trial, as the government's burden of proof as to sentencing factors is a preponderance of the evidence.   Indeed, a sentencing court may base its sentence even on acquitted conduct, where the conduct is established by a preponderance of the evidence.   *United States v. Watts*, 519 U.S. 148, 156–57 (1997) (per curium); *see, e.g., United States v. Browne*, 953 F.3d 794, 802 (D.C. Cir. 2020); *United States v. Kpodi*, 824 F.3d 122, 126 (D.C. Cir. 2016); *United States v. Jones,* 744 F.3d 1362, 1369 (D.C. Cir. 2014).

intelligent person – he has a degree in mechanical engineering, is writing a book, is the executor of a family member's estate, and has brought many lawsuits on his own behalf. He clearly had knowledge regarding the election and certification, contrary to his testimony.   It is difficult to believe that anyone would physically assault police just to get inside to protest, especially in a building he believed to be unoccupied.

• Gillespie testified that he did not know that he was not allowed in the Lower West Terrace tunnel or that it was part of the restricted area (*Id.* at 105).   He testified to this despite also acknowledging the police line in the tunnel was six police deep, and police were using pepper spray to keep him and others out.   (*Id.* at 105-106).

• Gillespie testified that although he pulled on an officer's arm, he would have never pulled an officer out into the mob (*Id.* Tr. at 55).   This testimony is belied by the fact that there were thousands of rioters on the west front of the Capitol, and Gillespie was pulling Sergeant Riley towards that mob.

• Gillespie testified that he would have tried to help an officer who he saw was getting hurt (*Id.* at 55-56), and further claimed he helped a female officer in the tunnel (*Id.* at 60).   This testimony is belied by the fact that another rioter was able to strike Sergeant Riley with a crutch while Gillespie had him by the arm.   The CCTV and BWC evidence from inside the tunnel does not support Gillespie's assertion of helping an officer in the tunnel.

• Gillespie testified that he did not recall saying, in response to the Associated Press reporter's question about what he and others would have done, had they succeeded in taking control of the Capitol, "I would hope they would flood in so there's nothing they can do…Take it over, take it over.   Own it for a few days.   I'm not an anarchist, but you can't let this stand what happened in this election."   *Id.* at 72-73; Associated Press video, Trial Exhibit 601.   He also testified that he did not mean "to take over the Capitol on January 6, 2021," but instead meant to take over the Capitol at some other point in time. Despite claiming that he did not remember making the statements on the video, he simultaneously testified that he knew exactly what he had meant at the time he made the statements.   Tr. 12/22/2022 at 12-17, 22-28.

Gillespie was untruthful at trial with respect to material matters, and he testified untruthfully about these material matters that were designed to substantially affect the outcome of the case.   Accordingly, the Chapter 3 adjustment for obstruction of justice applies in the instant case.[13]   *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (holding that the commission of

---

[13]  Courts in this district, including this Court, have found that USSG §3C1.1 applied in several of

perjury is of obvious relevance to determining appropriate type and extent of punishment after issue of guilt has been resolved, because it reflects on defendant's criminal history, on her willingness to accept commands of law and authority of court, and on her character in general).

### *Four-Level Upward Enhancement for Use of a Dangerous Weapon*

Guidelines Section 2A2.2(b)(2)(B) provides for a four-level increase in the offense level if a dangerous weapon was used.   Application Note 1 states that "dangerous weapon" "has the meaning given that term in §1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such instrument is involved in the offense with the intent to commit bodily injury."   Section 1B1.1, Application Note 1, states that "'Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.*   a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)."

Here, Gillespie used police riot shields both before and after he assaulted Sergeant Riley. Gillespie used the riot shields offensively, to ram and charge against multiple police officers and

---

other January 6 cases.   *See e.g.*, *United States v. Guy Reffitt*, Case No. 21-cr-32 (DLF); *United States v. Thomas Robertson*, Case No. 21-cr-34 (CRC); *United States v. Thomas Webster*, Case No. 21-cr-208 (APM); *United States v. Hale-Cusanelli*,, Case No. 21-cr-37 (TNM); *United States v. Christian Secor*, Case No. 21-cr-157 (TNM); *United States v. Matthew Bledsoe*, Case No. 21-cr-204 (BAH); *United States v. Mark Andrew Marza*, Case No. 21-cr-736 (JEB); *United States v. Dustin Thompson*, Case No. 21-cr-736 (JEB); *United States v. Mathew Wood*, Case No. 21-cr-223 (APM); *United States v. William Reid*, Case No. 21-cr-316 (DLF); *United States v. Tommy Allan Frederick*, Case No. 21-cr-64 (CKK); *United States v. Ronald Sandlin*, Case No. 21-cr-88 (DLF); *United States v. Erik Herrera*, Case No. 21-cr-619 (BAH).

in an effort to get past the police line prior to assaulting Sergeant Riley. *Supra at* page 15 (Image 8, Trial Exhibit 903). On at least one occasion, after assaulting Sergeant Riley, he raised the shield and then slammed it down at/near the officers guarding the tunnel. *Supra at* page 20 (Image 15, Trial Exhibit 403). The shields are over five-feet tall and made of a very hard plastic material (Tr. 12/20/2022 at 79), which used to charge the police and slam it down at/near them, were capable of causing serious bodily injury, as defined in U.S.S.G §1B1.1.

Other courts have found that police riot shields, wielded by January 6 defendants, could be considered "dangerous weapons" depending on how they were used, within the meaning of U.S.S.G. §2A2.2(b)92)(B). *See, e.g.,* in *United States v. McCaughey, III et al*, 21-cr-40-TNM, Tr. 09/13/2022 at 23, 26); *See also* PSR (ECF No. 78) at ¶ 52.

Courts have determined that objects such as a car (*see United States v. Dayea*, 32 F.3d 1377 (9th Cir. 1994)); plastic water pitcher (*see United States v. Tolbert*, 668 F.3d 798 (6th Cir. 2012)); and shoes (*see United States v. Velasco*, 855 F.3d 691 (5th Cir. 2017)) were dangerous weapons under particular circumstances. Similarly, here, the police riot shields used by Gillespie in the tunnel were "dangerous weapons" under the facts of this case, and therefore the Section 2A2.2(b)(2)(B) enhancement applies.

### *The Two-Level Upward Enhancement for Restraint of a Victim*

Chapter 3 of the Guidelines provides for a two-level, victim-related upward enhancement "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. Application Note 1 to U.S.S.G. § 3A1.3 further provides that the applicable definition of "physically restrained" is found in the Commentary to U.S.S.G. § 1B1.1: "'Physically restrained'

means the forcible restraint of the victim such as by being tied, bound, or locked up."   U.S.S.G. § 1B1.1, cmt.  n.1(L).   Courts, including the D.C. Circuit, have consistently held that the victim "being tied, bound, or locked up" is not a requirement for physical restraint, but instead is a non-exhaustive list of examples of physical restraint.   *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) ("the use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1… indicates that the illustrations of physical restraint are listed by way of example rather than limitation") (quoting *United States v. Anglin,* 169 F.3d 154, 163 (2d Cir.1999)); *see also United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Nineth, and D.C. Circuits).

Circuit courts have varying approaches to determining whether the physical restraint enhancement applied.   *See United States v. Taylor*, 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh and Ninth Circuits in cases involving two-level enhancements for use of physical restraint in robberies).   The Third Circuit recently developed an approach incorporating various considerations adopted by the other Circuits, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines.   *Bell*, 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here").   The five factors identified by the Third Circuit are:

28

1.  Use of physical force;

2.  Exerting control over the victim;

3.  Providing the victim with no alternative but compliance;

4.  Focusing on the victim for some period of time; and

5.  Placement in a confined space.

*Bell*, 947 F.3d at 56.[14]  Each factor will be addressed below.[15]

1.  <u>Gillespie used physical force against Sergeant Riley.</u>

The D.C. Circuit Court has found that "physical restraint requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way."  *Drew*, 200 F.3d at 880 (finding no physical restraint pursuant to U.S.S.G.  § 3A1.3 where the defendant

---

[14] The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G.  § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels."  U.S.S.G. § 2B3.1(b)(4)(B).  This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was physically restrained in the course of the offense."  U.S.S.G.  § 3A1.3.  The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of the offense [of robbery] or to facilitate escape."  *Bell*, 947 F.3d at 60.   However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G.  § 1B1.1 (*see Bell*, 947 F.3d at 54–55), *Bell* and similar cases interpret the meaning of "physically restrained" as it is used in § 3A1.3.

[15] Judge Mehta relied on the *Bell* factors in deciding to apply the § 3A1.3 enhancement in *United States v. Thomas Webster*, 21-cr-208 (APM), a January 6 assault on a federal officer case in which the defendant tackled the victim officer to the ground and attempted to strip the officer of his gas mask while he was enveloped by the mob.   Judge Berman Jackson applied the § 3A1.3 enhancement in *United States.  v. Kyle Young*, 21-cr-291-3 (ABJ), a January 6 assault on a federal officer.   Judge Berman Jackson applied the enhancement but did not explicitly state that she relied on *Bell* versus ordinary definitions.   Judge Berman Jackson went on to state that she would have imposed a sentence of 86 months in the *Young* case even without the enhancement.   Judge Berman Jackson also applied the § 3A1.3 enhancement to Young's co-defendant in *United States v. Albuquerque Head*, 21-cr-291-2 (ABJ).

ordered his victim to leave her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical") (citing *United States v. Harris,* 959 F.2d 246, 265 (D.C.Cir.1992) *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)).   Here, Gillespie made direct bodily contact with Sergeant Riley—using two hands to grab Sergeant Riley's arm; pulling Sergeant Riley from the police line in the LWT tunnel; attempting to pull Sergeant Riley into the mob of thousands of rioters on the Lower West Terrace; and holding Sergeant Riley's arm while another rioter hit Sergeant Riley with a crutch, an assault Riley could not protect himself from due to Gillespie's grasp and control over him.

At trial, Gillespie acknowledged he used two hands to pull Sergeant Riley "pretty hard" (Tr. 12/21/2022 at 99).   This was only after nothing else worked.   "I tried pushing, I tried rushing; that didn't work.   And then the idea came to me, let me try pulling and see if that works."   (*Id.*)

Similar conduct has been found by courts to involve physical restraint under the Guidelines.   For instance, in *United States v. Johnson*, 492 F.3d 254 (4th Cir. 2007), the court held that the defendant gripping the victim's arms while another co-defendant (sexually) assaulted her qualified as physical restraint under the Guidelines.   *Id.* at 256-57; *see id.* "We   hold here that Johnson's act of gripping the victim's arms and holding her down while Hodge raped her is sufficiently akin to the definition's examples (being tied, bound, or locked up) to constitute forcible restraint.   His act therefore qualifies as physical restraint under the guidelines' definition."

Gillespie's conduct falls within even the narrowest interpretation of restraining the victim through "bodily contact."   *See supra* at pages 19 and 20 (Images 13 and 14 Trial Exhibit 702).

2. <u>Gillespie exerted control over Sergeant Riley.</u>

Consistent with the definition of "restrained" and examples of being physically restrained provided in the Guidelines ("being tied, bound or locked up"), "a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner." *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (internal citations omitted); *United States v. Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls 'Forcible' means effected by the use of force") (internal citations omitted). *See also id.* (defendant forcibly restrained two women when he held up a bank by dragging one woman by the neck to a teller station while pushing a hairbrush into her back (pretending it was a gun), and he grabbed another woman, a customer service representative, as well).

Here, Gillespie grabbed Sergeant Riley's right arm and pulled him towards the mob. Gillespie had control of Sergeant Riley's arm for at least seven seconds, and Sergeant Riley testified it felt like an eternity.   Sergeant Riley also testified that he was concerned about being pulled into the crowd by himself; he was fearful; and his fear was that the crowd would kill officers (Tr. 12/20/2022 at 156).[16] Further, Gillespie prevented the sergeant from protecting himself from the assault of another rioter, who hit Riley with a crutch.

---

[16] Officer Fanone had been pulled into the mob from the LWT tunnel and nearly killed less than an hour before Gillespie assaulted Sergeant Riley.

3. <u>Gillespie provided Sergeant Riley with no alternative but compliance.</u>

Sergeant Riley was stuck in the dangerous rioting crowd, unable to fight back while being assaulted by another rioter as Gillespie held his arm with both his hands. Sergeant Rile was incapacitated, unable to do anything about his situation because of the physical restraint. Evidence at trial, testimony BWC and CCTV confirms this point. The evidence showed that as Gillespie pulled Sergeant Riley's dominant arm with two hands, another rioter was able to hit Sergeant Riley with a crutch. *See supra* at page 16 (Image 9, Trial Exhibits 403, 702, and 903). Accordingly, he had no alternative but compliance. *See, e.g., United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993) (confirming the application of § 3A1.3 where the defendant had stood on his victim's throat (pinning him to the ground by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint." *Id.* at 320-21 (internal citations omitted)).

4. <u>The brief duration of the restraint does not preclude application of the enhancement.</u>

Another consideration in determining whether Section 3A1.1 applies is the duration of the defendant's restraint of the victim. *Bell*, 947 F.3d at 59. While sustained restraint may militate in favor of applying the enhancement, it is not required. *See, e.g., United States v. Coleman*, 664 F.3d 1047, 1050–51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey*, 431 F. Supp. 2d 903, 907–09 (N.D. Ind. 2006) (finding that the victim of a bank robbery was physically restrained even though the duration of the restraint was only about

two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling").

In any event, even under the Third Circuit's analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to determine whether a victim was "physically restrained" under the Guidelines.   *Bell*, 947 F.3d at 56.   Also, the Court in *Bell* made clear that "[n]o single factor is dispositive nor does any factor carry more weight than any other factor; rather, district courts should balance all of these factors." *Id.* at 60.   Here, while Gillespie's restraint of Sergeant Riley may not seem long, context matters greatly.   The restraint occurred during a sustained medieval battle, from which Sergeant Riley had already been defending himself, other officers, and the Capitol for hours, and after Riley had been assaulted by others throughout the afternoon.   Most significantly, the duration of the restraint was long enough to provide another rioter with the opportunity to strike Sergeant Riley, without Sergeant Riley being able to defend himself or engage his assailant.   Sergeant Riley testified that the time Gillespie had his arm felt like and "eternity."   Consequently, any perceived brevity of the restraint should not preclude application of the enhancement.

5.   <u>Gillespie, in conjunction with the rioting crowd, placed Sergeant Riley in a confined space.</u>

Gillespie grabbed Sergeant Riley's arm as he was being assaulted by another rioter, in the tight space of the LWT tunnel.   *See supra* at pages 15-16, 19-20 (Images 8, 9, 13, and 14, Trial Exhibits 403, 702, and 903).   Such behavior is considered in determining whether a victim was "physically restrained" pursuant to U.S.S.G. § 1B1.1.   For instance, in *United States v. DeLuca*, the First Circuit found that the victim was "physically restrained" by two of the defendant's co-conspirators where one co-conspirator "pushed [the victim] as he attempted to leave the hallway in which he

was being assaulted and [another co-conspirator], throughout the encounter, stood at the hallway door barring egress by [the victim]," even though the victim was never "tied, bound, or locked up," because "[t]he examples listed in the guideline definition of 'physically restrained' [in U.S.S.G. § 1B1.1, comment.   (n.1(i))] are merely illustrative...not exhaustive").   137 F.3d 24, 39 (1st Cir. 1998).

### Application of the enhancement punishes conduct that is not inherently part of the offense of conviction.

Application Note 2 for U.S.S.G. § 3A1.3 notes that the restraint-of-a-victim enhancement should not be applied where either "the offense guideline specifically incorporates this factor" or "where the unlawful restraint of a victim is an element of the offense itself (*e.g.*, this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint))." U.S.S.G.   § 3A1.3 cmt. n. 2.   The Tenth Circuit has indicated that courts should "determine whether the offense *conduct* specifically addressed whether the victim was physically restrained" in determining whether a Guideline enhancement incorporates the victim restraint adjustment. *United States v. Troup*, 426 F. Supp. 3d 1072, 1136 (D.N.M. 2019) (quoting *United States v. Joe*, 696 F.3d 1066, 1071 (10th Cir. 2012) (emphasis in original).   Additionally, in order to determine whether "restraint" is an element of the offense, courts look to the statutory definition of the offense.   *United States v. Benitez-Torres*, 73 F. App'x 78 (5th Cir. 2003) (citing *United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996)).   When conducting this inquiry, courts should consider whether "the act of physical restraint "adds to the basic crime."   *United States v. Wilson*, 198 F.3d 467, 472–73 (4th Cir. 1999) (quoting *United States v. Mikalajunas,* 936 F.2d 153, 156 (4th Cir.1989)).

Here, the offense guideline for the 18 U.S.C. § 111 offense (§ 2A2.2) does not specifically incorporate physical restraint.   The specific offense characteristics for § 2A2.2, such as the enhancement for use of a dangerous weapon or bodily injury sustained by the victim, do not necessarily involve conduct constituting physical restraint and can appropriately be applied in tandem with the victim restraint adjustment in § 3A1.3.   *See United States v. Davis*, No. 20-30438, 2022 WL 226000, at *2 (5th Cir. Jan. 24, 2022), *cert. denied*, 142 S. Ct. 2767 (2022) (rejecting defendant's contention that the serious bodily injury enhancement in U.S.S.G. § 2A2.2(b)(3)(B) incorporates physical restraint as a factor and noting that the Fifth Circuit has previously upheld application of the victim restraint adjustment under § 3A1.3 when the bodily injury enhancement applied.).   Additionally, unlawful restraint of a victim is not an element of a Section 111(a) violation.   Section 111(a) criminalizes "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" an officer while he is engaged in the performance of official duties.   Not all assault includes physically restraining a victim.   As noted above, restraint principally defined as "to hold back; to check; to hold from action, proceeding, or advancing." *Taylor*, 961 F.3d at 78.   Hence it is clear that while assault involves some force, but it does not necessarily involve restraint.   Physical force is distinct from qualifying physical "*restraint*."   *Id.* at 78–79 (citing *Rosario*, 7 F.3d at 321 ("[M]ere physical contact with the victim does not inevitably amount to physical restraint")).   For instance, in *United States v. Wilson*, the Fourth Circuit upheld the two-level physical restraint enhancement for a carjacking, noting that physical restraint was not an element in all robberies or the other specific offenses characteristics.   198 F.3d at 472 (4th Cir. 1999).   By contrast, the Court explained that the restraint adjustment was not

applicable to a conviction for murder, because "'[e]very murder involves the ultimate restraint[, and s]uch terminal restraint is simply an element of the crime of homicide.'" *Id.* (quoting *Mikalajunas,* 936 F.2d at 156).

Here, Gillespie's conduct -- purposely holding Sergeant Riley and trying to yank him into the violent mob -- is meaningfully different from a typical assault, and so not otherwise accounted for in the assault guideline.   Accordingly, the Chapter 3 adjustment for restraint of a victim should apply in the instant case.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Gillespie's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   The violent nature and circumstances of Gillespie's offenses, as set forth in detail above and at trial, were of the utmost seriousness, and fully support the government's recommended sentence of 87 months' incarceration.

### B.   The History and Characteristics of the Defendant

Gillespie has no prior convictions, a fact that is already taken into consideration in the criminal history category calculation.   PSR ¶ 66.

Unlike many defendants who had difficult upbringings and no role models, Gillespie

36

reported that he had a good relationship with his father, a positive relationship with his mother, and a "positive upbringing."   PSR ¶¶ 78, 81.   And unlike many defendants who had no benefit of education, Gillespie received a B.S. in mechanical engineering from San Francisco University in 1990, was enrolled in University of Massachusetts at Amherst in 1979 and 1982 and completed a math course at the University of Berkeley in California (*sic*) in 1988.[17]  PSR ¶¶ 95, 96.   At one time he worked as a junior engineer, and has held other positions, but for the past 20 years he has supported himself from his inheritances from his parents.   PSR ¶ 99.

In the past when Gillespie had disagreements with authority, he availed himself to the court system.   Specifically, the PSR notes that Gillespie contested a $15 non-refundable parking ticket to the state's highest court; he filed a state court complaint against his step-mother; and he has litigation pending in the District of Massachusetts, relating to the award of attorney's fees against him in litigation related to the complaint against his step-mother.   Additionally, he sued two women in Massachusetts, alleging that they lied against him in a criminal case in which he was a defendant.   To date, he has not prevailed in any case.   PSR at ¶¶ 107, 108.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Gillespie's criminal conduct, in charging the police at the Lower West Terrace tunnel using one of their own shields, and attempting to drag Sergeant Riley into the mob, was the epitome of disrespect for the law.   Furthermore, Gillespie's complete lack of remorse at trial and his testimony that he felt a "strong sense of indignation" about the police conduct (Tr. 12/21/22 at 71)

---

[17] Presumably, the University of California, Berkeley.

and that it was a "pleasant" experience being at the Capitol (*Id.* at 41)

D.      **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[18] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although Gillespie has a criminal history category of I, he testified falsely at trial and has shown no remorse for his conduct at the Capitol.   When confronted on cross examination regarding the absurdity of his statements, Gillespie continually re-committed to them, insisting that he would have never intentionally caused harm to a law enforcement officer, and that he had no idea that Congress was inside the Capitol that day.

Gillespie's unwillingness to accept responsibility for his conduct demonstrates that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence.   Gillespie testified that his experience at the Capitol was "fun, exciting, enjoyable" (Tr. 12/21/22 at 43).   Gillespie used the words "pleasant" and "vacation" numerous times during his

---

[18] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

testimony to describe the atmosphere at the Capitol on January 6 (Tr. 12/21/22 at 41, 44, 45).

Despite the overwhelming evidence at trial that law enforcement was outnumbered (Sergeant Riley

testified the rioters outnumbered the police 30 to 1 (Tr. 12/20/2021 at 128, 129)) and overpowered

by the rioters, at Gillespie testified that he felt a "strong sense of indignation" regarding the police's

conduct against the "protesters" (*Id.* at 71, 104), i.e., he was angry that the police responded to

being attacked with force.   At no time during his testimony did Gillespie express even a modicum

of remorse for his actions or sympathy towards the police.   To date, Gillespie has expressed no

remorse or contrition.

###        E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United

States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied]

and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency,

complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S.

85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission

"has the capacity courts lack to base its determinations on empirical data and national experience,

guided by professional staff with appropriate expertise," and "to formulate and constantly refine

national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts

must give "respectful consideration to the Guidelines."   *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).    In short, "the Sentencing Guidelines are themselves an anti-disparity formula."   *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).    Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.    18 U.S.C. § 3553(a).    After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).    The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent

district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant."   *Id.* at 1095.   "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when

warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[19]

      In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail

'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly."   *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).   *See id.*

("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[20]

      Although the other defendants discussed below participated in the Capitol breach on

January 6, 2021, many salient differences explain the differing recommendations and sentences.

While no previously sentenced case contains the same balance of aggravating and mitigating

---

[19] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[20] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.   To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jensen*, 21-cr-006-TJK, Jensen led a crowd that chased USCP Officer Goodman up a flight of stairs and into the corridor just outside the Senate chamber.   Jensen made no physical contact with Officer Goodman.   Jensen faced a guideline range of 57 to 71 months' incarceration after a jury convicted him of violating 18 U.S.C. §§1512 and 111(a), and the court sentenced him to 60 months' incarceration.   Gillespie should be sentenced to a lengthier period of incarceration than Jensen because Gillespie's assault involved both a dangerous weapon (the riot shield) and physically grabbing and restraining Sergeant Riley.

In *United States v. Williams*, 21-cr-377-BAH; the defendant was convicted of violating 18 U.S.C. §1512 after a jury trial.   The Court sentenced Williams to 60 months' incarceration. Williams did not assault police as Gillespie did. Gillespie should be sentenced to a lengthier period of incarceration than Williams.

After entering a guilty plea, this Court sentenced the defendant to a within Guidelines sentence of 78 months' incarceration in *United States v. McGrew*, 21-cr-398-BAH, for a violation of 18 U.S.C. § 111(a).   McGrew engaged in a series of confrontations with law enforcement officers on January 6, the most serious of which involved throwing a wooden handrail at police in the tunnel, which appeared to hit the shield or visor of an officer.   McGrew had an extensive criminal history, while Gillespie does not, but based on Gillespie's conduct on January, lack of acceptance of responsibility, and false statements at trial, a greater sentence is appropriate.

In *United States v. Young*, 21-cr-291-ABJ, the defendant was one of several rioters who participated in the assault of MPD Officer Fanone, who was dragged from the tunnel into the mob, and a taser was used on him causing serious bodily injury.   Young pled guilty to violating 18 U.S.C. § 111(a).   Young had a higher criminal history category than Gillespie, but he received a Guideline reduction for acceptance of responsibility, and there was no guideline enhancement for obstruction of justice.   Thus, Young's final Guideline range was 77-96 months, virtually identical to Gillespie's range.   This Court sentenced Young to 86 months' incarceration.   Young A comparable sentence is warranted for Gillespie.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub.   L.   No. 97-291 § 3579, 96 Stat.   1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096.   Second, the Mandatory Victims Restitution Act ("MVRA"), Pub.   L.   No. 104-132 § 204, 110 Stat.   1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.

*See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.   Both require that restitution "be tied to the loss caused by the offense of conviction."   *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[21]   Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.   [22]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).   "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ...   Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a

---

[21] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.   *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan.   15, 2020).   The defendant in this case did not enter into a plea agreement.

[22] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.   *See United States v. Emor*, 850 F.   Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[23] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose

---

[23] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Gillespie's conduct in battling law enforcement at the Lower West Terrace tunnel as part of a mob caused damage to that building.

restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[24]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

---

[24] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Gillespie to pay $2,000 in restitution for his convictions on Counts One, Two, Five, and Seven.   This amount fairly reflects Gillespie's role in the offense and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

**VIII.   FINE**

Gillespie's convictions under Sections 111 and 231 subject him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G.   § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."   *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

While the government rarely recommends a fine, it is appropriate in this case.   Gillespie is not employed, but he is financially independent, living off "several inheritances" (Tr. 12/21/2022 at 6 and PSR at ¶ 99.) Gillespie has defiantly refused to provide any financial disclosures, both at the time of his initial appearance (qualifying him for court-appointed, taxpayer-funded attorneys) and in the preparation of the PSR.   (PSR at ¶¶ 102, 103, 104, and 109).   The PSR recommends a fine

47

of $5,000, and the government believes that no less than that is warranted under these circumstances.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 87 months of imprisonment, a term of supervised release of three years, a fine of no less than $5,000, and a mandatory special assessment of $235.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ JACQUELINE SCHESNOL*
JACQUELINE SCHESNOL
Assistant United States Attorney
Arizona Bar No. 016742
United States Attorney's Office, Detailee
601D Street, N.W.
Washington, DC 20530
(602) 514-7500
jacqueline.schesnol@usdoj.gov

*/s/ CAROLINA NEVIN*
CAROLINA NEVIN
Assistant United States Attorney
New York Bar No. 5226121
601 D Street, NW
Washington, DC 20530
(202) 803-1612
carolina.nevin@usdoj.gov