```
                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,           )  Criminal Action
                                    )  No. 22-60
vs.                                 )
                                    )  April 14, 2023
VINCENT GILLESPIE,                  )  9:25 a.m.
              Defendant.            )  Washington, D.C.
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

**<u>APPEARANCES:</u>**

FOR THE UNITED STATES:

                CAROLINA NEVIN
                United States Attorney's Office
                601 D Street NW
                Washington, DC 20001
                (202) 803-1612
                Email:  carolina.nevin@usdoj.gov

                JACQUELINE N. SCHESNOL
                DOJ-USAO
                40 North Central Avenue
                Phoenix, AZ 85004-4449
                (602) 514-7689
                Email:  jacqueline.schesnol@usdoj.gov

FOR THE DEFENDANT:

                TIMOTHY G. WATKINS
                AZIZA HAWTHORNE
                Federal Defender Office
                District of Massachusetts
                51 Sleeper Street
                Boston, MA 02210
                (617) 223-8061
                Email:  timothy_watkins@fd.org

ALSO PRESENT:        AIDEE GAVITO, U.S. Probation
                CHRISTINE SCHUCK, Pretrial Agent
                RAYMOND ADAMS, FBI, Special Agent
                SHIRINE ROUHI, U.S. Attorney's Office
                JOSEPHINE ROBERTS, U.S. Attorney's Office

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                Official Court Reporter

          Proceedings reported by machine shorthand.
      Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

1  
2          THE COURTROOM DEPUTY:  Matter before the Court,
3  Criminal Case No. 22-60, United States of America versus
4  Vincent Gillespie.
5          Your Honor, for the record, Probation Officer
6  Aidee Gavito and Pretrial Agent Christine Schuck are
7  appearing via video.
8          Counsel, please come forward and state your names
9  for the record, starting with the government.
10         MS. SCHESNOL:  Good morning, Your Honor.
11 Jacqueline Schesnol and Carolina Nevin, representing the
12 United States.
13         Also with us at counsel table, FBI Agent Raymond
14 Adams, Paralegals Shirine Rouhi and Josephine Roberts.  We
15 also have FBI Agent Derrick Bouche [sic] in the -- in the
16 gallery, as well as Detective Sergeant Jason Mastony.  We
17 are also expecting a couple other members of MPD to arrive
18 any moment.
19         THE COURT:  Okay.  Are you planning on calling any
20 of them?  Are any of them making statements?
21         MS. SCHESNOL:  It is my understanding that none of
22 them will be making statements.
23         THE COURT:  Okay.
24         MS. SCHESNOL:  Thank you.
25         THE COURT:  Thank you.

1           MR. WATKINS:  Good morning, Your Honor.

2      Tim Watkins, Federal Defender, Office of the District of

3      Massachusetts.  With my is Aziza Hawthorne, also with the

4      Federal Defender Office of the District of Massachusetts, on

5      behalf of Vincent Gillespie, who is with us here in court

6      today.

7           THE COURT:  Yes, good morning.

8           All right.

9           So, Mr. Gillespie, you are not vaccinated, right?

10          THE DEFENDANT:  No, I am not.

11          THE COURT:  Okay.  So let me give you a mask.

12          Ms. Gumiel, could you give him a mask.

13          I know it's very confusing.  Some people wear

14     masks, some people don't.  We are in a closed room without

15     that much air flowing, so we're still taking precautions

16     here.  But if you are fully vaccinated and you're feeling

17     okay, certainly, when you are speaking, please remove your

18     masks.

19          All right.  So we're here this morning for the

20     sentencing of the defendant, Vincent Gillespie, after his

21     conviction by a jury on December 23, 2022, of four charges

22     against him:  In Count 1, for assaulting, resisting, or

23     impeding law enforcement officers in violation of 18 U.S.C.

24     Section 111(a)(1); in Count 2, for civil disorder in

25     violation of 18 U.S.C. Section 231(a)(3); Count 5, for

engaging in physical violence in a restricted building or grounds in violation of 18 U.S.C. Section 1752(a)(4); and Count 7, for acts of physical violence in the Capitol grounds or buildings in violation of 18 U.S.C. Section 5104(e)(2)(F).

So let me just start the way I normally do in all of my sentencings, I talk about all of the things that I have reviewed, in connection with the sentencing, to make sure everyone is working from the same set of documents.

The documents have been coming in, so I think it's really incumbent upon me to make sure I haven't missed anything in the flow of filings by the parties in this case.

So I have certainly reviewed the probation office's presentence investigation report and sentencing recommendation docketed at ECF Nos. 78 and 79.

I have reviewed the defendant's three sentencing memos, which includes supplements and several letters of support from his family members docketed at ECFs 80, 83, 85.

I have also reviewed the government's sentencing memo docketed at 81 and the supplemental filing with trial testimony of MPD Officer Henry Foulds and Sergeant Jason Mastony docketed at ECF 84, plus the supplement -- I think that was filed just yesterday -- at ECF 86; the video exhibits submitted in support of the government's sentencing memo, along with the government's notice of filing of video

1    exhibits docketed at ECF 82.  And, of course, I presided

2    over the defendant's trial, so I am familiar with the trial

3    record and exhibits.

4              Have I missed anything from the government?

5              MS. SCHESNOL:  No, Your Honor.  That's everything.

6              THE COURT:  Do you have everything I have listed?

7              MS. SCHESNOL:  I do, yes.  We do.

8              THE COURT:  And, Mr. Watkins --

9              MR. WATKINS:  No, Your Honor.

10             THE COURT:  -- have I missed anything from you?

11             MR. WATKINS:  No, you have not.

12             THE COURT:  Okay.  Good.  And do you have

13   everything I have mentioned?

14             MR. WATKINS:  Yes.

15             THE COURT:  Excellent.  All right.

16             Okay.  So now, Mr. Gillespie, let me just tell you

17   how this sentencing hearing will proceed.  You can stand

18   while I am speaking to you.

19             Judges do sentencing hearings in different ways, I

20   do my sentencing hearings in four different steps.  I like

21   to tell the defendants, at the beginning of the hearing, how

22   this is going to proceed over the next hour or so, so you

23   know what is coming and what we're discussing, even if you

24   are not following some of the legal stuff -- but you are

25   smart, I am sure you will -- but just so you know what we're

1    discussing at each stage.

2            So step one of the hearing is where I review the

3    presentence investigation report and any objections filed by

4    either side to the factual portions of the PSR.  And you

5    will sometimes hear people refer to the presentence

6    investigation report as a "PSR," that's the acronym for it.

7            The second step is to determine how the federal

8    guidelines apply in your case based on your criminal history

9    and offense conduct and the applicable guidelines.  There

10    are a number of objections that have been filed by both

11    sides to that, so that's going to be a fairly lengthy

12    discussion here.

13            Then at step three, I will hear first from the

14    government, then I will hear from your lawyer, and then I

15    will hear directly from you if you wish to speak to me about

16    application of factors under the statute at 18 U.S.C.

17    Section 3553(a) and what the recommendations are and why,

18    from the parties, about an appropriate sentence in your

19    case.

20            Then the last step requires me to explain the

21    sentence I am about to impose, and impose sentence.

22            Do you have any questions about what's going to be

23    happening next?

24            MR. WATKINS:  I just didn't hear the last thing

25    you said.

```
1              THE COURT:  I will explain the sentence I am about

2    to impose, and then I will impose sentence.  That's what

3    happens at the last step.

4              Do you understand?

5              You have to speak.

6              THE DEFENDANT:  Yes.

7              THE COURT:  Okay.  Sit down, please.

8              All right.  So let's start at step one, which is

9    the presentence investigation report.  I understand that the

10   government has no objections regarding any of the factual

11   parts of the presentence report; is that correct?

12             MS. SCHESNOL:  That is correct regarding the

13   facts.

14             THE COURT:  No, I understand that.  I am going to

15   get to the guidelines at the second step.

16             MS. SCHESNOL:  Okay.

17             THE COURT:  But I would like to get the facts set

18   first.

19             MS. SCHESNOL:  Yes.  Thank you.

20             THE COURT:  Okay.  Thank you.

21             Mr. Gillespie, could you just stand right where

22   you are.

23             Are you fully satisfied with your attorneys in

24   this case?  At trial, I think you had three of them

25   Mr. Watkins, Ms. O'Neill-Greenberg, and Ms. Hawthorne.
```

1          Are you satisfied with all of your attorneys in

2     this case?

3          THE DEFENDANT:  Yes.  Yes.

4          THE COURT:  And do you feel that you have had

5     enough time to talk to your attorneys about the presentence

6     investigation report and all of the other papers submitted

7     in connection with your sentencing?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.  You may be seated.

10         Mr. Watkins, have you and your client read and

11    discussed the presentence investigation report?

12         MR. WATKINS:  We have.

13         THE COURT:  And I understand that you have a

14    number of objections to the PSR, but most of those concern

15    the guidelines calculation, which I will address next.

16         As to the facts, I think you have a couple of

17    factual objections.  My understanding is that you objected

18    to paragraph 27.

19         Were there any other objections to the factual

20    portions of the PSR?

21         MR. WATKINS:  Judge, on behalf of Mr. Gillespie,

22    he wants to make sure -- and I will make sure -- obviously,

23    this case went to trial and it will be on appeal.  I

24    explained to him that presentence reports are not used in

25    that fashion in the appeals court but, nevertheless,

1      Mr. Gillespie would want me to object to the factual

2      recitations generally, relying more on what happened at

3      trial.

4              With that, I have nothing else.

5              THE COURT:  Okay.  I thought the PSR, at page 26

6      through 27, had indicated that you objected to paragraph 27.

7              MR. WATKINS:  More informational.  I described it

8      as irrelevant.  Again, it's talking about, as we did at

9      trial, a lot of activities that happened before

10     Mr. Gillespie was even on the grounds.

11              I understand that the Court is permitted to take

12     whatever information it wants into consideration.  But we

13     would say to the extent that those things are going to be

14     part of your decision, they should not be, as far as

15     specific things that other people did.

16              THE COURT:  Okay.  And this was a motion that you

17     made pretrial that was denied, and your objection on the

18     same basis is also overruled.

19              This paragraph in the PSR describes this offense

20     as involving a large crowd of individuals who gathered

21     outside the U.S. Capitol, some of whom forced entry inside

22     the building resulting in over, you know, close to

23     $3 million in repairs to the Capitol.

24              I appreciate that you think that that's

25     irrelevant.  But as I have said, in denying your pretrial

1    motion in limine which was docketed at ECF 29, for all of

2    the same reasons -- evidence of the magnitude of the crowd

3    that descended on the Capitol on January 6, 2021, law

4    enforcement being overwhelmed -- provides very significant

5    and important context to every individual participant's

6    conduct that day, and what that -- each individual operating

7    in that mob saw, heard, and appreciated about his or her own

8    individual conduct.

9            So that objection to paragraph 27 is overruled.

10            Any other -- other than your general objection, no

11    other specific objections; is that right?

12            MR. WATKINS:  No, Your Honor.

13            THE COURT:  All right.  Thank you.  You may be

14    seated.

15            So hearing no other objections, the Court will

16    accept the factual portions of the presentence investigation

17    report as findings of fact at sentencing as supplemented by

18    the trial record because everything I saw in the PSR factual

19    record is quite consistent, although not as fulsome as the

20    trial record in this case, and so the trial exhibits and the

21    other evidence submitted at sentencing will also form part

22    of the record of this sentencing hearing.

23            Okay.  So now we're at the second part of the

24    hearing where we're going to talk about determination of the

25    guidelines.

1              The defendant's conviction on Count 7, which is a

2    petty offense, is not subject to the guidelines, but I do

3    have to determine how the guidelines apply to his three

4    convictions on Counts 1, 2, and 5.

5              I am going to start with the defendant's criminal

6    history, which is also an important part of figuring the

7    sentencing range.  And I don't think that there is any

8    objection to the PSR's calculation of his criminal history.

9              The presentence investigation found that he had no

10   prior criminal convictions and, as a result, his criminal

11   history score is zero, putting him in Criminal History

12   Category I of the Sentencing Table.

13             Let me just review what I understand to be the

14   objections to the offense level determination because I want

15   to structure this so we can all keep track of where we are.

16   Since there has been a lot of paper back and forth, some

17   withdrawal of objections and then renewal of the objections

18   by the defendant -- so I just want to summarize, as I

19   understand, the lay of the land as we sit here today at

20   sentencing.

21             Okay.  First of all, I understand the government

22   has no objection to the total offense level determined in

23   the PSR but does believe a two-level enhancement to the base

24   offense level for Count 1 for physical restraint under the

25   guideline at 3A1.3 should be added.

1          Is that still the government's position?

2          MS. SCHESNOL:  Yes.  That's correct, Your Honor.

3          THE COURT:  Okay.  So that's objection No. 1.

4          Objection No. 2 -- why are you getting up,

5     Mr. Watkins?

6          I am doing a summary.  I am not hearing argument

7     yet.  I just want to make sure I have got my list correctly

8     of what we have to discuss.

9          Second, the defendant objects to using the

10    guideline for aggravated assault at 2A2.2 rather than the

11    guideline for obstructing and impeding officers at 2A2.4 as

12    the base-offense level for Count 1, which is assault, and

13    Count 2, which is civil disorder, for a couple of reasons.

14         The defendant had initially withdrawn an objection

15    to the presentence investigation report's paragraphs 45 and

16    53 specifying a victim-related adjustment of 6 under the

17    guideline at 3A1.2(b) but has since reasserted that

18    objection in his latest supplemental memo docketed at

19    ECF 85.

20         The defendant, third -- because I view both of

21    those things as interrelated -- so the third objection I

22    have to deal with is the defendant's objection to the PSR's

23    separate calculation of a guideline range for Count 2, the

24    civil disorder conviction.  And I guess he argues this

25    conviction should be grouped together with the convictions

 1    on Count 1 and Count 5 under 3D1.2.

 2            And then, finally, the defendant objects to the

 3    PSR's obstruction of justice enhancement for perjurious

 4    testimony provided by the defendant at trial under the

 5    guideline at 3C1.1.

 6            Have I captured, Mr. Watkins, all of your

 7    objections that I need to address?

 8            MR. WATKINS:  You have, Your Honor.

 9            THE COURT:  Okay.  Thank you.

10            All right.  So now let's -- I am just going to

11    take those in an organized fashion one by one.

12            Okay.  Let's start with the government's objection

13    that the presentence investigation report did not add a

14    two-offense level increase for defendant's physical

15    restraint of Sergeant Riley under the guideline at

16    Section 3A1.3.

17            This really turns, to my mind, on the government's

18    argument that the definition of "physically restrained,"

19    which is defined for Guideline 3A1.3 in a separate guideline

20    note at 1B1 -- Note 1, subparagraph L; and that definition

21    defines the term to mean:  The forcible restraint of the

22    victim, such as by being tied, bound, or locked up.

23            Just so the record is clear, probation agreed with

24    defense that the two-offense-level increase does not apply.

25            So let me just ask the government -- you have

1    elaborated on this in your papers.  Do you want to elaborate

2    on it more?

3          MS. SCHESNOL:  No, Your Honor.

4          We believe, in the sentencing memo, we've laid out

5    extensively our position and we are confident that you have

6    a firm grasp of that, so I have nothing to add.

7          THE COURT:  Okay.  Mr. Watkins, do you want to say

8    anything about it?

9          MR. WATKINS:  I think it's pretty well briefed,

10   Your Honor, unless the Court has any particular questions.

11         THE COURT:  No.  I agree that it's fairly well

12   briefed.

13         So let me just issue my ruling for purposes of the

14   record and any appeal by the government on this issue.

15         The PSR's guideline calculation did not add a

16   two-offense-level increase for physical restraint under

17   Section 3A1.3, titled "Restraint of Victim."  And the

18   government argues this is incorrect and that the

19   two-offense-level enhancement should apply because, in

20   pulling Sergeant Riley's arm, the defendant physically

21   restrained him.

22         Guideline 3A1.3 refers to the definition of

23   "physically restrained," set out in Guideline 1B1.1,

24   Note 1(L), which defines the phrase to mean:  The forcible

25   restraint of the victim, such as by being tied, bound, or

1    locked up.

2         The D.C. Circuit has made clear that, quote, The

3    illustrations of physical restraint, close quote, listed in

4    the definition for "physically restrained" in 1B1.1,

5    Note 1(L), are listed by way of example rather than

6    limitation.  See *U.S. v* Drew, 200 F.3d 871, 880, D.C.

7    Circuit 2000.

8         The Circuit further noted that the phrase being

9    "tied, bound, or locked up," which is used in the

10   definition, indicates that physical restraint requires the

11   defendant either restrain the victim through bodily contact

12   or confine the victim in some way and, thus, the required

13   restraint must, as the language plainly recites, be

14   physical.

15        The Circuit elaborated that while the victim in

16   that case, quote, No doubt felt restrained by the defendant

17   by being directed to move at gunpoint, that still lacked the

18   physical contact required for imposition of the

19   two-offense-level increase.

20        The D.C. Circuit in *Drew* provided an example of

21   what would qualify for application of this upward

22   adjustment, citing *U.S. v Harris*, a D.C. Circuit case from

23   1992, where the victim was physically restrained when the

24   defendant's coconspirators beat the victim and detained him

25   for seven days.

1    So here we clearly have some physical contact by

2    the Defendant Gillespie with Sergeant Riley, with the

3    defendant grabbing hard onto the officer's arm for about

4    seven seconds.  The issue, then, is whether that amounted to

5    physical restraint sufficient to trigger this enhancement.

6    I conclude that it does not.

7    "Restrain" is defined as, quote, To prevent from

8    doing, exhibiting, or expressing something; to limit,

9    restrict, or keep under control; to moderate or limit the

10    force, effect, development, or full exercise of; to deprive

11    of liberty.  See the definition of "restrain" in

12    *Merriam-Webster Dictionary*.

13    Whether defendant's actions fit that definition

14    is, to my mind, actually a close call.  Luckily, we do have

15    a video of what occurred, and that helps both measure the

16    time and see the effectiveness of defendant's restraint on

17    Sergeant Riley.

18    Trial Exhibit 702 shows the defendant pulling

19    Sergeant Riley's arm towards the mob.  Riley can be seen

20    resisting defendant's pulling at that time.  And throughout

21    that fairly brief encounter, the defendant never obtains

22    full control over Sergeant Riley, who is pulling back on the

23    defendant quite vigorously.  And ultimately, thankfully,

24    successfully resists the defendant's aggressive pulling of

25    Sergeant Riley closer and into the midst of the mob.

1          Although, the defendant clearly uses physical

2     force, as *Drew* requires, and does limit or restrict Sergeant

3     Riley's freedom of movement to some extent, the fact that

4     defendant's restraint was brief, less than 10 seconds, and

5     never sufficient to gain total control over Sergeant Riley's

6     ability to move and wrestle fee, to my mind falls short of

7     the physical restraint necessary for application of this

8     guideline.

9          To be clear, neither what the defendant intended

10    by his action nor what the victim was feeling during this

11    physical contact is the measure of whether this adjustment

12    should apply.  And I do remember quite well Sergeant Riley's

13    poignant testimony that it felt like an eternity to him, but

14    that is not the measure of whether this definition is met.

15         Clearly, the defendant intended to clear a path

16    into the Capitol to take control of Sergeant Riley and pull

17    him out of the way, so his intent was to overcome Sergeant

18    Riley.  And as I said, Sergeant Riley certainly felt like he

19    was being pulled and overcome, but that's not the measure.

20         If this guideline were written as "an attempt to

21    physically restrain a victim in the course of the offense,"

22    I would have no hesitation in applying it, but that's not

23    the plain text of the guideline or the definition of

24    "physically restrain."

25         The government suggests the Court apply the test

1   developed in Third Circuit, which considers five factors in

2   determining whether Section 3A1.3 should apply.  See *U.S. v*

3   *Bell,* 947 F.3d 49, jump cite 56, Third Circuit 2020.  The

4   Third Circuit stated that those five factors should be

5   balanced with no one factor weighing more than others.

6        I will just briefly review those factors because I

7   think even the consideration of those factors does not

8   result in a different finding than the one I have made based

9   on the plain text and the guidance from the Circuit in *Drew*.

10       The first *Bell* factor requires consideration of

11  the use of physical force.  And as previously explained,

12  defendant using his hands to grab Riley's arm amounts to use

13  of physical force and, thus, weighs in favor of application

14  of the enhancement.

15       The second factor requires consideration of

16  exerting control over the victim.  Also, as discussed, Riley

17  was able to fight back against defendant's pulling and

18  successfully pull away from his grip.  Although the

19  defendant has some limited control of Riley's one arm, he

20  does not exert control over Riley completely.  This factor

21  weighs against application of the enhancement.

22       The third factor requires consideration of

23  providing the victim with no alternative but compliance.

24  Sergeant Riley had an alternative to compliance.  He did not

25  sit quietly and let the defendant just drag him passively

1    into the mob.  He fought back, thankfully, as I said,

2    successfully pulled away from this defendant.  So the

3    defendant was not able to force Riley to comply with his

4    physical directive to move away from -- out of the line of

5    police officers into the mob.  So, again, this factor weighs

6    against application of the enhancement.

7           The fourth factor requires consideration of

8    focusing on the victim for some period of time.  The Third

9    Circuit stated, in *Bell,* that the focus of this factor

10   should be more than a momentary restraint, and so duration

11   of the restraint must be considered.

12          As Trial Exhibit 702 shows, the defendant was

13   pulling Sergeant Riley's arm for approximately seven

14   seconds.  As I have said, I acknowledge that Sergeant

15   Riley's testimony at trial -- and I credit it -- that this

16   time felt like an eternity given the context here.  But this

17   seven seconds of pulling is short compared to the entire

18   length of the defendant's time in the lower west tunnel.

19   This factor weighs against application of the enhancement.

20          Finally, the fifth factor requires consideration

21   of placement in a confined space.  The Third Circuit went on

22   to define that phrase as, quote, The perpetrator's act of

23   enclosing or confining the victim in a space or with a

24   barrier, actual or threatened, that constitutes the action

25   meriting enhancement of the offense level.

1           The defendant's conduct simply doesn't fit that

2     definition.  By pulling Sergeant Riley's arm he did not

3     enclose Riley into any space.  And I know that the

4     government says that defendant grabbed Riley's arm in the

5     tight space of the lower west tunnel, but that really

6     doesn't help the analysis here because the defendant was not

7     forcing Riley to stay in the tight tunnel; he was -- rather,

8     Sergeant Riley was station to that location to guard the

9     Capitol's entrance.  And no act of defendant's worked to

10    confine Sergeant Riley to that space against his will.  So

11    this factor also weighs -- to the extent it even applies,

12    weighs against application of the enhancement.

13          So, on balance, four of those five *Bell* factors

14    weigh against application of the enhancement.  And for both

15    of the analysis that I did -- just based on the plain text

16    in the guidance from the D.C. Circuit, in *Drew* -- even

17    applying the *Bell* factors under either analysis, I find that

18    the defendant did not physically restrain Sergeant Riley.

19          The government's objection that the enhancement at

20    Section 3A1.3 should apply to this defendant is overruled.

21    There will be no enhancement for physical restraint added to

22    Defendant Gillespie's guideline calculation.

23          Okay.  Now let's turn to the defendant's

24    objections.  First, the defendant objects to the base

25    offense level and to the Guideline 3A1.2 official

1    enhancement -- official victim enhancement.  So I am going

2    to deal with both, whether the aggravated assault guideline

3    applies and whether the six-level enhancement for an

4    official victim should apply because that clearly wouldn't

5    apply if the right guideline is 2A2.4.

6         I will hear from you, Mr. Watkins, if you want to

7    elaborate on what has already been fairly comprehensive

8    briefing on both -- both these issues.

9         MR. WATKINS:  Judge, I will mostly rely on the

10    briefing.  But it is, as the Court, I am sure, has read.

11    It's a close issue.

12         Judge Berman-Jackson questioned what the

13    difference, to a certain extent, between assault on an

14    officer and civil disorder, whether they merge in some way.

15    For purposes of statutory claim, do these establish two

16    different crimes.

17         Here, it's talking about --

18         THE COURT:  And I really don't agree with her

19    about that at all.  I mean, I think the guidelines are

20    clearly related to two different things.  The statutes are

21    really clear.  The civil disorder statute has so many other

22    parameters to it.  I really -- I don't understand why she

23    was so confused, to be quite honest with you.  Although, I

24    haven't spent a lot of time -- I have my own cases, I don't

25    need to read her cases -- her sentencing transcripts in a

1    totally different case.  But to the extent you are accurate

2    in describing what she was puzzled by, I can't agree with

3    that.

4           MR. WATKINS:  In turning to a different case and

5    different circumstances, here it's clear that the same

6    act -- that same series of acts in those few seconds at the

7    start, right, are the basis for the civil disorder, right?

8    It's a -- it's very -- all of the facts coalesce at that

9    point.

10           The question is:  Why does that then trigger an

11    intent to commit yet another crime?  And --

12           THE COURT:  I know.  You sort of make this

13    argument, Mr. Watkins, in your briefing where you said that:

14    While committing the assault against the officer he lacked

15    an intent to commit another felony; and you seem to contend

16    that civil disorder does not require intent.  And you say

17    that:  There is no evidence of a larger independent

18    felonious purpose that was intended, furthered, or advanced

19    by Gillespie when he engaged with the officers in the lower

20    west terrace tunnel.

21           And so you are basically making that same argument

22    orally here, that there was no separate intent, no separate

23    felonious intent.

24           Do I sort of understand you right?

25           MR. WATKINS:  That is correct.  That is my

1    argument, that there has to be a separate intent to commit

2    that other felony in order for it to be -- to qualify to get

3    that cross-reference here.

4         I know the Court doesn't like Judge

5    Berman-Jackson's description, but analogizing it to a 924(c)

6    where that intent is required, one can have a firearm, one

7    can be committing another felony, it is not strict

8    liability; one has to intend to use that firearm in the

9    other felony.  Here, the same thing is true.  Only right now

10   the statute does not appear to require any kind of -- it

11   does require the intent, and that is not here.  So --

12        THE COURT:  But the civil disorder statute does

13   require an intent that the defendant knowingly committed an

14   act with the intended purpose of obstructing, impeding, or

15   interfering with law enforcement officers.

16        MR. WATKINS:  I did misspeak.  I'm sorry, Your

17   Honor.

18        What I'm trying to say --

19        THE COURT:  The civil disorder is not a strict

20   liability statute, it has an intent requirement.

21        MR. WATKINS:  Well, as to the intent part, it is.

22   If a civil disorder is going on and an officer is impeded in

23   some way, that alone is sufficient.  The defendant does not

24   have to know that there is a civil disorder going on.  He

25   does not have to intend that his assault on the officer

1    furthered that civil disorder in some way.  It's not --

2          THE COURT:  I'm sorry.  Our jury instructions to

3    the jury in this case that convicted this defendant --

4          MR. WATKINS:  Right.

5          THE COURT:  -- the jury instructions specifically

6    state that:  The government must prove beyond a reasonable

7    doubt that the defendant knowingly committed an act with the

8    intended purpose of obstructing, impeding, or interfering

9    with law enforcement officers.

10          MR. WATKINS:  Correct.  And that -- that is true;

11    he does have to have that intent to assault.  What he

12    doesn't have to have is the intent for the larger crime.

13    And that is the different here between the 924(c) situation,

14    which does have that specific intent that the weapon has to

15    be used; there has to be a larger purpose in the defendant's

16    mind.  And that is why this is different, and that is why

17    there should not be any cross-reference to the aggravated

18    assault guideline.

19          THE COURT:  All right.  Thank you.

20          Does the government want to respond?

21          MS. SCHESNOL:  Yes, Your Honor, just to make a

22    complete record.

23          First of all, it's the government's assertion that

24    under the facts that we have in this case, the 231 and the

25    111(a) assault are two separate and distinct acts.

1          Someone can commit a civil disorder without

2     assaulting a police officer.  The statute for civil disorder

3     talks about an intent.  It can -- the intent is to commit an

4     act to obstruct, impede, interfere with law enforcement

5     officers.

6          As a matter of fact, we have defendants convicted

7     in this courthouse all the time, either by plea agreement or

8     jury trial, as I just did earlier in March before Judge

9     Bates, who was convicted of a 231 without an assault.  So

10    these are two separate crimes.

11         And in this case specifically, under the facts,

12    the government asserts that the 231 is separate and distinct

13    from the assault.

14         As Your Honor has pointed out, the assault on

15    Sergeant Riley -- who is here now, just so the record is

16    clear, in the courtroom -- lasted approximately seven

17    seconds.  But the defendant was in the lower west terrace

18    tunnel for far more than seven seconds.  He was in the lower

19    west terrace tunnel for more than 15 minutes, during which

20    time he used a riot shield to charge the officers on more

21    than one occasion; he was yelling "traitor" and "treason" at

22    them, and pushing his way closer and closer to the doors to

23    the Capitol.

24         So that's part one.

25         Part two, is that even in some world where the

1    defendant is correct that the 231 does not count as an other

2    felony, which we believe it does, the "other" other felony

3    is the 1512.

4        I certainly understand that the government hung on

5    the 1512; but here, at sentencing, the standard is

6    preponderance of the evidence.  And the government still

7    contends that the defendant's -- one of his other felonies

8    was obstruction of an official proceeding under 1512.

9        With regard to Judge Berman-Jackson, whether

10    anyone agrees with her or not, the two cases that the

11    defense cites are completely distinguishable than the facts

12    we have here.

13        In *Hamner*, Hamner was only convicted of a 231.

14        In *Williams*, the government abandoned the theory

15    of 111(a) under an assault theory.  And the jury instruction

16    showed, as well as the sentencing transcript, that the

17    government proceeded under the other acts that are

18    contemplated by 111(a), specifically, resisting, opposing,

19    impeding, intimidating, and interfering.

20        So, again, those cases are completely

21    distinguishable than what we have here.  And for those

22    reasons, the government asserts that the correct base

23    guideline offense is 2A2.2, and then, of course, that the

24    official victim sentencing guideline applies as well.

25        Thank you.

1          THE COURT:  Do you want to respond?

2          MR. WATKINS:  I think I heard Ms. Schesnol say

3    that an act is not required.  Obviously, an act is required

4    in order to -- an act has to be committed in the context of

5    a civil disorder, so there has to be something which leads

6    me to *Hamner* and *Williams*.

7          I guess, I -- is the government saying that there

8    are some acts that don't go -- some acts under 111 -- I

9    heard impeding and obstructing, which are under 111.

10   Clearly, under the government's theory any time you commit a

11   111 and you have a civil disorder, even if you are not

12   charged with a 111, even with -- if you have a 111 and a

13   civil disorder, it is always going to be the case --

14   right? -- that it goes to the aggravated assault guideline.

15   I don't -- I don't see that.  I don't think that's the -- I

16   don't think that's the way the Sentencing Commission wanted

17   it to go.

18         THE COURT:  All right.  I think -- okay.  Have a

19   seat.  I am prepared to rule.

20         I think a lot of this discussion has gotten off

21   into the ether of legal theories, and I just like to just

22   look at the facts, just look at what the guidelines say

23   because they're not that complicated.

24         The presentence investigation report, at

25   paragraphs 34 and 35, state that for Counts 1 and 2 the

1    applicable guideline is the guideline at 2A2.4, but that the

2    cross-reference in that section applies because defendant's

3    conduct constituted aggravated assault, thereby making

4    applicable the guideline at Section 2A2.2, which provides a

5    base offense level of 14.  And I think that's correct.

6         The guideline at 2A2.2, Note 1, defines

7    "aggravated assault" as a felonious assault that involved:

8    A, a dangerous weapon with intent to cause bodily injury,

9    i.e., not merely to frighten with that weapon; B, serious

10   bodily injury; C, strangling, suffocating, or attempting to

11   strangle or suffocate; or D, an attempt to commit another

12   felony.

13        I agree with the probation office that the

14   aggravated assault guideline at Section 2A2.2 applies here

15   for two reasons.  Under Section 2A2.2, in Note 1(A),

16   defendant committed a felonious assault with a dangerous

17   weapon with intent to cause bodily injury with that weapon,

18   i.e., the police shield he had stolen, or several of the

19   police shields he had stolen; and two, under 2A2.2,

20   Note 1(D), that he committed a felonious assault with intent

21   to commit another felony.

22        Let me just explain.

23        The guideline at 1B1.1, Note 1(E) defines

24   "dangerous weapon" as an instrument capable of inflicting

25   death or serious bodily injury or an object that is not an

1    instrument capable of inflicting death or serious bodily

2    injury but closely resembles such an instrument, or the

3    defendant used the object in a manner that created the

4    impression that the object was such an instrument.

5           And defendant's conduct, indeed, involved use of a

6    dangerous weapon with the intent to cause bodily injury with

7    that weapon.  He used abandoned or stolen police riot

8    shields offensively against officers.  He repeatedly used a

9    police shield to ram into the officers with the intent to

10   push them aside by force and get into the Capitol Building

11   through that tunnel.  Although the officers intended the

12   extremely large and seemingly heavy police shields to

13   protect them from the rioters individuals, such as Defendant

14   Gillespie, instead used the shield in a beating and ramming,

15   slamming fashion such that the shield was capable of

16   inflicting serious physical harm.  As such, the guideline at

17   Section 2A2.2 applies because of defendant's use of the

18   stolen police shields as a dangerous weapon.

19          Second, the defendant did assault Sergeant Riley

20   with the intent to commit another felony, namely civil

21   disorder and assault.  This defendant was not casually or

22   randomly attacking these officers but doing so in order to

23   get into the Capitol Building.  As he told the AP reporter

24   later the same day, he wanted to occupy the building; a

25   totally unlawful purpose.

1        Defendant's assault on Sergeant Riley was part of

2   his larger goal to dislodge the officers lined up guarding

3   the Capitol door, many of whom thought that this was the

4   only breach happening then, they were the last stand before

5   this mob could get into the Capitol; they were wrong about

6   that.  There had been other breaches, but some of them

7   didn't even know that at the time.  But this defendant

8   wanted to get in there and, in his words, "flood into the

9   Capitol Building."

10        The jury found the defendant had the requisite

11   intent to support a conviction for civil disorder; that the

12   defendant knowingly took actions on January 6 with the

13   intended purpose to obstruct, impede, or interfere with the

14   law enforcement officers serving to protect the Capitol.

15   See the Jury Instructions, at page 6.

16        Defendant pulled Sergeant Riley from the police

17   line with his fellow officers towards the violent mob with

18   the intent to further disrupt the officer's official duties

19   during a civil disorder.  And this civil disorder occurring

20   on January 6 fits the definition of such in 18 U.S.C.

21   Section 232(1), which defined a "civil disorder" as any

22   public disturbance involving acts of violence by assemblages

23   of three or more persons, which causes an immediate danger

24   of or results in damage or injury to the property or person

25   of any other individual.

1          And on January 6, as the defendant was in the

2     lower west tunnel, he engaged in acts of violence, along

3     with many other rioters, that resulted in the immediate

4     danger to the responding officers crammed into the tunnel,

5     and millions of dollars worth of damage to the Capitol

6     Building itself.

7          Based on this analysis, since guideline at 2A2.2

8     provides the base offense level and not guideline 2A2.4,

9     defendant's objection to application of the official victim

10    enhancement under the guideline at 3A1.3 is a moot point.

11         Therefore, the defendant's objection that

12    Guideline 2A2.4 should provide the base offense level, which

13    is 10 versus 14, in 2A2.2 is overruled.

14         The base offense level is provided at 14 under the

15    guideline at 2A2.2, and the official victim enhancement

16    supplied by the guideline at 3A1.3 applies.

17         Now, the defendant also has an objection to the

18    grouping under the guideline at 3D1.2.  He objects that the

19    PSR's failure to group Count 2 with Counts 1 and 5 because

20    he argues that the three counts all arise from the same

21    general specific facts, share the same victims, and are

22    temporally related, justifying their grouping under the

23    section at 3D1.2.  This is getting into pretty esoteric

24    guideline theories on grouping --

25         Step forward, Mr. Watkins.

1          MR. WATKINS:  Judge --

2          THE COURT:  -- that, for most people it's, like,

3    really, they're arguing about grouping?

4          But I understand and appreciate your concern about

5    the grouping because it does add two additional offense

6    levels if they're grouped separately.  I appreciate your

7    point.

8          MR. WATKINS:  Thank you, Your Honor.  I agree with

9    the Court --

10          THE COURT:  And I understood your arguments.

11          MR. WATKINS:  I'm sorry?

12          THE COURT:  I have understood your arguments, but

13    if you can to supplement your record.

14          MR. WATKINS:  The only thing I wanted to

15    add here -- I get that the Court understands my argument.

16          After filing this and really trying to think

17    through it, I went through other January 6 cases as much as

18    I can.  Of course, I can look at sentencing memoranda, I

19    can't look at PSRs.  But --

20          THE COURT:  I know.  It's becoming an overwhelming

21    task doing this comparison, and -- I know.  There are

22    hundreds of them.  I feel your pain.

23          MR. WATKINS:  Probably much more than I do.

24          What I did notice in cases I looked at, I can't

25    see where this grouping or failure to group has come up

1    before.  Particularly, I looked at *Rubenacker*, the Court --

2    the case that was before this Court.

3              THE COURT:  Yes.

4              MR. WATKINS:  Where Mr. Rubenacker was convicted

5    not only of 111 and 231, but also 1512, and there was no

6    effort to perform separate groups on any of those.  So --

7              THE COURT:  Simplicity, that's what I like.  Yeah.

8              MR. WATKINS:  If simplicity is the goal, then I

9    think maybe I'm winning here, and I'll sit down.

10             THE COURT:  You can sit down.

11             MR. WATKINS:  Thank you.

12             THE COURT:  So I will turn to the government.

13             Really?  I mean, this was -- I mean, offense

14   conduct can be segregated into different harms.  I

15   understand that the government has separated the assault in

16   Count 1 as focused on Sergeant Riley versus the other

17   counts.  But, actually, Sergeant Riley isn't named anywhere

18   in Count 1 of the indictment, and the use of the police

19   shield was fairly broad-based against multiple officers.

20             So the grouping by trying to isolate the victims,

21   both the assault in Count 1 and civil disorder, who were

22   being subjected to that aggressive assaultive conduct, to

23   me, seems -- even though you can identify one person who was

24   on videotape caught being targeted individually, one could

25   say that everybody in that tunnel was targeted.  I am not

 1   persuaded that there is -- should be different groupings

 2   here.  Even though you and the probation office were

 3   persuaded, but I just don't see it.

 4            Do you want to try again with me orally?

 5            MS. SCHESNOL:  Your Honor, we respect the decision

 6   that you have come to, and I believe any further argument

 7   would be in vain.  I will sit down.

 8            THE COURT:  I just put my cards on the table.

 9            MS. SCHESNOL:  Right.

10            THE COURT:  You can tell me where I am wrong.

11            MS. SCHESNOL:  I completely see your point of

12   view.  As I already mentioned, when we were talking about

13   the base offense level and I discussed the fact that these

14   two crimes really are -- can be and in this case are

15   different, that someone can commit a civil disorder, and our

16   position is that the Defendant Gillespie did that with his

17   15-plus minutes in the tunnel, and all of his conduct really

18   is separate and distinct from the assault on Sergeant Riley

19   and the physical violence directed at Sergeant Riley.  That

20   was the reason the government felt that this grouping

21   analysis was appropriate.  Again, though, we certainly

22   respect your decision, and --

23            THE COURT:  Okay.  I am just going to issue my

24   ruling.

25            The PSR recommends, in paragraph 38, that Counts 1

1    and 5 be grouped together pursuant to the guideline at

2    3D1.2(b) because they involve the same victim, which the PSR

3    has identified as Sergeant Riley, and two or more acts or

4    transactions committed by a common criminal objective or

5    constituting part of a common criminal scheme or plan; and,

6    in paragraph 39 of the PSR, that Count 2 should not be

7    included in that group because it involves different victims

8    and separate and distinct harms.

9         The defendant argues that Counts 1, 2, and 5

10   should be grouped together under the guideline at 3D1.2

11   because they all rise from the same specific facts, share

12   the same victims, and are temporally related.

13        The guideline at 3D1.2 states that, "all counts

14   involving substantially the same harm shall be grouped

15   together into a single group."  And "substantially the same

16   harm" is defined four ways in the guideline at 3D1.2.

17        A, when counts involve the same victim in the same

18   act or transaction.

19        B, when counts involve the same victim and two or

20   more acts or transactions connected by a common criminal

21   objective or constituting part of a common scheme or plan.

22        C, when one of the counts embodies conduct that is

23   treated as a specific offense characteristic in or other

24   adjustments to the guideline applicable to another of the

25   counts.

1        And D, when the offense level is determined

2    largely on the basis of the total amount of harm or loss,

3    the quantity of the substance involved, or some other

4    measure of aggravate harm, or if the offense behavior is

5    ongoing or continuous in nature and the offense guideline is

6    written to cover such behavior.

7        The guideline at 2A2.2, which I found applies

8    here, is not listed as a guideline that must be grouped or

9    excluded from grouping under the grouping guideline at

10    3D1.2(d), which results in a case-by-case determination

11    whether grouping should apply based upon the facts of the

12    case.  I agree with the defendant, that Counts 1, 2, and 5

13    should be grouped under 3D1.2(b).

14        Even deeming that Sergeant Riley alone was the

15    victim of Counts 1 and 5, he is also a victim of the conduct

16    underlying Count 2.  As the PSR correctly states, the

17    victims of the Count 2 conduct are all of the officers in

18    the lower west tunnel, which include Sergeant Riley.

19        Defendant's acts in the tunnel, including

20    obstructing, impeding, and interfering with the lawful

21    duties of all of the officers in the tunnel, as well as

22    Sergeant Riley's lawful duties protecting the Capitol on

23    January 6, means that they were all victims of those counts.

24        Additionally, the indictment does not support the

25    PSR's separate grouping of the counts.  The indictment does

1    not identify any specific victims for any counts, let alone

2    articulating that any of the counts had varying victims.  So

3    that aspect of the analysis in the PSR seems not grounded in

4    the original notice in the indictment.

5            Thus, defendant's actions towards Sergeant Riley

6    and all of the tunnel officers that day involve the same

7    victim in two of more acts or transactions connected by a

8    common criminal objective or constituting part of a common

9    scheme or plan to disrupt the officer's lawful duties and

10   supports grouping under 3D1.2(b).  Therefore, defendant's

11   objection that Counts 1, 2, and 5 should be grouped together

12   under 3D1.2 is sustained.  Counts 1, 2, and 5 are a single

13   group of offenses for which a single guideline calculation

14   applies.

15           All right.  We're now turning to the defendant's

16   objection to a two-level enhancement under the guideline at

17   3C1.1 because he argues that Mr. Gillespie's testimony was

18   not materially false at trial.  And I think -- although,

19   Mr. Watkins, you had originally argued from *Montague* that

20   the government has to meet a clear-and-convincing standard,

21   for this exception, I think you have withdrawn that

22   objection.

23           MR. WATKINS:  I have, Your Honor.

24           THE COURT:  Okay.

25           MR. WATKINS:  The argument is the same.

1          THE COURT:  Right.  So do you want to -- I mean,

2     the briefing on this has also been fairly extensive, but I

3     will hear you if you want to supplement your written record.

4          MR. WATKINS:  Judge, briefly, this is perhaps the

5     zenith of the Court's ability.  The Court saw Mr. Gillespie

6     testify, so I don't want to go too much into depth, other

7     than what I did in the briefing.

8          I think there is always a worry -- and I'm sure

9     the Court is sensitive to it, as I want to put it -- telling

10    the story through a world view we don't agree with.  I think

11    certainly the jury and all of us here in the courtroom can

12    disagree with the world view that Mr. Gillespie presented

13    there.

14         The question is whether that more -- somehow is

15    intentionally lying because Mr. Gillespie, to my mind, was

16    brutally honest about some of the things -- talking about

17    things he didn't have to, talking about his world view,

18    which was not going to be something that was going to earn

19    him any points with the jury here.

20         He very much presented the man who he is, which is

21    a person who was dedicated to what he was doing down there,

22    which was to go in and do peaceful protests as he understood

23    it.  Obviously, that's not what he did, and that's not what

24    the jury convicted of him.

25         So -- and he not only detailed or admitted the

1    government's facts but filled in many gaps, details about

2    what he was doing on there that provided fodder for the

3    government in its closing argument.  He overexplained when

4    he didn't need to, and I think that was to his detriment to

5    the jury.

6            At the end, what his testimony was, was

7    consistent, that this was not something that was planned.

8    It was something that he got caught up with and made a

9    decision on the spur of the moment, that his goal was to go

10   in there and protest on this one occasion.  That was the

11   gravamen of the charge, and he admitted to it, and he was

12   quite forthright about that.

13           I would suggest, for all of those reasons, that

14   his testimony was not perjurious, as is understood by the

15   guidelines.  I would ask the Court not to impose that.

16           THE COURT:  All right.

17           MS. SCHESNOL:  Very briefly, Your Honor, because,

18   as you noted, we have laid this out extensively in ECF 81,

19   at pages 24 through 26.  But just in response, this is not

20   about Mr. Gillespie's world view.  This is -- that is not

21   laid out as a basis for why 3C1.1 applies here; it has to do

22   with Mr. Gillespie's false testimony at trial.

23           And one of the examples that we give is -- has

24   nothing to do with whether or not he planned to go to the

25   Capitol in advance or not.  It's all the things -- the other

1       things that we have laid out in our sentencing memo.

2               And just to highlight, I think the one that is the

3       most egregious -- and I don't use this word often, but I

4       think it applies here -- the most preposterous is

5       Mr. Gillespie claiming that he thought the Capitol was empty

6       and that he was willing to push and, when that didn't work,

7       rush, and, when that didn't work, pull police officers out

8       of the way to get into the Capitol to protest in an empty

9       building when he had never protested before any other

10      election that he thought that he didn't agree with the

11      outcome or any other time or place in regard to the 2020

12      election; that -- that that is a preposterous claim and,

13      again, for me, basically the most offensive of the things he

14      said on the stand that the government asserts was false

15      testimony and why we believe that 3C1.1 applies here.

16              Thank you.

17              THE COURT:  Well, are you getting close, then, to

18      asking me to find that he lied when he denied knowing that

19      the certification of the Electoral College results were

20      occurring that day?  I mean, because there was a hung jury

21      on that.

22              I mean, the use of acquitted conduct, the

23      Sentencing Commission is considering that right now, whether

24      they're going to change the guidelines on it.  We have some

25      judges on the D.C. Circuit who have raised questions about

1    use of acquitted conduct at sentencing.  You know, with all

2    of the very complex policy ramifications from that, I think

3    district court judges would be well served to sort of stay

4    away from acquitted conduct until all of this gets fleshed

5    out into how it can be used or not.

6            Even earlier, in the arguments today, on another

7    issue, you argued use of preponderance of the evidence

8    standard of 1512(c), which the jury hung on.  And is that

9    what you are asking me to do here, is to find that his

10   denial that he knew that the certification of the Electoral

11   College vote was going on in the Capitol on January 6 was

12   unbelievable?

13           MS. SCHESNOL:  I am, Your Honor.  I found it

14   unbelievable.

15           THE COURT:  Even though the -- I mean, 11 of the

16   12 jurors would have voted to convict on that count, but

17   there was one holdout.  So I don't have a conviction on that

18   count.  It's not acquitted conduct, but it was a hung jury.

19   And why should I use -- I mean, do I need to use that here?

20           I mean, it was incredible given his educational

21   level, given -- I mean, I think Mr. Watkins has used the

22   term in things that he's interested in he gets "obsessive

23   interest" in it.  He had information about Washington, D.C.

24   that was found during the discovery of -- you know, when the

25   search warrant was executed at his house.  It is incredible

1    that he didn't know what was going on at the Capitol, but

2    there was one jury holdout on that.  So it's not -- there is

3    no conviction on that here.

4            But there are other things that he stated during

5    his testimony to carefully, smartly work around, in terms of

6    what he knew, what he recognized, overshared some things

7    where it might not, to his mind, hurt him, but carefully

8    thread that needle as only a very smart man can do -- and

9    successfully, because he had one jury holdout.  If they had

10   continued -- well, he had one jury holdout.

11           But do I need to rely on that incredible denial?

12           MS. SCHESNOL:  We don't need to.  That was just

13   one of many.  And Your Honor is correct, that was not an

14   acquittal; the jury did hang.  Certainly, at trial, the

15   burden is beyond a reasonable doubt versus applying

16   sentencing enhancements, preponderance of the evidence.

17           But also, as Your Honor very wisely noted, that

18   this intelligent man did thread a needle.  Also, especially

19   when it came to describing that AP video and exactly what he

20   meant about going in and occupying the Capitol.  He said on

21   the witness stand:  Oh, I didn't mean today, I meant someone

22   else at a future point in time, which I also will use the

23   word "preposterous" with regards to that, in addition to all

24   of the other examples laid out in the sentencing memorandum.

25           So based on many things that Mr. Gillespie said on

1    the stand that the government asserts were false, any one of

2    a number of those and/or a combination of them does lead us

3    to the 3C1.1 being applicable here.

4            THE COURT:  All right.  Mr. Watkins, it's your

5    objection, so I will give you an opportunity to reply, if

6    you would like.

7            MR. WATKINS:  No.  I have nothing further to say,

8    Your Honor.

9            THE COURT:  Okay.  Thank you.  That's perfectly

10   fine, to have nothing further to add to briefing that has

11   been very extensive.

12           All right.  I am prepared to rule on this defense

13   objection to the two-level enhancement for providing false

14   testimony at trial.  Just to be clear, as to the standard of

15   proof the government must meet for this sentencing

16   enhancement, the defendant has withdrawn his assertion in

17   reliance on the D.C. Circuit's decision in *U.S. v Montague*

18   from 1994 that the clear-and-convincing standard applies

19   when considering an obstruction of justice adjustment based

20   on the defendant's testimony.

21           After an amendment in 1997 to the guidelines, the

22   D.C. Circuit has made clear that no heightened standard of

23   proof applies and the default preponderance of evidence

24   standard is used to evaluate application of the guideline at

25   3C1.1.  See, for example, *U.S. v Dozier*, a D.C. Circuit case

1    from 1998; *U.S. v Smith*, a D.C. Circuit from 2004; and

2    *U.S. v McCoy*, a D.C. Circuit case from 2001; and *U.S. v*

3    *Irving*, which is 593 F.Supp. 2d, jump cite 141, a

4    D.D.C. case from 2009.

5            So with the government's burden established, I

6    will address the testimony at issue.  The PSR and the

7    government recommend a two-offense-level increase under the

8    guideline at 3C1.1 for obstruction of justice because the

9    defendant provided materially false testimony during his

10   trial on three topics:  Of the defendant's pulling of

11   Sergeant Riley's arm, the defendant's attempting to help an

12   officer in the tunnel, and defendant's belief that he

13   thought he could lawfully be in the tunnel at that time.

14           The defendant argues his testimony in all three

15   topics does not meet the burden that he provided false

16   testimony.

17           Convictions for conduct related to the above

18   areas, particularly regarding defendant's assault and

19   physical violence convictions, does not mean that every time

20   a defendant is convicted after a trial he gets an

21   offense-level increase under the guideline at 3C1.1 for

22   obstruction by providing materially false testimony.

23           The Supreme Court has explained, quote, Of course

24   not every accused who testifies at trial and is convicted

25   will incur an enhanced sentence under Section 3C1.1 for

1    committing perjury.  As we have just observed, an accused

2    may give inaccurate testimony due to confusion, mistake, or

3    faulty memory.  In other instances, an accused may testify

4    to matters such as lack of capacity, insanity, duress, or

5    self-defense.  Her testimony may be truthful, but the jury

6    may nonetheless find the testimony insufficient to excuse

7    criminal liability or prove lack of intent.  See *U.S. v*

8    *Dunnigan*, 507 U.S. 87, jump cite 95, from 1993.

9            Here, the Court easily finds that the

10   preponderance of evidence standard is amply met that the

11   defendant was untruthful at trial with respect to material

12   matters in this case, and testified untruthfully about

13   material matters that were designed to substantially affect

14   the outcome of the case.

15           As a consequence, the Court concludes that the

16   false testimony at trial warrants an upward adjustment by

17   two levels.  I will address each of the three topics on

18   which the defendant asserts he did not give materially false

19   testimony at trial in turn.

20           First, his pulling of Sergeant Riley's arm.  Trial

21   Exhibit 702 clearly shows the defendant pulling Sergeant

22   Riley from his fellow officers out of the police line

23   towards the angry mob.  Sergeant Riley is pulling back,

24   showing he did not want to get any closer to the mob.

25   Sergeant Riley also testified at trial that, as the

1    defendant pulled him towards the crowd, he feared for his

2    life for the first time in his 20-plus years as an officer.

3    The defendant was standing between the officers and the

4    crowd, and there was nowhere he could have been pulling

5    Sergeant Riley towards other than into the crowd.

6         The defendant also knew that the crowd was

7    violent.  As he pulled Sergeant Riley, an individual was

8    actually hitting Sergeant Riley with a crutch.  It was

9    clearly defendant's intent to pull Sergeant Riley away from

10   the officers into the crowd, and his contrary testimony was

11   simply not credible.

12        Second, defendant makes a spurious claim to have

13   helped an injured officer while in the tunnel.  Trial

14   Exhibit 903 shows the defendant forcing himself deeper and

15   deeper, and deeper into the wall of officers.  It does not

16   show him assisting any officer.  Rather, the video shows him

17   pushing against the officers, along with other attackers,

18   trying to breach the police line and get inside the Capitol

19   Building.

20        He is not yelling for help, nor is he standing

21   next to or near an officer yelling for help.  Rather, he is

22   surrounded by other individual rioters, pushing their weight

23   against officers to force entry into the lower west tunnel

24   doors.  His contrary testimony was not credible.

25        Third, the defendant stated his belief that he was

1    permitted at that location in the tunnel.  The police line's

2    actions witnessed by the defendant clearly indicate he was

3    not permitted at that location or anywhere near the tunnel.

4    Not only were sirens blaring all around, but he sustains

5    hits from police batons, sprays of pepper spray and OC

6    spray.  He sees the line of officers six deep guarding the

7    tunnel entry.  He sees all of the police shields, which

8    should have been a clear sign to him he was not permitted at

9    that location.  And he actually realizes that the only way

10   to break in was to have gotten the mob to push even harder

11   against the officers, and he reports as such in an interview

12   with AP news later that afternoon when he says, basically,

13   essentially -- I am paraphrasing:  If there were only more

14   people, we could have broken through that line and gotten

15   into the building.

16          The defendant's objection that the enhancement at

17   Section 3C1.1 should not apply to him is overruled.  He will

18   receive a two-level enhancement for obstruction of justice

19   for his perjurious testimony during trial.

20          Okay.  Now, with those objections resolved, I will

21   now review how the guidelines apply to this defendant.

22          The three counts to which the guidelines apply --

23   Counts 1, 2, and 5 -- are grouped together under the

24   guideline at 3D1.2(b) for the purpose of calculating the

25   relevant offense level.  So that the offense level

1    applicable to the group is driven by the count that results

2    in the highest offense level.  Here that is Count 1,

3    assaulting an officer.

4            The guideline at Section 2A2.2(a) applies to

5    Count 1, charging assaulting, resisting, or impeding certain

6    officers.  And this guideline provides a base offense level

7    of 14 under 2A1.2(a).

8            Four offense levels are added for the defendant's

9    use of a dangerous weapon, under the specific offense

10   characteristic at 2A2.2(b)(2)(B).

11           Six offense levels are added because the conduct

12   was towards an official victim, and the applicable Chapter 2

13   guideline is from Chapter 2, Part A, under the guideline at

14   Section 3A1.2(b).

15           Two offense levels for obstruction of justice are

16   added because the defendant provided materially false

17   statements under oath during his trial testimony, under the

18   guideline at 3C1.1, resulting in a total offense level of

19   26, which, in combination with his Criminal History Category

20   of I, produces an advisory guidelines range of 63 to 78

21   months.

22           For Count 5, which is a Class A misdemeanor, the

23   maximum sentence that may be imposed is 12 months based on

24   the statute of conviction, at 18 U.S.C. Section 1752(a)(4).

25           And for Count 7, which is a Class B petty offense

1    misdemeanor, the maximum sentence to be imposed is six

2    months, under 40 U.S.C. Section 5104(e)(2)(F).

3          The defendant is also subject to a supervised

4    release range following imprisonment of one to three years

5    under 18 U.S.C. Section 3583(b)(2); and to an advisory

6    guideline fine range of 25,000 to $250,000; a special

7    assessment of $100 for Counts 1 and 2 each, $25 for Count 5,

8    and $10 for Count 7, for a total of $235.

9          All right.  Before I turn to the third step of the

10   hearing, are there any objections not already noted for the

11   record to this guideline determination from the government?

12         MS. SCHESNOL:  No, Your Honor.

13         THE COURT:  And from Mr. Watkins?

14         MR. WATKINS:  No, Your Honor.

15         THE COURT:  All right.  So now we're at the third

16   step of the hearing where I will start with the government

17   just to lay out the different sentencing recommendations.

18         At the outset, the government here recommends 87

19   months' incarceration, 3 years of supervised release, a fine

20   of no less than $5,000, and a mandatory $235 special

21   assessment.

22         The probation office recommendation is 78 months'

23   incarceration, which is actually -- well, the government's

24   recommendation of 87 months is now over the guideline upper

25   range as I have determined of 78 months.  The probation

1    office's recommendation of 78 months is actually just at the

2    highest end of that guideline.

3              The probation officer also recommends two years of

4    supervised release, also a $5,000 fine, and a mandatory 235

5    special assessment.

6              And the defendant recommends 30 months'

7    incarceration -- well, which I think has now been changed

8    with your most recent filing to something other than 30

9    months, which was --

10             MR. WATKINS:  Yes.  Given the Court's rulings, I

11   am back to 30 months.  Thank you.

12             THE COURT:  All right.

13             -- two years of supervised release; and a

14   restitution order commensurate with that levied in similar

15   cases, which is $2,000 for felony offenses, that's the

16   standard amount the government has been requesting; and no

17   fine.

18             I think what -- the fine amount that the

19   government is asking for here -- the restitution amount is

20   $2,000?

21             MS. SCHESNOL:  Yes, Your Honor.  That's correct.

22             THE COURT:  All right.  So those are the -- that's

23   sort of the lay of the different recommendations.

24             So I will ask the government to go first, then I

25   will turn to Mr. Watkins.  And then, Mr. Gillespie, it will

1    be your opportunity to say anything, if you wish.

2              Ms. Schesnol.

3              MS. SCHESNOL:  All right.  Thank you, Your Honor.

4              "Fun," "exciting," "enjoyable," those are the

5    words that defendant Gillespie used at trial to describe the

6    events of January 6th.

7              It wasn't fun for the officers guarding the

8    Capitol.  It wasn't exciting for the lawmakers hiding

9    inside.  And it wasn't enjoyable for Sergeant Riley, who the

10   defendant tried to yank out into the tunnel to the awaiting

11   mob.

12             The officers who were in the lower west terrace

13   tunnel described the attack as nothing short of brutal and

14   medieval.  Many officers were injured, bleeding, and

15   fatigued, but they continued to hold the line.

16             Detective Sergeant Mastony, who is here in the

17   courtroom today and whose body-worn camera was admitted at

18   trial as Exhibit 703, described at another trial, under oath

19   subject to cross-examination -- the tunnel as being clogged,

20   shoulder to shoulder.  But he knew as long as the police

21   stayed in that location the rioters couldn't get past and

22   into the Capitol.  Despite the hours of hand-to-hand combat,

23   the police held that entrance.

24             Sergeant Mastony was in the tunnel at the same

25   time that the defendant was there.  He testified in the

1    other trial that he was completely exhausted.  He was hit in

2    the head with a crutch causing a large bruise.  The skin all

3    over his body burned for days, he couldn't even put in his

4    contact lenses.  He testified he worked until 1 a.m., trying

5    to figure out all of the various injuries.  But the next day

6    he went to work, and only half of his platoon could show up

7    due to their injuries.

8         Officer Mustafa Ak, who is also in the courtroom

9    today, testified at our trial.  You might recall, Your

10   Honor, he actually grew emotional on the witness stand as he

11   testified about his experience in the tunnel on January 6th.

12   And when he saw the image of himself that he had taken, the

13   selfie in the bathroom with the wet paper towels around his

14   neck trying to alleviate the burning on his skin, he got

15   emotional, understandably.

16        He described the officers as trying to hold down

17   the tunnel by physically fighting with whatever they had.

18   And the rioters were fighting with whatever they had,

19   punching officers, kicking, throwing unknown liquids,

20   spraying with unknown chemicals and fire extinguisher.  He

21   went on to describe the rioters using wooden objects, metal

22   pieces, and shields, anything they can get their hands on.

23        He also testified that, by the end of the day, he

24   was very tired, very sore; he had back pain.  And he

25   testified that what happened affected him emotionally.  He

1    was scared and worried about what happened at the Capitol on

2    January 6th.

3              And Sergeant Riley, who is also here in the

4    courtroom today, he testified, as Your Honor noted, that he

5    knew if he was pulled into the crowd that he would be in a

6    very bad position.  He feared he could be killed.  He

7    testified that the time the defendant held his arm felt like

8    an eternity.

9              Looking at what the government has submitted as

10   Sentencing Exhibit 2, it was not used at trial, you can

11   actually see Sergeant Riley within seconds of the

12   defendant's assault -- you can see Sergeant Riley coming

13   back into the Capitol and sort of walking unsteady,

14   staggering, holding his hands up, almost as though he wants

15   to touch his eyes but knows that he cannot because of the

16   chemicals all over him.  Sergeant Riley comes into the

17   tunnel [sic] while the defendant is still out in the tunnel

18   committing his ongoing crimes and attempts to get in.

19             We have all done a lot of sentencings, and we

20   often hear all about the defendant and their background and

21   they are personalized.  But the officers sitting in the

22   courtroom today and all of the officers in the tunnel,

23   they're persons too; they have families too.  They were

24   affected by this.  And while so many of them have a really

25   hard time coming to court -- they won't use the word

1    "victim" to call themselves that, but they're humans, too,

2    that were affected by this.

3            Sergeant Riley testified he had been a college

4    student, U.S. Marine Reserves, he has been with MPD for

5    28 years, a sergeant for 25.  He testified he works a lot of

6    protests and rallies; but January 6th was like none other.

7            He responded to a citywide distress call.  He was

8    first on the west plaza until MPD had to relocate to higher

9    ground, which was the tunnel.

10           He did not leave the Capitol that day until

11   sometime between 11 p.m. and midnight.  He went home,

12   battered and bruised, covered in chemical spray, head

13   hurting from the crutch that hit him, and his hands -- I

14   believe he used the word "busted up."  But the next day he

15   returned to work at 6:30 in the morning.

16           The first time that I met Sergeant Riley in

17   February of 2022, to find out if he was the officer on the

18   video -- we watched videos, several of them.  I asked him:

19   How did you go on that day?  Just physically, how did you

20   fight for hours and hours?

21           And I never will forget.  He said to me:  What

22   choice did we have?  What choice did the officers have that

23   day?

24           As we sit here over two years later, with the

25   Capitol just steps from where we are, Officer Ak, Sergeant

1    Riley, Detective Sergeant Mastony, and hundreds of other

2    officers not only protected the Capitol from -- and the

3    people inside, they protected our very democracy.  My

4    informed guess is, they would not call January 6th fun,

5    enjoyable, or exciting, as the defendant called it.

6         Today we are here to deal with a violent crime

7    against law enforcement officers and the democracy they

8    risked to defend on January 6th.

9         The government still believes that the appropriate

10   sentence is 87 months.  And we believe that's appropriate

11   both under the 3553(a) factors, which I will address, as

12   well as even under the guidelines.

13        We understand the guidelines, as the Court has

14   calculated them.  But the Court has additional options for

15   upward departures under the 5K, specifically, we believe,

16   5K2.7 and 5K2.21 can apply here as well.

17        Turning to the 3553(a) factors, the nature of the

18   offense, Your Honor knows -- we know you have presided over

19   many trials and many plea agreements, and you have seen a

20   lot of evidence.  But it is still just shocking to think

21   about --

22        THE COURT:  You do realize that for a variance I

23   don't have to give presentencing notice.  But if I am going

24   to rely on a departure -- and I have always wondered why the

25   government doesn't look to 5K2.7 for, you know, disrupting

1    and the government function for an upward departure --

2    there's been no notice of that given.  I don't think 5K2.7

3    has been mentioned anywhere in any of this very extensive

4    briefing, so it's a little difficult for me to rely on an

5    upward departure.

6            MS. SCHESNOL:  We understand, Your Honor.

7            THE COURT:  But I know you didn't know exactly how

8    I was going to do the guideline determination since the

9    briefing was coming in up until last night.

10           But just future reference, 5K2.7 seems well

11   designed for January 6th cases, but in none of the cases I

12   have had has the government ever brought it up.

13           MS. SCHESNOL:  You are correct, Your Honor.

14           And to be abundantly truthful, that was my error.

15   I pointed those out to the probation officer in calculating

16   the sentencing guideline, and then it was my error not

17   including it in -- in my briefing.  Certainly, a lesson

18   learned for future reference.

19           But still -- we can still get to 87 months

20   pursuant to the 3553(a) factors, the nature of the offense.

21   Most of us watched either --

22           THE COURT:  Well, let me just pause you there

23   because I was curious.  I mean, because I understand that

24   the 87-month recommendation that you originally made was

25   predicated on when the sentencing range, as set out in the

1    PSR, was 78 to 97 months; and you were pointing to a

2    midpoint of that estimated sentencing range.  With the

3    sentencing range at -- and the probation office was

4    recommending something at the bottom of that estimated

5    range.

6         With the range now at 63 to 78, you are asking for

7    an upward departure.  That can't be a departure because

8    nothing has been noticed, which can piggy-back on the

9    guideline departures, but why aren't you just suggesting a

10   midpoint of the new range of 63 to 78 months.

11        MS. SCHESNOL:  Because, Your Honor, under the

12   3553(a) factors we believe that the 87 months is still

13   appropriate.  And what I will get to in a moment is also,

14   certainly, in line with other sentences that have been

15   imposed.  So one of the factors is avoiding an unwarranted

16   sentencing disparity, which I can cite to some those cases

17   as we go through these chronologically.

18        So the nature of offense, as most of us watched

19   either in realtime or afterwards, the likes of which really

20   are still hard to believe actually happened in this country.

21   We'd expect to see things like this in a third-world banana

22   republic; but just steps from where we sit, our Capitol was

23   under attack.

24        We watched in horror; Mr. Gillespie wanted to get

25   closer to it.  He talked about at trial, every step was a

1    landmark accomplishment to -- as a goal to get closer and

2    closer.  He was drawn to the violence in the lower west

3    terrace tunnel.  And his attacks were not made in isolation,

4    they were made in conjunction with other rioters coming at

5    the police in that tunnel.  They had been fighting the

6    police -- rioters had been fighting the police for hours.

7    And every defendant, every member of the mob that attacked

8    officers made it harder for them to defend themselves,

9    increase the chance that other rioters would succeed in

10   their attacks; as we know happened with Sergeant Riley, he

11   couldn't protect himself so someone using a crutch was able

12   to hit him over the head.

13         Even though the defendant in this case didn't get

14   inside the Capitol, it certainly wasn't for lack of trying.

15   His own testimony was he tried to push the police; when that

16   didn't work, he tried to rush the police; and when that

17   didn't work, he tried to pull them out.

18         For all of the police that were guarding the

19   Capitol at the lower west terrace tunnel, that took them

20   away from protecting what was going on inside the Capitol

21   where lawmakers' staff were completely under siege.

22         Judge Moss noted, in a sentencing of Defendant

23   Paul Hodgkin's, quote, Because the defendant's actions and

24   others on that day, the members of the United States

25   Congress were forced to flee their respective chambers in an

1    extraordinary event under any circumstances.  It was the

2    mob's objective to stop the constitutional statutory duty to

3    declare the person elected president, and the mob was

4    prepared to break the law to prevent Congress from

5    performing its constitutional duty.

6         Democracy requires cooperation of the governed.

7    But the mob that day damaged -- the damage caused by the

8    defendant and others goes long beyond the several-hour delay

9    of the certification that occurred on January 6th; it is a

10   damage that will persist in this country for decades.  And

11   the gravity of this offense should be met with the

12   imposition of an 87-month sentence.

13        The characteristics of the defendant.  He is a

14   grown man.  He knows better.  He is a smart man.  He knows

15   better.

16        He points out in his memo he didn't conspire with

17   others.  Well, that has been accounted for; he was not

18   charged with a conspiracy.  He points out that he didn't

19   come with weapons or protective gears -- protective gear,

20   but that doesn't change the crimes he committed once it

21   became possible for him to commit those crimes.

22        There are people who came to the Capitol with

23   protective gear and weapons.  Some of them used those

24   weapons, but not all.  Some people who came with protective

25   gears didn't engage in assaultive conduct.

1          As Your Honor may remember, Defendant Erik Herrera

2     came with a bulletproof vest, a respirator face mask.  He

3     didn't assault any officers.

4          The defendant points out in his sentencing memo

5     that he didn't post on social media before or after the

6     assault as some people did.  But the defendant also claims

7     that he doesn't use social media at all, so I don't see how

8     that weighs in his favor that he didn't post anything on

9     social media.

10          He points out that he has been compliant on

11    pretrial release; he has been.  He did what was required of

12    him, and that served to keep him out of pretrial custody.

13          He has letters in support of him from family.  One

14    says he has never been aggressive.  Another says:  He would

15    never hurt anyone, and he is not violent in any way.  Either

16    these individuals have not seen the evidence that was

17    presented at trial or they're idea of aggressive and violent

18    is very different than most of ours.

19          The letters describe him as kind and caring.  He

20    did not act kind nor caring on January 6th at the

21    United States Capitol.

22          But who did demonstrate those characteristics and

23    qualities?  The lawmakers and their staff who hid for hours

24    on end as the riot ensued and still had the bravery and

25    courage to reconvene late that night and go into the wee

1    morning hours of the next day to ensure that we could --

2    that we, as a people, could go forward with our democracy

3    and the Electoral College votes could be counted.

4              The janitorial staff, they were cleaning up the

5    mess that the rioters made at the U.S. Capitol and the

6    damage that was caused, millions of dollars of damage

7    caused --

8              THE COURT:  Let me just pause on the damages.

9              I understand that it's really hard to figure out

10   damages other than the $2,000 in restitution.  But this is a

11   case where the government has asked for a $5,000 fine when

12   the guideline recommends, as an advisory basis, a fine I

13   think that starts at 25,000.

14             So why is it that the government is eschewing the

15   advisory guideline range here?

16             When I look at the PSR and the personal history

17   and the financial background of this defendant who hasn't

18   had to work one day -- one day -- for 20 years?  He has

19   lived off inheritances.  And while living off inheritances

20   from his parents, he has been litigating for almost 20 years

21   against his stepmother to get more inheritance.  His counsel

22   argues that he lives frugally, but he has got cars, he has

23   got a house.  Although that's a little bit strange because

24   it's not in his name.

25             So why can't a guy who hasn't had to earn income

1    for 20 years, who owns multiple cars, a house in

2    Massachusetts, which is not an inexpensive place to live is

3    my understanding, able to travel to D.C. because he doesn't

4    have any other obligations to work -- why can't he pay more

5    of a fine that's greater than $5,000 at the guideline

6    minimum?

7            He has not submitted a net worth statement or a

8    monthly cash flow.  He has not provided any documentation --

9    declined to provide any documentation as to his income, his

10   assets, his debts, his liabilities.  He won't even consent

11   to disclosure of any credit reports.  So I am left with

12   defense counsel's representation that he lives frugally.

13           He couldn't get dressed in a suit today for court

14   at his sentencing.  He looks very relaxed.  Hasn't earned a

15   cent for 20 years.

16           Why can't he at least pay the minimum fine?

17           And so I was interested to see that the government

18   is only asking for a $5,000 criminal fine.

19           MS. SCHESNOL:  Just to be clear, Your Honor, we

20   asked for no less than $5,000.  And Your Honor may certainly

21   impose upwards of that.

22           Part of the reason that the government was not

23   more assertive or aggressive with regard to the fine was

24   because the government so rarely asks for a fine.  But we do

25   believe one is appropriate in this case.  And, again, we

1    said no less than 5,000, so --

2            THE COURT:  Okay.  Well, thank you for that

3    clarification.

4            MS. SCHESNOL:  And we certainly -- I agree with --

5    the government agrees with everything Your Honor has stated

6    about the defendant.

7            I would add, which I -- which is in the

8    presentence -- I'm sorry, the government's sentencing memo,

9    the defendant also would not give a financial statement at

10    his initial appearance, which allowed him to receive

11    court-appointed counsel.

12            THE COURT:  And he had three lawyers at trial.

13            MS. SCHESNOL:  Correct.  So a fine -- a hefty fine

14    would certainly be appropriate in this case, we definitely

15    agree with the Court with regard to that.

16            THE COURT:  All right.

17            MS. SCHESNOL:  So back to the characteristics of

18    the defendant.

19            Again, we have all done a lot of sentencings.  And

20    this defendant is not a typical defendant, maybe for --

21    maybe for January 6th cases, but not in -- not for other

22    cases that we see in this courthouse and other courthouses

23    across the country.

24            Usually we see defendants who never had to support

25    a family, good role models, an opportunity at education, an

1    opportunity at an honest living.  But Mr. Gillespie did have

2    all those things, so he did know better than to commit the

3    crimes he committed on January 6th.  And I think that is --

4    that makes him, I think, especially dangerous because he

5    knew better and did it anyway.

6         I don't know what Mr. Gillespie will get up here

7    and say, if anything, to Your Honor.  In most of the

8    sentencings where I have represented the government in

9    January 6th cases, defendants -- at the time of sentencing,

10   and usually only at the time of sentencing -- claim to be

11   remorseful and regretful.  I don't know if he will say that

12   to you now; but if he does, the government would submit that

13   that simply is not true.

14        At trial, he was indignant about the way he was

15   treated on January 6th.  He used that word more than once.

16   That's not my word.  He used the word "indignant."

17        THE COURT:  I well remember.

18        MS. SCHESNOL:  He also talked about that he felt

19   like people were maybe boosting his ego, like maybe he did a

20   good thing.  And when he was asked what was his sense of

21   emotion, a strong sense of indignation:  I got whacked on

22   the head three times, maybe more than three times.  It

23   seemed uncalled for.

24        Who wants to get whacked in the head?  I agree.

25        I bet Sergeant Riley didn't want to get whacked in

1    the head with a crutch.  We have testimony from Detective

2    Sergeant Mastony that he also got whacked in the head with a

3    crutch that day.  We heard from Officer Ak that -- that he

4    and other officers were hit with all kinds of objects by the

5    rioters.

6         And yet, the defendant has the chutzpah to be

7    indignant about him being hit while the police were tying to

8    get rioters out of the tunnel, which is technically part of

9    the Capitol, who were trying to get in.  The police, who

10   thought -- who several of them thought that was the only

11   entrance and the last stand at keeping rioters out.

12        The defendant tries to minimize his conduct in his

13   sentencing memo by saying he was mimicking others in the

14   crowd.

15        He was the one assaulting police.  He is not

16   taking responsibility or demonstrating any remorse.  He is

17   trying to deflect responsibility.

18        To promote seriousness of the offense and respect

19   for the law.  Everything about the defendant's actions on

20   January 6th defied the law.  These were voluntary actions

21   that he committed, and then he is indignant about how he was

22   treated.

23        We have already talked in the sentencing

24   guidelines about how he -- as a smart man, very carefully

25   threaded a needle with regard to his testimony about what he

1    did and didn't do that day; and the government submits that

2    that, too, is a showing that he does not have respect for

3    the law, that he would take the witness stand and give false

4    testimony.

5         In his sentencing memo, the defendant says

6    officers didn't sustain injuries; that's simply not true.

7         His attack allowed other rioters to assault

8    officers.  The mob that acted in concert was able to inflict

9    physical injuries.  And we know from officers -- and

10   directly Officer Ak testified about the emotional toll this

11   has taken on them.  All of the officers in the tunnel were

12   exhausted from fighting for hours, and all injuries are not

13   visible.

14        Your Honor stated in -- when sentencing Defendant

15   Rubenacker:  Dissatisfaction with our country's legitimate

16   and peaceful avenues for expression of discontent don't give

17   citizens license to disobey the law and overthrow

18   democratically elected governments.

19        We agree.  And we believe a sentence of 87 months

20   is appropriate.

21        The recommended sentence will provide both

22   specific and general deterrence.  If Defendant Gillespie is

23   not sentenced commensurate with the gravity of his crimes,

24   what message will that send?  What message will that send to

25   him?  And what message will that send for general

1   deterrence?

2          The message will be:  If you have the benefit of a

3   good upbringing and every advantage to succeed, then you can

4   commit serious acts of violence and suffer mild

5   consequences.

6          As I already stated, I think what makes

7   Mr. Gillespie especially dangerous and why he needs this

8   specific deterrence is that he was indignant about how he

9   was treated at trial.  The fact that he does have members of

10  his family who support him and all kinds of other

11  opportunities and yet, instead of taking advantage of them,

12  he committed crimes on January 6th that are abhorrent and

13  doesn't seem to appreciate the gravity of.

14         Again, he says in his sentencing memo he was

15  mimicking others.  That's not true.

16         There were 25 to 30,000 people that went to the

17  United States Capitol on January 6th, they didn't all

18  assault police officers.  They didn't all attempt to get

19  into the Capitol.  He is a grown man trying to deflect

20  responsibility.

21         Mr. Gillespie does not strike me as the type of

22  person who is inclined to follow others.  He has a mind of

23  his own, and he blazes his own path.

24         At his inauguration, President Reagan said:  In

25  the eyes of many in the world, this every four-year ceremony

 1    we accept as normal is nothing less than a miracle.

 2              And without a sentence to deter Gillespie and

 3    others, this miracle will be harder and harder to achieve,

 4    and this miracle will become more and more tarnished.

 5              Finally, to avoid unwarranted sentencing

 6    disparities -- again, thousands of people came to

 7    Washington, D.C., on January 6th, but they didn't all go to

 8    the Capitol.  I think there were over a million people that

 9    went to former President Trump's rally.  Of those who went

10    to the Capitol, they didn't all assault police officers or

11    try to go inside.

12              Again, Mr. Gillespie was drawn to the tunnel,

13    drawn to the violence.  Instead of being horrified, he got

14    closer and closer to it.

15              The government sets out in its sentencing memo

16    comparable cases of why we believe an 87-month sentencing is

17    appropriate.  And in the defendant's various memorandum,

18    they largely set out cases that were resolved by way of plea

19    agreement.

20              We do look to the conduct, of course, but we do

21    also -- we do look to the sentencing guidelines.  And

22    Mr. Gillespie's sentencing guidelines are higher than many

23    people who pled because those people received two, more

24    often, three levels off for acceptance of responsibility.

25    And they -- people who did not go to trial and then take the

1    stand and provide false testimony did not receive the

2    adjustment of the two-level enhancement.

3         Mr. Gillespie made a series of choices on

4    January 6th that at any time he could have turned back, but

5    he kept going forward.  He kept going closer to the

6    violence.  And in the thick of the combat, he made the

7    choice to engage in assaultive conduct on the police, the

8    people inside the Capitol, and our very democracy.

9         In Detective Sergeant Mastony's testimony in the

10   other trial, which has been submitted to Your Honor, I was

11   nearly brought to tears when I read that he felt that there

12   was a failure that day because he thought that the lower

13   west terrace tunnel was the only point of entry and he did

14   not realize that the Capitol had already been breached.  But

15   what we know, Your Honor, from -- supported by the record

16   because United States Capitol Police Officer Mark Gazelle

17   testified -- that that lower west terrace tunnel, that is a

18   pivotal area of the Capitol that then leads to every other

19   part of the tunnel -- into the Crypt, up the stairs to the

20   Rotunda, spiders out to the tunnels that lead to office

21   buildings.

22        The fact that officers held the tunnel on

23   January 6th was victorious and it was heroic, and it kept

24   thousands of people from gaining entrance to the tunnel, and

25   it was anything but a failure.

1           We saw testimony -- excuse me, an exhibit in

2    trial, and you also have it as Sentencing Exhibit No. 1,

3    where Commander Ramey Kyle said:  We are not losing the

4    Capitol today.  And they didn't.

5           They saved the Capitol, but that wasn't for lack

6    of Defendant Gillespie and others like him trying.  For

7    that, the defendant should be sentenced to a significant

8    fine, the mandatory special assessment of $235, 3 years of

9    supervised release, and 87 months in prison.  Thank you.

10           THE COURT:  Thank you.

11           We're going to take a five-minute break.

12           My court reporter has been working diligently

13    since 9 a.m.

14           (Whereupon, a recess was taken.)

15           MS. SCHESNOL:  I'm sorry.  I just neglected to

16    formally ask to move the exhibits that we submitted in

17    conjunction with sentencing into evidence.  I understand

18    that all -- all but two were trial exhibits, but I would ask

19    that they be moved into evidence.

20           THE COURT:  Okay.  Thank you.

21           Any objection?  No.

22           I've looked at them.  Motion granted.

23           Sorry for the interruption, Mr. Watkins.

24           MR. WATKINS:  Thank you.

25           Two takeaways from Ms. Schesnol's presentation.

 1    One is, there may be some confusion that I am asking for

 2    probation on the part of Mr. Gillespie; I am not.

 3    Various --

 4            THE COURT:  I don't think she was saying that at

 5    all.

 6            MR. WATKINS:  It was talked about holding him

 7    accountable, it was talked about -- those kinds of issues

 8    there.

 9            It is a significant sentence for a 62-year-old man

10    I am requesting from the Court of 30 months; and it is a

11    sentence that is sufficient under all of the factors under

12    3553(a).

13            The D.C. Circuit courts are in somewhat of a

14    unique position here that you have developed a very robust

15    common law of sentencing in these January 6th cases that can

16    be drawn upon for purposes particularly of 3553(a)(6), which

17    is the need to avoid to unwarranted disparities.

18            I know we have both -- I know I have gone in on a

19    lot of cases, and I know the Court studies all of the cases

20    quite a bit, so I am not going to go into any more detail

21    than I did there.

22            Ms. Schesnol faulted me in the sentencing

23    memoranda to talk about social media posts and some of the

24    other things that were going on here.  The reason I went

25    into that, and I think it's clear from the memo, is that

1    there are trend lines and themes about how defendants are

2    sentenced in January 6th cases quite apart from the

3    guidelines.  There are some guideline sentences here but, of

4    course, that still doesn't absolve the Court from

5    determining whether there is unwarranted disparity here.

6        So some of the trends and themes I see in the most

7    serious of sentences is preparation and planning; we simply

8    don't have that from Mr. Gillespie's case, really not any

9    indicia whatsoever.  We don't have the kind of encouragement

10   and coordination that we see in some of the most serious

11   players in the January 6th riots.  We have no indication of

12   any kind of preparation, let alone weapons or tactical gear.

13       I mention these things because, again, these are

14   important considerations that all of the courts necessarily

15   are doing.  Someone who is planning for these kinds of

16   things are the most lethal, perhaps, when they come in.  A

17   person who is armed with a weapon coming in there is in a

18   very, very different state of mind and a very, very

19   different opportunity to be able to do injury to others.

20       THE COURT:  And I think you are raising good

21   points on some of these -- you know, some of these issues I

22   actually pointed out in my *Chrestman* decision dealing with

23   pretrial detention, planning, social media.  Because what

24   are we doing?

25       The same thing we're doing at sentencing we're

1    doing at pretrial detention, which is trying to assess,

2    totally a science -- totally not a science.  It's an art of

3    mere JDs -- not sociologists, not psychologists -- assessing

4    potential risk of future criminal conduct.

5         So some of these factors go into that assessment.

6    But you can also look at the offense conduct itself to make

7    some of those same assessments, a person who -- you know,

8    was just walking along and bumped into a police officer, so

9    had physical conduct -- maybe even had gotten aggressive

10   with language -- is a very different person in terms of

11   capability and the need for future deterrents of criminal

12   conduct for matters that he disagrees with, who engaged in

13   hand-to-hand combat with police officers over a sustained

14   period of time.

15        So let me just say that all of these factors, in

16   terms of how I look at it, are important in making that

17   assessment, but you don't need them when you can have --

18   look at offense conduct itself to say that's not somebody

19   who did a momentary lapse or a reaction.  You can look at

20   offense conduct of this defendant, the lower west tunnel,

21   Mr. Watkins, and say:  I don't need social media telling me

22   what a risk he poses and how he's thinking.  I don't need

23   tactical gear or weapons, and I don't need preplanning.

24        I can look to see what he did for hours on

25   January 6th and over sustained -- you know, I don't know how

1    long he was at the lower west tunnel.  You know, certainly

2    more than ten minutes; it was a sustained period of time.

3              MR. WATKINS:  Fifteen minutes.

4              THE COURT:  Fifteen minutes.  I mean, that's not

5    momentary, to make some the same evaluation.

6              MR. WATKINS:  And the Court is exactly correct.  A

7    person who got into the actual Capitol, maybe bumped into an

8    officer might have gotten four months or perhaps even

9    eight --

10             THE COURT:  A parading petty offense charge.

11             MR. WATKINS:  I'm sorry?

12             THE COURT:  A parading petty offense charge, and

13   so wouldn't be even facing these kinds of charges.

14             MR. WATKINS:  Yes.  That's right.  And, again,

15   that's not what I am asking for Mr. Gillespie.  There is an

16   increased punishment, it is not simply knocking into a

17   police officer.  But is it that much more in the scheme of

18   things as we compare what other people did?

19             For example, a person who has a PVC pipe who was

20   repeatedly hammering on the head of a police officer -- I

21   think we can all say that that is more serious than what

22   Mr. Gillespie did here, which is for -- you know, he was in

23   the tunnel for a total of 15 minutes; the portion with the

24   shield and the portion with Sergeant Riley, much less than

25   that.  I think the whole thing, maybe a minute and a half

1    there; the rest of it is him being in that scrum.

2          So I agree with the Court that the conduct itself

3    needs to be gradated when considering what the sentence

4    should be.  But what it's not is the kind of 87-month

5    sentence that gets doled out for people who actually

6    brought, planned, encouraged others to bring weapons to the

7    fight; and that is also something that the Court needs to

8    consider in that spectrum of sentences that it's -- as it

9    decides what is right for Mr. Gillespie.

10          I don't want to go too much in depth because it's

11    clear the Court has thought all of the same things that I

12    do.  Again, other than to emphasize I picked 30 months,

13    obviously, that's why we're here at sentencing.  People can

14    choose other sentences, and those would also be reasonable,

15    as the Supreme Court has repeatedly told us, as well as

16    the courts of appeal.  There are a lot of different kinds of

17    reasonable sentences.  But it is going to be --

18          THE COURT:  So when you ask for a 30-month

19    sentence, which is -- while the government is asking for an

20    87-month sentence, which is over the guideline range --

21    which now has a maximum of 6 -- 78, you are asking for 30

22    months, which is, like, half.  The minimum of the guideline

23    range is 63.  You are asking for a fairly significant

24    variance downward.  And the reason you are asking for a

25    downward variance is because he didn't engage in the

1    preplanning, didn't bring tactical gear or weapons, and he

2    didn't have social media, as I understood it.

3         Is that sort of the line of your argument for

4    support for variance?

5         MR. WATKINS:  The specific support would be the

6    need to avoid unwarranted disparity.

7         THE COURT:  And 3553(a)(6).

8         MR. WATKINS:  Six.  There are factors that go into

9    it, and the Court has linked some of the factors that would

10   go into it, in addition to the offense conduct.  All of

11   those things.

12        The offense conduct is, again, to avoid

13   unwarranted disparity.  I do not want to sentence

14   Mr. Gillespie to the same sentence that you would sentence

15   somebody who took a fire extinguisher and assaulted an

16   officer that way.  You wouldn't want to take --

17        THE COURT:  Well, I am not sure about that.  I

18   mean, you think that there is a big difference between a

19   fire extinguisher and a police shield; I am not so sure.

20        MR. WATKINS:  Well, the proof of the pudding is in

21   the eating.

22        I believe the officer was injured as a result of

23   that direct action of that particular defendant.  And that's

24   another thing that we see, is did this defendant himself --

25   not the entire -- I understand --

1          THE COURT:  But if Mr. Gillespie had succeeded in

2     pulling Officer Riley into the midst of that feverish,

3     aggressive crowd -- we saw what happened to other officers

4     who were Tasered, you know, and stomped on and beaten.  That

5     could have happened to Sergeant Riley.

6          MR. WATKINS:  Sure.  And we can always --

7          THE COURT:  So, you know, the fact that,

8     thankfully, didn't happen doesn't spare this defendant from

9     being penalized for his conduct, which was intended to pull

10    Sergeant Riley out away from the police line, clear the

11    path, and have him incapacitated by the crowd.

12         MR. WATKINS:  I know Mr. Gillespie will want me to

13    reiterate that he had no intention of pulling Sergeant Riley

14    into any kind of crowd or that any kind of injury come to

15    him or anyone else.  He thought he was doing what he could

16    to get him out of the way to go and protest.

17         So, again, it's not a mathematical calculation,

18    but it is something that must be done.  We do not want

19    defendants being sentenced more seriously for conduct

20    than -- than others, either similar conduct or more

21    significant conduct.  Certainly, the 87-month sentence that

22    the government is asking for here puts him, as I put it in

23    there, in the pantheon of the most serious of the

24    January 6th defendants.

25         THE COURT:  Can I ask you a couple of questions.

1          You can keep talking afterwards, but I wanted to

2     get some of my questions clarified.

3          You object to Condition 7, that the defendant will

4     work full-time, at least 30 hours per week, at a lawful type

5     of employment unless the probation officer excuses the

6     defendant from doing so.  That's one of the standard

7     conditions of supervision.

8          And so what is the basis for your objection to

9     that standard condition, other than the fact that the

10    defendant hasn't worked for 20 years?

11         MR. WATKINS:  In addition -- no matter if the --

12    if the Court sentences him to 30 months or more than

13    30 months, he will come out, by definition, at retirement

14    age, where people are not required to work by society.

15    Generally speaking, we do want the standard condition of

16    employment to abrogate any kind of criminal activity that

17    might --

18         THE COURT:  Also to help defray any financial

19    obligations that are incurred as part of --

20         MR. WATKINS:  And there are so --

21         THE COURT:  -- at sentencing, which would be a

22    criminal fine and restitution, and the special assessment.

23         MR. WATKINS:  Right.  He will have those things

24    to pay off, all of those things as well.

25         So it's -- it was really a practical issue.

1    Mr. Gillespie will be essentially unemployable at the time

2    he gets out, simply because he has no work history for quite

3    a bit of time.  And after having been in prison with this

4    kind of conviction, his job opportunities will be sharply

5    limited.  I guess, again, it was more just a practical

6    suggestion to the Court, where it might be driving the

7    probation department crazy to try to figure out what to do

8    with an older man with no work history.

9            THE COURT:  Okay.  Well, just so you won't be

10    surprised, I am not going to suspend that condition.  But

11    what I will do is say:  The obligation to work, the standard

12    condition, will apply so long as he has any outstanding

13    financial obligations under the terms of the judgment --

14            MR. WATKINS:  Right.

15            THE COURT:  -- which would include a criminal

16    fine, which would include a special assessment, and the

17    restitution.

18            MR. WATKINS:  That's sensible.

19            THE COURT:  All right.

20            Okay.  You also objected to the mandatory drug

21    testing as a condition of release because you say that he

22    doesn't use alcohol or illicit drugs and is a low risk of

23    future substance abuse by him.  I regularly do suspend that.

24            But I did look, and he reported to the probation

25    officer that he did use marijuana in December 2022, so he

1    does use illicit drugs; perhaps not abuse them but, for that

2    reason, just so you know -- was that wrong?  Are you

3    contesting that?  Because if it's not wrong, I am not going

4    to suspend his mandatory drug testing.

5            MR. WATKINS:  I am not contesting.  No.  That is

6    correct --

7            THE COURT:  Okay.

8            MR. WATKINS:  -- that he did use marijuana on one

9    occasion.

10            THE COURT:  Okay.

11            MR. WATKINS:  I told him that he did not -- he

12    told me he didn't understand the original release

13    conditions.  But once I told him that is absolutely -- even

14    though, as in the District of Columbia and the Commonwealth

15    of Massachusetts, it's legal there, that he simply cannot do

16    that.

17            THE COURT:  Okay.  And I saw in the PSR that he

18    had liens on his house.  Did you see that?

19            MR. WATKINS:  That's correct.

20            THE COURT:  And the federal tax liens that, I

21    guess, remain unpaid.  Do you know what that's about?

22            MR. WATKINS:  Just a little bit.  Exactly what the

23    Court said, that there are liens against his home that he's

24    contesting with the IRS.

25            THE COURT:  I see.

1          And it also said that his current residence is

2     owned by Ultra White, LLC [sic].

3          MR. WATKINS:  Yes.

4          THE COURT:  Was that an entity to take over

5     ownership of his home that he controls and has an ownership

6     stake in this Ultra White, LLC?

7          MR. WATKINS:  Yes.  It has been for several years,

8     as I understand it, in the name of a corporation.  Not --

9     perhaps rare, but not unusual in -- other way around --

10    perhaps unusual, not rare, in holding property; and that is

11    what he has done here.

12         THE COURT:  And did he put his property ownership

13    into an LLC after these tax liens were imposed on him in

14    order to avoid those tax liens?

15         MR. WATKINS:  I don't believe so.  I don't know

16    the answer to that.  But my understanding is the IRS has

17    perfected the tax lien so if, indeed, he put it in there, it

18    has not been successful so far.

19         THE COURT:  All right.  You can proceed.

20         MR. WATKINS:  Judge, I really don't want to into

21    too much detail because, again, I have cited several cases

22    there.  And as I was looking, getting ready for today, the

23    Court has talked, in past sentencings, about the

24    differential for people being caught up in the moment versus

25    coming.

1          Certainly, Mr. Gillespie, I believe, falls

2    squarely in that first category.  There is no evidence

3    whatsoever that he came prepared to go down to the Capitol,

4    let alone be -- do anything once there.  It doesn't,

5    obviously, excuse anything, but it is something that the

6    Court has -- I think all courts deem significant in -- when

7    trying to sentence.  What he did, once he did make that

8    decision, is serious, and there is no doubt about it; and

9    that is why he does need to be sentenced to some term of

10   imprisonment.

11         A couple of comparators that I looked at getting

12   ready for today was the *Rubenacker* case.  And, of course,

13   Mr. Rubenacker was convicted of all three offenses; the 111

14   charge, as well as the 231 and the 1512, which would

15   ordinarily talk about an even more severe sentence than

16   Mr. Gillespie is looking at, notwithstanding the fact that

17   he pled guilty there.

18         Another comparator that I was looking at, again,

19   in preparation for today was the case in front of Judge

20   Berman-Jackson, the *Riley June Williams* case; very, very

21   similar to Mr. Gillespie, where she did go to trial and was

22   convicted on the 111(a) and the 231 counts, was the jury

23   hung on the 1512 count.

24         Ms. Williams was very, very obsessed with not only

25   the election, by coming down here on January 6th, she posted

1    constantly.  She worked with others, developed a plan for

2    the trip, came here with others who were armed, and had

3    tactical gear with her.  She came with the avowed intention

4    that she was going to kill Nancy Pelosi, Speaker of the

5    House.  Indeed, she got into the Speaker -- she got into the

6    Capitol, went into the Speaker's office, stole a gavel,

7    stole a hard drive, trashed the Speaker's office there.  As

8    the government put it in her sentencing, she was the

9    accelerant for a lot of other people there, urging them on,

10   urging them to violence, urging them to resist police.

11          But, nevertheless, she was sentenced by Judge

12   Berman-Jackson to 36 months' imprisonment, 3 years there,

13   which -- because of the differences between Mr. Gillespie's

14   conduct, I think we would all have to say that Ms. Williams'

15   conduct in preparation, and the kinds of things that she was

16   trying to accomplish, were much different from what

17   Mr. Gillespie's avowed goal in getting was.  And the fact

18   that she not only engaged with officers, but told others to

19   engage with them, makes hers much more culpable.

20          Given all of that, that is why I think there's a

21   substantial basis for a 30-month sentence here for

22   Mr. Gillespie and ask the Court to consider imposing that.

23          Unless the Court has any additional questions for

24   me, I will sit down.

25          THE COURT:  No, I don't.  But your conversation

1    about the *Williams* case -- I mean, I am not that familiar

2    with the *Williams* case.  I am certainly not Judge Jackson,

3    but I know she is a very good judge.

4        Who knows what's in the personal history, the

5    psychological history, the mental/physical situation that

6    Judge Jackson felt that that sentence was warranted; but it

7    only demonstrates that, as we have hundreds and hundreds of

8    these cases, no sentence given to any single January 6

9    defendant is dispositive of the sentence that should be

10   given to any other January 6 defendant because -- despite

11   the fact that it was mob action and it all occurred within a

12   six-hour period, generally, on January 6, 2021, all

13   generally in the same location -- every defendant's offense

14   conduct has its own twists and its own unique

15   characteristics, as do each of the defendants personally,

16   both in terms of their criminal history and in terms of

17   their personal affect and characteristics.

18       So I am not even going to begin to try and deal

19   with the *Williams* case because I don't really know enough

20   about it to understand why a defendant who was convicted of

21   231, 111 -- assault and civil disorder, had planning, wanted

22   to kill Nancy Pelosi -- got 36 months.  Not even going to

23   begin to understand that because there is a lot more, I am

24   sure, going on there that I am just not informed about.

25       But thank you.

 1          MR. WATKINS:  Thank you.

 2          THE COURT:  All right.  Mr. Gillespie, this is

 3     your opportunity to speak directly to me, if you wish.  You

 4     don't have to, but it's up to you.

 5          I can't hear you either.  Can you speak into the

 6     microphone.

 7          THE DEFENDANT:  No comment.  No comment.

 8          THE COURT:  Okay.  You may stand, Mr. Gillespie,

 9     in front of me, and with your counsel --

10          MR. WATKINS:  Would you like us at the lectern?

11          THE COURT:  Yes, please.

12          So I am now going to explain the sentence I am

13     going to impose and impose sentence.

14          So after considering the parties' sentencing

15     memoranda, the probation department's presentence

16     investigation report, sentencing recommendations from all of

17     the parties and the probation office, hearing argument,

18     reading fairly extensive briefing, I must now consider the

19     relevant factors set out by Congress in 18 U.S.C. Section

20     3553(a), and ensure I impose a sentence that is sufficient

21     but not greater than necessary to comply with the purposes

22     of sentencing.

23          And I do think it's always useful for everybody,

24     including the defendant specifically, to hear what the

25     purposes of sentencing are.

1          The purposes for the sentence imposed include the

2     need to reflect the seriousness of the offense, and this was

3     a very serious offense, what happened at the Capitol on

4     January 6, 2021; to promote respect for the law, and what

5     happened on January 6, 2021, at the U.S. Capitol showed

6     enormous disrespect for our fundamental law, our

7     Constitution, because it disrupted a constitutionally

8     mandated function there; to provide just punishment for the

9     offense; deter criminal conduct, because we definitely are

10    very interested in general deterrence here because imagine

11    what this country would be like if, at every election,

12    people who were disappointed in the results created mob

13    action to overturn it.  We can't have that.  That's not the

14    country -- that's not the way our democracy, in our ideal

15    view, should work.

16          We also have to protect the public from future

17    crimes by you, Mr. Gillespie; and to promote rehabilitation.

18          So pursuant to Section 3553(a), I have to consider

19    these specific factors:  The nature and circumstances of the

20    offense, your history and characteristics, the types of

21    sentences available, the need to avoid unwarranted sentence

22    disparities among defendants with similar criminal histories

23    who have committed similar conduct, and the need to provide

24    restitution to any victims of the offense.

25          I usually begin with the restitution amount owed

1     here.  The government asked for the same amount of

2     restitution that it has asked for from all defendants

3     convicted of felony offenses, such as you, for their conduct

4     on January 6, 2021.  Restitution is mandatory under the

5     Mandatory Victims Restitution Act, in 18 U.S.C. Section

6     3663(a).  For your conviction on Counts 1, assaulting

7     certain officers; 2, civil disorder; and 5, engaging in

8     physical violence in a restricted building or grounds.

9          Restitution is discretionary under the Victims and

10    Witness Protection Act of 1982, at 18 U.S.C. Section 3663,

11    for the same convictions, Counts 1, 2, and 5.

12         And where, as here, a case involves the related

13    criminal conduct of multiple defendants, the procedures for

14    awarding restitution under both the MVPA and the VWPA, the

15    Victims Witness Protection Act, allow the Court discretion

16    to hold the defendants jointly and severally liable for the

17    full amount of restitution owed to the victims or apportion

18    the restitution and hold the defendant responsible for only

19    his individual contribution to the victims' total losses.

20         The government argues, the Court agrees, that

21    ordering you to pay the $2,000 to approximate the harm you

22    caused is the appropriate choice here.

23         Based on the record, the restitution payment of

24    $2,000 is the best available estimate of damage for which

25    this defendant should be held responsible to the

1    identifiable victim.  Here, that restitution goes to the

2    Architect of the Capitol on the limited record presented in

3    the case.  It's also the most fair amount, since this is the

4    standard payment required by the government in plea

5    agreements to felony charges, even as the estimated amount

6    of damages to the Capitol Building have grown to almost

7    $3 million.  So I will order this amount pursuant to

8    18 U.S.C. Section 3663(a)(1)(A).

9         The Court further finds that determining the

10   complex issues of fact related to the cause or amount of the

11   victim's losses would complicate or prolong the sentencing

12   process to a degree that the need to provide restitution to

13   any victim is outweighed by the burden on the sentencing

14   process.  So the mandatory restitution provisions of

15   Section 3663(a) do not apply, and the Court need not

16   endeavor to fix the restitution amount more precisely than

17   the $2,000 amount for which the government argues; and that

18   is pursuant to 18 U.S.C. Section 3663A(c)(3)(B).

19        I do think that the amount of restitution to be

20   paid by those defendants convicted of misdemeanor and felony

21   offenses on January 6, 2021, is fairly low since taxpayers

22   are still going to be left holding the bag, so to speak, for

23   much of the damages to the Capitol.  What occurred from the

24   entire mob action on January 6th and payment of a criminal

25   fine by defendants able to pay more helps to defray some of

1    those costs to taxpayers as well as to reimburse taxpayers

2    for the cost of incarceration of defendants.

3            Here, the guideline range is $25,000 to $250,000,

4    and the defendant has declined to provide any documentation

5    to the probation office that would show he is unable to foot

6    the bill, even at the minimum amount of the fine range.

7            The PSR, at paragraph 102, states:  The defendant

8    has not submitted a net worth statement and monthly cash

9    flow statements, nor any supporting documentation of his

10    income, assets, debts, or liabilities.  Mr. Gillespie has

11    not consented to the release of his credit report.

12            The PSR, at 109, says:  The defendant has not

13    submitted his monthly cash flow and net worth statement,

14    accordingly has not demonstrated an inability to pay a fine.

15            So in determining any fine amount, the Court is

16    directed to consider the expected cost to the government of

17    any imprisonment, which is an estimated $3,688 per month;

18    and here, at the lowest end of the applicable sentencing

19    guideline range of 63 months, that would amount to a fine of

20    $232,344.

21            The defendant says he lives frugally and he has

22    only two working cars out of the five registered to him.

23    But his say-so about living frugally is not enough reason

24    for me not to impose a fine, particularly since the

25    defendant has enough resources to have been able to avoid

1    working and earning a living for the past 20 years.

2            So I am not going to impose a fine at almost close

3    to the maximum of the fine allowed of $250,000, but I will

4    impose a fine at the lowest end of the advisory fine amount;

5    that seems totally appropriate based on the record before

6    me.  So I do plan to impose a criminal fine of $25,000.

7            Regarding the nature and circumstances of the

8    offense here, he has been convicted of assaulting,

9    resisting, or impeding law enforcement officers; the civil

10   disorder felony; as well as engaging in physical violence in

11   a restricted building, a Class A misdemeanor; and an act of

12   physical violence in the Capitol grounds or buildings, which

13   is a petty offense, misdemeanor.

14           These are all serious offenses.  And his role in

15   the events on January 6, 2021, place him at a higher level

16   of culpability than many of the hundreds of other people who

17   participated in this attack on the Capitol.

18           His criminal conduct helped facilitate a riot that

19   overwhelmed law enforcement, succeeded in disrupting the

20   proceeds of Congress.  His activity took place at the lower

21   west tunnel, where the most serious hand-to-hand combat with

22   rioters and police occurred with the most harm to the

23   officers in a concentrated area.

24           He drove through the night from Massachusetts to

25   Washington, D.C., to attend the former President's "Stop the

1    Steal" rally at the Ellipse on January 6, 2021, with a few

2    of his friends.  And he had planned somewhat for that trip

3    because, when the FBI conducted a search of his home, they

4    found a folder with a January 6th date with the title

5    "Washington, D.C.," and inside that folder, maps of the D.C.

6    Metro system, various pamphlets from groups and locations in

7    the District.  None of that planning, though, indicated that

8    he was planning for violence that day; and I do credit the

9    defense argument that, you know, he maybe was planning just

10   to participate at the Ellipse and do some sightseeing.

11   That's what he testified to.

12        When the defendant arrived in D.C., he -- they

13   went to the rally.  The defendant claims he didn't hear what

14   the speakers were saying, and then they went with the crowd

15   to the Capitol.  And the defendant testified that he

16   witnessed, when he got to the Capitol, saying what he felt

17   was a sense of community, happiness in seeing others who

18   shared his views about what he viewed then, perhaps even

19   views now -- despite all evidence to the contrary -- a

20   stolen election.

21        He then wanted to get closer to the Capitol

22   Building, despite his friend's choice not to go deeper into

23   what was apparently already becoming a melee.  He turned

24   this into a game to get closer and closer to the Capitol

25   Building, all while police officers were trying to keep the

1     mob away from the Capitol Building.  He fought his way

2     through the shoulder-to-shoulder crowd to end up at the

3     stairs to the lower west tunnel, where he made it to the

4     very front of the mob there.  And the pictures make it

5     actually a real puzzle how anybody could get through that

6     crowd, it was so tightly crowded.  But he made it to the

7     front of the mob to face the police officers head on.

8          He admitted he tried pushing against the police to

9     gain entry to the Capitol, and he accomplished this by using

10    a police -- police riot shields that were, he says, left on

11    the ground of the tunnel.  He used those shields both

12    offensively and defensively as a battering ram, putting it

13    up in front of his face and body and running into the police

14    line in an attempt to force back the officers and inch

15    closer to the Capitol entrance.  He also used the shield

16    defensively to protect himself from the police officers

17    attempts to push him out of the tunnel and to protect

18    himself from the OC spray that the officers were valiantly

19    trying to use to keep people away from the tunnel and out of

20    the building.

21         When those attempts proved unsuccessful, he

22    admitted that he tried to pull officers out individually

23    from the police line.  And the footage from that tunnel show

24    that the defendant grabbed, with two hands, Sergeant Riley's

25    arms and violently tried to pull him out into the mob for at

1    least two seconds.  The defendant testified he wanted to get

2    Riley out of the way so that he could gain access to the

3    Capitol entrance that Riley was guarding.

4        At trial, Sergeant Riley testified, in his more

5    than 20 years working in law enforcement, it was during his

6    violent encounter with this defendant that he felt like he

7    was going to die.  Although seven seconds doesn't seem long,

8    he felt the encounter lasted an eternity.

9        As the defendant was restraining and holding on to

10   Sergeant Riley's arm, as he was struggling to get away and

11   stick with the police line, in the safety of the police

12   line, another rioter repeatedly hit Sergeant Riley with a

13   crutch, which can also be seen on the video.

14       Eventually, this defendant let go of the

15   sergeant's arm after he is repeatedly hit with batons by two

16   officers standing on either side of Sergeant Riley.

17       And while in this tunnel, this defendant was

18   repeatedly calling the officers traitors, yelling out

19   "treason," valiantly pointing at the officers.  He was

20   aggressive.  He was pugnacious.  He was distracting.  He was

21   helping the mob trying to get into the Capitol.

22       After these attempts proved unsuccessful, he and

23   his fellow rioters -- this defendant and his fellow rioters

24   joined together to form waves of bodies that would push

25   against the line of officers and force their way deep into

1    the tunnel.  They eventually got very close to the door

2    leading into the Capitol; it can be seen on the video.  He

3    is very deep into the tunnel.  At one point we can only see

4    the tip of this defendant's head until we see a policeman

5    with a helmet on pushing him away.

6         All the while, sirens are blaring in the tunnel.

7    The officers are hitting this defendant and others with

8    police batons, spraying them with OC spray.  But this

9    defendant was so persistent, so riled up, he just kept at

10   it.  He was there for 15 minutes, a sustained period of

11   time, battling the officers.

12        Then, once out of the tunnel, the defendant pushed

13   out of the tunnel by the police line, the defendant stopped

14   on the Capitol grounds to catch his breath.  He took that

15   moment to talk to an Associated Press reporter who recorded

16   his conversation.  And during that interview, posted

17   publicly on the Associated Press website, the defendant

18   stated that he and his fellow rioters in the tunnel were

19   very close to overcoming the officers.  They would have done

20   so if more rioters had only joined their efforts.

21        When asked what he would have hoped would happen

22   if the rioters overpowered the officers, the defendant

23   stated he hoped they would flood into the Capitol and take

24   it over because what happened in the election cannot stand.

25        To be sure, he carried no weapons, no tactical

1    gear, or other equipment with him on January 6th, nor did he

2    enter the Capitol Building, not for lack of trying.

3         He has entered -- he has since expressed

4    absolutely no remorse for his actions, including his conduct

5    at the tunnel that contributed to the mob that gravely

6    damaged the Capitol Building, injuring responding officers,

7    both in the tunnel and outside.

8         At trial it struck me because he said more than

9    once he had indignation about how he was treated and others

10   were treated at the Capitol Building, when, if they had just

11   followed the police directions and left, none of this would

12   have occurred.

13        As to his personal history and characteristics, he

14   is in his early 60s.  He has had no prior convictions,

15   although he has been arrested before, but both cases were

16   dismissed.  He is unemployed.  He hasn't worked or earned an

17   income for about 20 years, supports himself financially

18   through multiple inheritances.  He doesn't have any

19   dependants.  He has no job, no dependant family members that

20   could be impacted by his actions nor by the punishment to be

21   meted out here today.

22        The need for the sentence imposed here to deter

23   criminal behavior and protect the public from further crimes

24   by the defendant are critical considerations at every

25   sentencing.  And I cannot overstate the seriousness of the

1    criminal conduct we witnessed on January 6th, and it

2    highlights the need for deterrence in the form of a

3    sufficient sentence to deter this defendant and others

4    disappointed by election results from engaging in this kind

5    of conduct in the future.

6         The defendant requires a sentence, given his lack

7    of remorse or even appreciation of what occurred on

8    January 6, 2021, that adequately illustrates to him how

9    serious his actions were on January 6th.

10        Counsel described in his sentencing memo that he

11   is a man of causes that occasionally evolve into obsessions;

12   and perhaps that is exactly what occurred on January 6th.

13   He was obsessed what he believed then, and possibly even

14   now, was a stolen election.

15        At the same time he treated January 6th as a game,

16   trying to make it ever closer with landmarks to the lower

17   west tunnel, where he tried to overpower police officers

18   there.  He made an independent choice to delve deeper into

19   that chaos and violence that day, despite his friends' more

20   astute decision to stay far away from the tunnel.  He was at

21   this front line of combat, and that makes this a very

22   serious case.

23        At one point, defendant's reply memo characterizes

24   defendant's violence as a two-to-three-second rush towards

25   the officers while holding on to a riot shield.  That is a

1    gross mischaracterization.  That is not supported by the

2    video evidence.

3           The video evidence in this case shows that this

4    was -- his sustained effort to get into this tunnel was far

5    longer than two or three seconds.  His holding onto Sergeant

6    Riley itself was at least seven seconds.  He picked up more

7    than one police shield seriatim to use both offensively and

8    defensively.  And this is what the footage -- both the trial

9    testimony and submitted at sentencing -- shows.

10          His obsession with the election, with election

11   fraud, has led to -- led him to the hand-to-hand combat with

12   the police officers in the tunnel and -- that makes the

13   guideline sentencing range here totally appropriate and

14   reasonable.

15          With respect to the types of sentences available,

16   the guideline range falls in Zone D of the Sentencing Table,

17   which recommends a sentence of incarceration, and I find

18   that entirely reasonable.

19          Regarding the need to avoid unwarranted sentence

20   disparities, there are just a few defendants who have been

21   previously sentenced following convictions at a jury trial

22   on violations of both the assault charge, 111(a)(1), and the

23   civil disorder charge at 231.

24          In both cases -- both parties have provided a

25   number of comparators of people who have been sentenced for

1    various terms, you know -- and whether 87 months is too long

2    or too short, whether 30 months is too long or too short.

3    Yesterday I had a three-hour sentencing, almost a three-hour

4    sentencing, where, literally, the defense attorney went

5    through 19 different comparators. I just think it's -- the

6    3553(a)(6) factor of avoiding unwarranted sentence

7    disparities is an important factor, important for the

8    fairness of our sentencing system, but I have to just point

9    out that comparators who pled guilty versus comparators who

10   were convicted after trial are not in comparative positions.

11        Defendants convicted through guilty pleas are

12   granted more leniency than those who are convicted at a jury

13   trial, period. By virtue of their guilty pleas, the

14   defendants have demonstrated an acceptance of responsibility

15   and accountability for their actions and, thus, get credit

16   under the guidelines with the usual three-offense level

17   reduction for a lower guideline sentencing range.

18        This is totally appropriate because such

19   acceptance of guilt shows the Court that the defendant's

20   knowledge -- that the defendants have acknowledged the

21   wrongful and unlawful nature of their actions, which are

22   very important considerations in assessing important

23   deterrence factors under 3553(a).

24        As the D.C. Circuit recently highlighted in *U.S. v*

25   *Otunyo*, which was issued on March 31, 2023: It is perfectly

1    appropriate to show leniency by treating more mildly

2    deserving defendants in return for guilty pleas.  See also

3    *U.S. v Lopesierra-Gutierrez*, a D.C. Circuit case from 2013,

4    which states that:  Some defendants pled guilty while others

5    did not provides a perfectly valid basis for a sentencing

6    disparity, and such disparity imposed no impermissible

7    burden on the defendant's jury trial rights.

8         This defendant exercised his right to go to a jury

9    trial and, by his testimony, indicated no remorse, no

10   acknowledgement of the wrongfulness of his offense conduct

11   on January 6th.  He may still, today, remain indignant, to

12   quote him, about his treatment and the treatment of others,

13   rioters, at the U.S. Capitol on January 6th.  These are

14   important considerations in assessing the need for

15   deterrence.

16        Almost all of the comparator cases cited by the

17   defendant involved guilty pleas; so already their sentencing

18   ranges have been reduced, and the concern about protecting

19   the public from further crimes by those defendants somewhat

20   mitigated.  The defendant lists five cases in which the

21   defendants were convicted of civil disorder, 231.  In all of

22   those cases, the defendants pleaded guilty to civil disorder

23   only and accepted responsibility for their actions on

24   January 6th.  I do not find them to be appropriate

25   comparators.  I am not -- I am just going to leave it at

1    that rather than going through each of them specifically.

2         The defendant also lists some cases in which the

3    defendants were convicted of 111, the assault, with

4    sentences much greater than what defendant argues he should

5    receive today.  And Young is a person who was -- pleaded

6    guilty, actually, to an assault and was sentenced to

7    86 months.  And like this defendant, Young participated in

8    the violence against officers in the same location, the

9    lower west tunnel, where he held a strobe light and pointed

10   it towards officers to impair their vision.  And he showed

11   another rioter how to use the same strobe light.  He then

12   participated in restraining an MPD officer and went on to

13   later assault yet another officer.

14        Young's actions appeared quite violent and

15   dangerous and -- even given his acceptance of responsibility

16   by entering a plea of guilty, which is totally -- no remorse

17   has been shown here.  Young's sentence was 86 months,

18   which -- it does support the government's request, you know,

19   for an 87-month sentence here, but that is above the

20   guideline sentencing range.  And I do think that -- I don't

21   know what else was going on in the *Williams* case, but it

22   puts the guideline range here certainly within the realm of

23   reasonableness, taking this defendant's sustained action at

24   the tunnel.

25        Some of the cases cited by the parties include

1    *U.S. v Palmer*, who also pleaded guilty to an assault and was

2    sentenced to 63 months.  Like this defendant, he was also at

3    the lower west tunnel.  He threw a wooden plank, an empty

4    fire extinguisher, and a spear-like pole at the officers,

5    which does show more similar violence to what the defendant

6    showed on January 6th by using the police shields.  But

7    unlike Palmer, this defendant didn't accept responsibility

8    or acknowledge the unlawfulness of his conduct.  Even up

9    until today he has not shown any remorse.  So Palmer's

10   sentence at the bottom of the guidelines, at 63 months,

11   which is also at the bottom of the defendant's sentencing

12   range would seem too low to account for the differences in

13   their cases, the differences in their posture, and this

14   defendant's perjury at trial.

15         The defendant also cites *Mazza*, who also pleaded

16   guilty to an assault charge, also under (b).  And he carried

17   a pistol without a license to D.C.; he was sentenced to

18   60 months.  He did exhibit more planning to attend the "Stop

19   the Steal" rally and to bring a loaded firearm which he

20   lost, apparently, when he was on the Capitol grounds.  He

21   also went to the lower west tunnel and participated in a

22   heave-ho push with other rioters to breach the police line

23   there.  And he actually, just like this defendant, made it

24   to the first set of doors in the tunnel leading into the

25   Capitol Building.

1         I guess Mazza held the door open to attempt to

2    help others force the entry and actually took a baton from

3    another officer and attempted to strike the officers with a

4    baton yelling:  This is our fucking house, we own this

5    house, we want our house, get out of the way.

6         So Mazza was quite violent in the same place and

7    used a police baton -- not a shield, but a police baton --

8    to strike the officer's arm.  Sort of like this defendant

9    using the police shield offensively against the officers.

10    Both of them recycled a police tool as a weapon to ram into

11    the officers in the tunnel and get into the building.

12         As defendant acknowledges, Mazza pleaded guilty,

13    accepted his responsibility.  He admitted to all of his

14    criminal conduct.  He expressed remorse for his actions,

15    submitted a written statement to the Court apologizing for

16    his actions.  And for that, in addition -- he was a

17    decorated Army Veteran who had spent time serving this

18    country in very important public service, unlike this

19    defendant who hasn't earned income for 20 years.  And Mazza

20    suffered from injuries sustained during his military

21    service, including PTSD.

22         So I can well imagine why the judge in that case,

23    taking account of that personal history, his contributions

24    to the security of this country over a term of military

25    service -- so his personal history, along with his

1    acceptance of responsibility, gave that defendant, Mazza,

2    60 months for conduct quite similar to this defendant and

3    only demonstrates to this Court that this defendant deserves

4    a sentence that is more than 60 months, and certainly within

5    the guideline range of 63 to 78 months.

6          So based on my consideration of these and other

7    factors, I will now state the sentence to be imposed on

8    Mr. Vincent Gillespie.

9          Pursuant to the Sentencing Reform Act of 1984 and

10   in consideration of the provisions of 18 U.S.C.

11   Section 3553, as well as the advisory sentencing guidelines,

12   it is the judgment of the Court that you, Vincent Gillespie,

13   are hereby committed to the custody of the Bureau of Prisons

14   for a term of 68 months, which is 5 years and 8 months, on

15   Count 1; concurrent terms of 60 months, 5 years, on Count 2;

16   12 months, 1 year, on Count 5; and 6 months on Count 7.

17         You are further sentenced to serve concurrent

18   terms of -- and all of those terms are concurrent.

19         You are further sentenced to serve a concurrent

20   term of 36 months, 3 years, of supervised release on

21   Counts 1 and 2; and 12 months on Count 5.

22         In addition, you are ordered to pay a special

23   assessment of $100 on each of Counts 1 and 2, $25 on

24   Count 5, and $10 on Count 7, for a total of $235, in

25   accordance with 18 U.S.C. Section 3013.

1          While on supervision, you shall abide by the

2   standard conditions of supervision which establish the basic

3   expectations for an individual under supervision as set

4   forth in the PSR at paragraph 134; except that, as to

5   Condition 7, requiring you to work full-time, at least

6   30 hours per week, will apply only so long as you have any

7   outstanding financial obligation under this judgment.

8          You must also abide by the following mandatory

9   conditions:

10         You must not commit another federal, state, or

11  local crime.

12         You must not unlawfully possess a controlled

13  substance, which includes marijuana, which is still a

14  federally controlled substance.

15         You must refrain from any unlawful use of a

16  controlled substance.

17         You must submit to one drug test within 15 days of

18  placement on supervision, and at least two periodic drug

19  tests thereafter as determined by the Court.

20         You must cooperate in the collection of DNA as

21  directed by the probation officer.

22         You must make restitution in accordance with

23  18 U.S.C. Section 3663, or any other statute authorizing a

24  sentence of restitution.

25         You shall comply with the following special

1    conditions:

2            You must submit to substance abuse testing to

3    determine if you have used a prohibited substance.  You must

4    not attempt to obstruct or tamper with the testing methods.

5            You must provide the probation officer access to

6    any requested financial information and authorize the

7    release of any financial information.  The probation office

8    may share financial information with the U.S. Attorney's

9    Office.  You must not incur new credit charges or open

10   additional lines of credit without the approval of the

11   probation officer.

12           You are ordered to pay a criminal fine in the

13   amount of $25,000 as well as any interest or penalties that

14   may accrue on the balance.

15           You are ordered to make restitution in the amount

16   of $2,000 to the Architect of the Capitol.  Given the amount

17   of the criminal fine, the Court determined that you do not

18   have to pay interest on the restitution and waives interests

19   or penalties that may accrue on the balance of restitution

20   owed.  Restitution payments shall be made to the Clerk of

21   the Court for the U.S. District Court, District of Columbia,

22   for disbursement to the following victim:  Architect of the

23   Capitol, Office of the Chief Financial Officer, Ford Office

24   Building, Room H2-205B, Washington, D.C. 20515, in the

25   amount of $2,000.

1              The financial obligations of the criminal fine,

2     special assessments, and restitution are immediately payable

3     to the Clerk of the Court for the U.S. District Court, 333

4     Constitution Avenue Northwest, Washington, D.C. 20001.

5     Within 30 days of any change of address, you shall notify

6     the Clerk of the Court of the change until such time as the

7     financial obligation is paid in full.

8              The probation office shall release the presentence

9     investigation report to all appropriate agencies, which

10    includes the U.S. Probation Office in any approved district

11    of residence in order to execute the sentence of the Court.

12             You can appeal your convictions of guilt to the

13    U.S. Court of Appeals for the D.C. Circuit.  Pursuant to

14    18 U.S.C. Section 3742(a), you also have a statutory right

15    to appeal your sentence to the D.C. Circuit under certain

16    circumstances, including if you think this sentence was

17    imposed in violation of the law or as a result of an

18    incorrect application of the sentencing guidelines or is

19    more severe than the maximum established in the guideline

20    range.  You may also appeal your sentence if you believe you

21    received ineffective assistance of counsel at sentencing.

22             Pursuant to 28 U.S.C. Section 2255, you also have

23    the right to challenge the conviction entered or sentence

24    imposed to the extent permitted by that statute.

25             Any notice of appeal must be filed within 14 days

1    of the entry of judgment or within 14 days of the filing of

2    a notice of appeal by the government.  If you are unable to

3    afford the cost of an appeal, you may request permission

4    from the Court to file an appeal without cost to you.  On

5    appeal, you may also apply for court-appointed counsel.

6            Are there any objections to the sentence imposed

7    not already noted for the record from the government?

8            MS. SCHESNOL:  No objections, Your Honor.

9            And to the extent that the outstanding counts have

10    not already been dismissed, we move to dismiss those counts.

11            THE COURT:  Okay.  That motion is granted.

12            Mr. Watkins, any objections to the sentence

13    imposed not already noted on the record?

14            MR. WATKINS:  Just one issue.

15            Would the Court consider waiving interest on the

16    fine while Mr. Gillespie is serving his sentence for the

17    next five years?

18            THE COURT:  No.  I am not going to waive that

19    interest.  I mean, because he doesn't earn income so it's

20    not like most people where I would waive the interest

21    because they're not going to be earning income, but he

22    hasn't earned any income, so I saw no reason for that.

23            MR. WATKINS:  That's all I have as far as the

24    sentence.  There would be the issue of whether Mr. Gillespie

25    can stay on pretrial release.

1           THE COURT:  Okay.  Why don't you all be seated.  I

2      know you have been standing for some time.

3           So let's take up the issue of whether

4      Mr. Gillespie should remain on pretrial release or not.

5           What's the government's position?

6           MS. SCHESNOL:  Your Honor, at this juncture, not

7      only has the defendant been convicted of very serious

8      crimes, he has now been sentenced to more than five and a

9      half years.  While he has been, for the most part, compliant

10     while on pretrial release, we do believe that it is

11     appropriate at this time for him to be taken into custody

12     and start serving his sentence.

13           Thank you.

14           MR. WATKINS:  Judge, the probation department has

15     recommended continual release in order to self-report.  He

16     has been completely compliant with all of the conditions of

17     release.  As the Court has heard --

18           THE COURT:  And has his passport been turned over?

19     Is that one of his conditions of release?

20           MR. WATKINS:  I believe, yeah, that would

21     ordinarily be the course.  I don't even know if he has one.

22     Hold on one second.

23           THE DEFENDANT:  I only have an expired passport.

24     It's somewhere in a very large -- it's most -- it's in a

25     very large storage space.  It would take a very long time to

1     find it.

2             MR. WATKINS:  If the Court is concerned about it,

3     we can try to find the expired passport; but I think the

4     answer is, he has no passport.  His travel has been

5     restricted to the District of Massachusetts and here.  He

6     has complied with that.  And he will continue to comply

7     should the Court release him.

8             THE COURT:  All right.  I am going to allow

9     Mr. Gillespie to remain on pretrial release given the fact

10    that he hasn't committed any other criminal -- engaged in

11    any other criminal conduct since January 6, 2021.  He had no

12    criminal history really before, certainly no convictions,

13    although some arrests.  He has been fully compliant, you

14    know, during the time of pretrial release.  I will allow him

15    to remain out of jail pending his surrender when designated

16    by the Bureau of Prisons to the facility where you will

17    serve your term of imprisonment.

18            I do need to caution you, Mr. Gillespie, about

19    your conduct while you are on release pending surrender.

20    You are required to appear for surrender for service of your

21    sentence as directed by the Bureau of Prisons and the

22    probation department.  Failure to appear as required is a

23    separate criminal offense for which you could be sentenced

24    to imprisonment, and that term of imprisonment could be

25    consecutive to the term of imprisonment here.  All of the

1    conditions to which you are released up until now continue

2    to apply, and the penalties for violating those conditions

3    can be severe.

4          If you violate any of the conditions of your

5    release, you may be subject to revocation of the release and

6    a separate prosecution for contempt of court.  If you are

7    convicted of any new offense committed while you are

8    released pending surrender then, in addition to the sentence

9    imposed for that offense, you could be sentenced to an

10   additional consecutive term of imprisonment for committing a

11   new crime while on release.

12         Do you understand all of that?

13         THE DEFENDANT:  To be honest, I was just kind

14   of -- not focused.

15         THE COURT:  Well, I am sure Mr. Watkins will

16   explain that this is a very sensitive period for you.  You

17   have to stay totally compliant with your pretrial release

18   conditions, as you have been up until now.

19         Is there anything further today from the

20   government?

21         MS. SCHESNOL:  No, Your Honor.  Thank you.

22         THE COURT:  Mr. Watkins?

23         MR. WATKINS:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  You are all excused.

25         (Whereupon, the proceeding concludes, 12:09 p.m.)

**<u>CERTIFICATE</u>**

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 25th day of June, 2023.

<u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
Official Court Reporter

**$**

**$10** [2] - 49:8, 103:24
**$100** [2] - 49:7, 103:23
**$2,000** [5] - 50:15, 50:20, 61:10, 87:21, 87:24, 88:17, 105:16, 105:25
**$232,344** [1] - 89:20
**$235** [4] - 49:8, 49:20, 70:8, 103:24
**$25** [2] - 49:7, 103:23
**$25,000** [3] - 89:3, 90:6, 105:13
**$250,000** [3] - 49:6, 89:3, 90:3
**$3,688** [1] - 89:17
**$5,000** [6] - 49:20, 50:4, 61:11, 62:5, 62:18, 62:20

**/**

**/s** [1] - 111:14

**0**

**02210** [1] - 1:18

**1**

**1** [31] - 3:22, 11:4, 11:24, 12:3, 12:12, 13:1, 13:20, 27:25, 28:6, 31:19, 33:16, 33:18, 33:21, 34:25, 35:9, 36:12, 36:15, 37:11, 37:12, 47:23, 48:2, 48:5, 49:7, 52:4, 70:2, 87:6, 87:11, 103:15, 103:16, 103:21, 103:23
**1(A** [1] - 28:15
**1(D** [1] - 28:20
**1(E** [1] - 28:23
**1(L** [2] - 14:24, 15:5
**10** [2] - 17:4, 31:13
**102** [1] - 89:7
**109** [1] - 89:12
**11** [2] - 41:15, 54:11
**111** [9] - 27:8, 27:9, 27:11, 27:12, 33:5, 82:13, 84:21, 100:3
**111(a** [4] - 24:25, 26:15, 26:18, 82:22
**111(a)(1** [2] - 3:24, 97:22
**12** [4] - 41:16, 48:23, 103:16, 103:21

**12:09** [1] - 110:25
**134** [1] - 104:4
**14** [7] - 1:4, 28:5, 31:13, 31:14, 48:7, 106:25, 107:1
**141** [1] - 44:3
**15** [4] - 25:19, 74:23, 94:10, 104:17
**15-plus** [1] - 34:17
**1512** [6] - 26:3, 26:5, 26:8, 33:5, 82:14, 82:23
**1512(c** [1] - 41:8
**1752(a)(4** [1] - 4:2
**1752(a)(4)** [1] - 48:24
**18** [17] - 3:23, 3:25, 4:2, 4:4, 6:16, 30:20, 48:24, 49:5, 85:19, 87:5, 87:10, 88:8, 88:18, 103:10, 103:25, 104:23, 106:14
**19** [1] - 98:5
**1982** [1] - 87:10
**1984** [1] - 103:9
**1992** [1] - 15:23
**1993** [1] - 45:8
**1994** [1] - 43:18
**1997** [1] - 43:21
**1998** [1] - 44:1
**1B1** [1] - 13:20
**1B1.1** [3] - 14:23, 15:4, 28:23

**2**

**2** [24] - 3:24, 11:4, 12:4, 12:13, 12:23, 27:25, 31:19, 35:6, 35:9, 36:12, 36:16, 36:17, 37:11, 37:12, 47:23, 48:12, 48:13, 49:7, 53:10, 87:7, 87:11, 103:15, 103:21, 103:23
**20** [9] - 61:18, 61:20, 62:1, 62:15, 78:10, 90:1, 93:5, 95:17, 102:19
**20-plus** [1] - 46:2
**200** [1] - 15:6
**2000** [1] - 15:7
**20001** [2] - 1:10, 106:4
**2001** [1] - 44:2
**2004** [1] - 44:1
**2009** [1] - 44:4
**2013** [1] - 99:3
**202** [1] - 1:10
**2020** [2] - 18:3, 40:11
**2021** [10] - 10:3, 84:12,

86:4, 86:5, 87:4, 88:21, 90:15, 91:1, 96:8, 109:11
**2022** [3] - 3:21, 54:17, 79:25
**2023** [3] - 1:4, 98:25, 111:13
**20515** [1] - 105:24
**22-60** [2] - 1:3, 2:3
**223-8061** [1] - 1:19
**2255** [1] - 106:22
**23** [1] - 3:21
**231** [11] - 24:24, 25:9, 25:12, 26:1, 26:13, 33:5, 82:14, 82:22, 84:21, 97:23, 99:21
**231(a)(3** [1] - 3:25
**232(1** [1] - 30:21
**235** [1] - 50:4
**24** [1] - 39:19
**25** [2] - 54:5, 67:16
**25,000** [2] - 49:6, 61:13
**25th** [1] - 111:13
**26** [3] - 9:5, 39:19, 48:19
**27** [4] - 8:18, 9:6, 10:9
**28** [2] - 54:5, 106:22
**29** [1] - 10:1
**2A1.2(a)** [1] - 48:7
**2A2.2** [12] - 12:10, 26:23, 28:4, 28:6, 28:14, 28:15, 28:19, 29:17, 31:7, 31:13, 31:15, 36:7
**2A2.2(a** [1] - 48:4
**2A2.2(b)(2)(B)** [1] - 48:10
**2A2.4** [5] - 12:11, 21:5, 28:1, 31:8, 31:12
**2d** [1] - 44:3

**3**

**3** [6] - 9:23, 49:19, 70:8, 83:12, 88:7, 103:20
**30** [12] - 50:6, 50:8, 50:11, 71:10, 75:12, 75:21, 78:4, 78:12, 78:13, 98:2, 104:6, 106:5
**30,000** [1] - 67:16
**30-month** [2] - 75:18, 83:21
**3013** [1] - 103:25
**31** [1] - 98:25
**333** [1] - 106:3
**34** [1] - 27:25
**35** [1] - 27:25

**3553** [1] - 103:11
**3553(a** [7] - 6:17, 55:11, 55:17, 56:20, 57:12, 85:20, 86:18
**3553(a)** [2] - 71:12, 98:23
**3553(a)(6** [2] - 71:16, 98:6
**3553(a)(6)** [1] - 76:7
**3583(b)(2** [1] - 49:5
**36** [3] - 83:12, 84:22, 103:20
**3663** [2] - 87:10, 104:23
**3663(a** [1] - 88:15
**3663(a)** [1] - 87:6
**3663(a)(1)(A)** [1] - 88:8
**3663A(c)(3)(B)** [1] - 88:18
**3742(a** [1] - 106:14
**38** [1] - 34:25
**39** [1] - 35:6
**3A1.2** [1] - 20:25
**3A1.2(b** [1] - 12:17
**3A1.2(b)** [1] - 48:14
**3A1.3** [9] - 11:25, 13:16, 13:19, 14:17, 14:22, 18:2, 20:20, 31:10, 31:16
**3C1.1** [11] - 13:5, 37:17, 39:21, 40:15, 43:3, 43:25, 44:8, 44:21, 44:25, 47:17, 48:18
**3D1.2** [7] - 13:1, 31:18, 31:23, 35:10, 35:13, 35:16, 37:12
**3D1.2(b** [2] - 35:2, 47:24
**3D1.2(b)** [2] - 36:13, 37:10
**3D1.2(d** [1] - 36:10

**4**

**40** [2] - 1:13, 49:2
**45** [1] - 12:15
**49** [1] - 18:3

**5**

**5** [20] - 3:25, 11:4, 13:1, 31:19, 35:1, 35:9, 36:12, 36:15, 37:11, 37:12, 47:23, 48:22, 49:7, 87:7, 87:11, 103:14, 103:15, 103:16, 103:21, 103:24

**5,000** [1] - 63:1
**507** [1] - 45:8
**51** [1] - 1:18
**5104(e)(2)(F)** [2] - 4:5, 49:2
**514-7689** [1] - 1:14
**53** [1] - 12:16
**56** [1] - 18:3
**593** [1] - 44:3
**5K** [1] - 55:15
**5K2.21** [1] - 55:16
**5K2.7** [4] - 55:16, 55:25, 56:2, 56:10

**6**

**6** [22] - 10:3, 12:16, 30:12, 30:15, 30:20, 31:1, 32:17, 36:23, 41:11, 75:21, 84:8, 84:10, 84:12, 86:4, 86:5, 87:4, 88:21, 90:15, 91:1, 96:8, 103:16, 109:11
**60** [4] - 101:18, 103:2, 103:4, 103:15
**601** [1] - 1:9
**602** [1] - 1:14
**60s** [1] - 95:14
**617** [1] - 1:19
**62-year-old** [1] - 71:9
**63** [8] - 48:20, 57:6, 57:10, 75:23, 89:19, 101:2, 101:10, 103:5
**68** [1] - 103:14
**6:30** [1] - 54:15
**6th** [36] - 51:6, 52:11, 53:2, 54:6, 55:4, 55:8, 56:11, 59:9, 60:20, 63:21, 64:3, 64:9, 64:15, 65:20, 67:12, 67:17, 68:7, 69:4, 69:23, 71:15, 72:2, 72:11, 73:25, 77:24, 82:25, 88:24, 91:4, 95:1, 96:1, 96:9, 96:12, 96:15, 99:11, 99:13, 99:24, 101:6

**7**

**7** [14] - 4:3, 11:1, 48:25, 49:8, 78:3, 103:16, 103:24, 104:5
**702** [3] - 16:18, 19:12, 45:21
**703** [1] - 51:18
**78** [10] - 4:15, 48:20, 49:22, 49:25, 50:1,

57:1, 57:6, 57:10,
75:21, 103:5
**79** [1] - 4:15

## 8

**8** [1] - 103:14
**80** [1] - 4:18
**803-1612** [1] - 1:10
**81** [2] - 4:20, 39:18
**82** [1] - 5:1
**83** [1] - 4:18
**84** [1] - 4:22
**85** [2] - 4:18, 12:19
**85004-4449** [1] - 1:13
**86** [3] - 4:23, 100:7,
100:17
**87** [9] - 45:8, 49:18,
49:24, 55:10, 56:19,
57:12, 66:19, 70:9,
98:1
**87-month** [7] - 56:24,
59:12, 68:16, 75:4,
75:20, 77:21, 100:19
**871** [1] - 15:6
**880** [1] - 15:6

## 9

**9** [1] - 70:13
**903** [1] - 46:14
**924(c** [2] - 23:5, 24:13
**947** [1] - 18:3
**95** [1] - 45:8
**97** [1] - 57:1
**9:25** [1] - 1:4

## A

**a.m** [3] - 1:4, 52:4,
70:13
**abandoned** [2] -
26:14, 29:7
**abhorrent** [1] - 67:12
**abide** [2] - 104:1,
104:8
**ability** [3] - 17:6, 38:5,
111:7
**able** [8] - 18:17, 19:3,
58:11, 62:3, 66:8,
72:19, 88:25, 89:25
**abrogate** [1] - 78:16
**absolutely** [2] - 80:13,
95:4
**absolve** [1] - 72:4
**abundantly** [1] - 56:14
**abuse** [3] - 79:23,
80:1, 105:2
**accelerant** [1] - 83:9
**accept** [3] - 10:16,

68:1, 101:7
**acceptance** [5] -
68:24, 98:14, 98:19,
100:15, 103:1
**accepted** [2] - 99:23,
102:13
**access** [2] - 93:2,
105:5
**accomplish** [1] -
83:16
**accomplished** [1] -
92:9
**accomplishment** [1] -
58:1
**accordance** [2] -
103:25, 104:22
**accordingly** [1] -
89:14
**account** [2] - 101:12,
102:23
**accountability** [1] -
98:15
**accountable** [1] - 71:7
**accounted** [1] - 59:17
**accrue** [2] - 105:14,
105:19
**accurate** [2] - 22:1,
111:4
**accused** [3] - 44:24,
45:1, 45:3
**achieve** [1] - 68:3
**acknowledge** [2] -
19:14, 101:8
**acknowledged** [1] -
98:20
**acknowledgement** [1]
- 99:10
**acknowledges** [1] -
102:12
**acquittal** [1] - 42:14
**acquitted** [4] - 40:22,
41:1, 41:4, 41:18
**acronym** [1] - 6:6
**Act** [4] - 87:5, 87:10,
87:15, 103:9
**act** [12] - 19:22, 20:9,
22:6, 23:14, 24:7,
25:4, 27:3, 27:4,
35:18, 60:20, 90:11
**acted** [1] - 66:8
**Action** [1] - 1:2
**action** [7] - 17:10,
19:24, 76:23, 84:11,
86:13, 88:24, 100:23
**actions** [16] - 16:13,
30:12, 37:5, 47:2,
58:23, 65:19, 65:20,
95:4, 95:20, 96:9,
98:15, 98:21, 99:23,
100:14, 102:14,

102:16
**activities** [1] - 9:9
**activity** [2] - 78:16,
90:20
**acts** [13] - 4:3, 22:6,
24:25, 26:17, 27:8,
30:22, 31:2, 35:3,
35:20, 36:19, 37:7,
67:4
**actual** [2] - 19:24, 74:7
**ADAMS** [1] - 1:21
**Adams** [1] - 2:14
**add** [7] - 13:13, 14:6,
14:15, 32:5, 32:15,
43:10, 63:7
**added** [5] - 11:25,
20:21, 48:8, 48:11,
48:16
**addition** [6] - 42:23,
76:10, 78:11,
102:16, 103:22,
110:8
**additional** [5] - 32:5,
55:14, 83:23,
105:10, 110:10
**additionally** [1] -
36:24
**address** [6] - 8:15,
13:7, 44:6, 45:17,
55:11, 106:5
**adequately** [1] - 96:8
**adjustment** [6] -
12:16, 15:22, 17:11,
43:19, 45:16, 69:2
**adjustments** [1] -
35:24
**admitted** [6] - 38:25,
39:11, 51:17, 92:8,
92:22, 102:13
**advance** [1] - 39:25
**advanced** [1] - 22:18
**advantage** [2] - 67:3,
67:11
**advisory** [6] - 48:20,
49:5, 61:12, 61:15,
90:4, 103:11
**affect** [2] - 45:13,
84:17
**affected** [3] - 52:25,
53:24, 54:2
**afford** [1] - 107:3
**afternoon** [1] - 47:12
**afterwards** [2] - 57:19,
78:1
**age** [1] - 78:14
**agencies** [1] - 106:9
**Agent** [5] - 1:21, 1:21,
2:6, 2:13, 2:15
**aggravate** [1] - 36:4
**aggravated** [7] -

12:10, 21:2, 24:17,
27:14, 28:3, 28:7,
28:14
**aggressive** [8] -
16:24, 33:22, 60:14,
60:17, 62:23, 73:9,
77:3, 93:20
**agree** [13] - 14:11,
21:18, 22:2, 28:13,
32:8, 36:12, 38:10,
40:10, 63:4, 63:15,
64:24, 66:19, 75:2
**agreed** [1] - 13:23
**agreement** [2] - 25:7,
68:19
**agreements** [2] -
55:19, 88:5
**agrees** [3] - 26:10,
63:5, 87:20
**aided** [1] - 1:25
**AIDEE** [1] - 1:20
**Aidee** [1] - 2:6
**air** [1] - 3:15
**Ak** [4] - 52:8, 54:25,
65:3, 66:10
**alcohol** [1] - 79:22
**alleviate** [1] - 52:14
**allow** [3] - 87:15,
109:8, 109:14
**allowed** [3] - 63:10,
66:7, 90:3
**almost** [6] - 53:14,
61:20, 88:6, 90:2,
98:3, 99:16
**alone** [5] - 23:23,
36:14, 37:1, 72:12,
82:4
**ALSO** [1] - 1:20
**alternative** [2] - 18:23,
18:24
**amendment** [1] -
43:21
**AMERICA** [1] - 1:2
**America** [1] - 2:3
**amount** [22] - 36:2,
50:16, 50:18, 50:19,
86:25, 87:1, 87:17,
88:3, 88:5, 88:7,
88:10, 88:16, 88:17,
88:19, 89:6, 89:15,
89:19, 90:4, 105:13,
105:15, 105:16,
105:25
**amounted** [1] - 16:4
**amounts** [1] - 18:12
**amply** [1] - 45:10
**analogizing** [1] - 23:5
**analysis** [6] - 20:6,
20:15, 20:17, 31:7,
34:21, 37:3

**angry** [1] - 45:23
**answer** [2] - 81:16,
109:4
**anyway** [1] - 64:5
**AP** [3] - 29:23, 42:19,
47:12
**apart** [1] - 72:2
**apologizing** [1] -
102:15
**appeal** [11] - 8:23,
14:14, 75:16,
106:12, 106:15,
106:20, 106:25,
107:2, 107:3, 107:4,
107:5
**Appeals** [1] - 106:13
**appeals** [1] - 8:25
**appear** [3] - 23:10,
109:20, 109:22
**appearance** [1] -
63:10
**APPEARANCES** [1] -
1:7
**appeared** [1] - 100:14
**appearing** [1] - 2:7
**applicable** [8] - 6:9,
28:1, 28:4, 35:24,
43:3, 48:1, 48:12,
89:18
**application** [12] -
6:16, 15:21, 17:7,
18:13, 18:21, 19:6,
19:19, 20:12, 20:14,
31:9, 43:24, 106:18
**applies** [15] - 20:11,
21:3, 26:24, 28:2,
28:14, 29:17, 31:16,
36:7, 37:14, 39:21,
40:4, 40:15, 43:18,
43:23, 48:4
**apply** [20] - 6:8, 11:3,
13:24, 14:19, 17:12,
17:25, 18:2, 20:20,
21:4, 21:5, 36:11,
47:17, 47:21, 47:22,
55:16, 79:12, 88:15,
104:6, 107:5, 110:2
**applying** [3] - 17:22,
20:17, 42:15
**appointed** [2] - 63:11,
107:5
**apportion** [1] - 87:17
**appreciate** [4] - 9:24,
32:4, 32:6, 67:13
**appreciated** [1] - 10:7
**appreciation** [1] - 96:7
**appropriate** [17] -
6:18, 34:21, 55:9,
55:10, 57:13, 62:25,
63:14, 66:20, 68:17,

87:22, 90:5, 97:13, 98:18, 99:1, 99:24, 106:9, 108:11
**approval** [1] - 105:10
**approved** [1] - 106:10
**approximate** [1] - 87:21
**April** [1] - 1:4
**Architect** [3] - 88:2, 105:16, 105:22
**area** [2] - 69:18, 90:23
**areas** [1] - 44:18
**argued** [2] - 37:19, 41:7
**argues** [10] - 12:24, 14:18, 31:20, 35:9, 37:17, 44:14, 61:22, 87:20, 88:17, 100:4
**arguing** [1] - 32:3
**argument** [12] - 12:6, 13:18, 22:13, 22:21, 23:1, 32:15, 34:6, 37:25, 39:3, 76:3, 85:17, 91:9
**arguments** [3] - 32:10, 32:12, 41:6
**arise** [1] - 31:20
**arm** [14] - 14:20, 16:3, 16:19, 18:12, 18:19, 19:13, 20:2, 20:4, 44:11, 45:20, 53:7, 93:10, 93:15, 102:8
**armed** [2] - 72:17, 83:2
**arms** [1] - 92:25
**Army** [1] - 102:17
**arrested** [1] - 95:15
**arrests** [1] - 109:13
**arrive** [1] - 2:17
**arrived** [1] - 91:12
**art** [1] - 73:2
**articulating** [1] - 37:2
**aside** [1] - 29:10
**aspect** [1] - 37:3
**assault** [40] - 12:10, 12:12, 21:2, 21:13, 22:14, 23:25, 24:11, 24:18, 24:25, 25:9, 25:13, 25:14, 26:15, 27:14, 28:3, 28:7, 28:14, 28:16, 28:20, 29:19, 29:21, 30:1, 33:15, 33:21, 34:18, 44:18, 53:12, 60:3, 60:6, 66:7, 67:18, 68:10, 84:21, 97:22, 100:3, 100:6, 100:13, 101:1, 101:16
**assaulted** [1] - 76:15

**assaulting** [7] - 3:22, 25:2, 48:3, 48:5, 65:15, 87:6, 90:8
**assaultive** [1] - 33:22, 59:25, 69:7
**assemblages** [1] - 30:22
**assertion** [2] - 24:23, 43:16
**assertive** [1] - 62:23
**asserts** [5] - 25:12, 26:22, 40:14, 43:1, 45:18
**assess** [1] - 73:1
**assessing** [3] - 73:3, 98:22, 99:14
**assessment** [9] - 49:7, 49:21, 50:5, 70:8, 73:5, 73:17, 78:22, 79:16, 103:23
**assessments** [2] - 73:7, 106:2
**assets** [2] - 62:10, 89:10
**assistance** [1] - 106:21
**assisting** [1] - 46:16
**Associated** [2] - 94:15, 94:17
**astute** [1] - 96:20
**attack** [4] - 51:13, 57:23, 66:7, 90:17
**attacked** [1] - 58:7
**attackers** [1] - 46:17
**attacking** [1] - 29:22
**attacks** [2] - 58:3, 58:10
**attempt** [4] - 17:20, 28:11, 67:18, 92:14, 102:1, 105:4
**attempted** [1] - 102:3
**attempting** [2] - 28:10, 44:11
**attempts** [4] - 53:18, 92:17, 92:21, 93:22
**attend** [2] - 90:25, 101:18
**attorney** [1] - 98:4
**Attorney's** [4] - 1:9, 1:22, 1:22, 105:8
**attorneys** [3] - 7:23, 8:1, 8:5
**authorization** [1] - 111:10
**authorize** [1] - 105:6
**authorizing** [1] - 104:23
**available** [3] - 86:21, 87:24, 97:15
**Avenue** [2] - 1:13,

106:4
**avenues** [1] - 66:16
**avoid** [8] - 68:5, 71:17, 76:6, 76:12, 81:14, 86:21, 89:25, 97:19
**avoiding** [2] - 57:15, 98:6
**avowed** [2] - 83:3, 83:17
**awaiting** [1] - 51:10
**awarding** [1] - 87:14
**AZ** [1] - 1:13
**AZIZA** [1] - 1:16
**Aziza** [1] - 3:3

**B**

**b)** [1] - 101:16
**background** [2] - 53:20, 61:17
**bad** [1] - 53:6
**bag** [1] - 88:22
**balance** [3] - 20:13, 105:14, 105:19
**balanced** [1] - 18:5
**banana** [1] - 57:21
**barrier** [1] - 19:24
**base** [10] - 11:23, 12:12, 20:24, 26:22, 28:5, 31:8, 31:12, 31:14, 34:13, 48:6
**base-offense** [1] - 12:12
**based** [12] - 6:8, 18:8, 20:15, 31:7, 33:19, 36:11, 42:25, 43:19, 48:23, 87:23, 90:5, 103:6
**basic** [1] - 104:2
**basis** [8] - 9:18, 22:7, 36:2, 39:21, 61:12, 78:8, 83:21, 99:5
**Bates** [1] - 25:9
**bathroom** [1] - 52:13
**baton** [4] - 102:2, 102:4, 102:7
**batons** [3] - 47:5, 93:15, 94:8
**battered** [1] - 54:12
**battering** [1] - 92:12
**battling** [1] - 94:11
**beat** [1] - 15:24
**beaten** [1] - 77:4
**beating** [1] - 29:14
**became** [1] - 59:21
**become** [1] - 68:4
**becoming** [2] - 32:20, 91:23
**BEFORE** [1] - 1:6
**begin** [3] - 84:18,

84:23, 86:25
**beginning** [1] - 5:21
**behalf** [2] - 3:5, 8:21
**behavior** [3] - 36:4, 36:6, 95:23
**belief** [2] - 44:12, 46:25
**believes** [1] - 55:9
**Bell** [5] - 18:3, 18:10, 19:9, 20:13, 20:17
**below** [1] - 111:11
**benefit** [1] - 67:2
**Berman** [5] - 21:12, 23:5, 26:9, 82:20, 83:12
**Berman-Jackson** [4] - 21:12, 26:9, 82:20, 83:12
**Berman-Jackson's** [1] - 23:5
**BERYL** [1] - 1:6
**best** [2] - 87:24, 111:6
**bet** [1] - 64:25
**better** [4] - 59:14, 59:15, 64:2, 64:5
**between** [6] - 21:13, 24:13, 46:3, 54:11, 76:18, 83:13
**beyond** [3] - 24:6, 42:15, 59:8
**big** [1] - 76:18
**bill** [1] - 89:6
**bit** [4] - 61:23, 71:20, 79:3, 80:22
**blaring** [2] - 47:4, 94:6
**blazes** [1] - 67:23
**bleeding** [1] - 51:14
**bodies** [1] - 93:24
**bodily** [7] - 15:11, 28:8, 28:10, 28:17, 28:25, 29:1, 29:6
**body** [3] - 51:17, 52:3, 92:13
**body-worn** [1] - 51:17
**boosting** [1] - 64:19
**Boston** [1] - 1:18
**bottom** [3] - 57:4, 101:10, 101:11
**Bouche** [1] - 2:15
**bound** [3] - 13:22, 14:25, 15:9
**bravery** [1] - 60:24
**breach** [3] - 30:4, 46:18, 101:22
**breached** [1] - 69:14
**breaches** [1] - 30:6
**break** [3] - 47:10, 59:4, 70:11
**breath** [1] - 94:14
**brief** [2] - 16:21, 17:4

**briefed** [2] - 14:9, 14:12
**briefing** [10] - 21:8, 21:10, 22:13, 38:2, 38:7, 43:10, 56:4, 56:9, 56:17, 85:18
**briefly** [3] - 18:6, 38:4, 39:17
**bring** [3] - 75:6, 76:1, 101:19
**broad** [1] - 33:19
**broad-based** [1] - 33:19
**broken** [1] - 47:14
**brought** [3] - 56:12, 69:11, 75:6
**bruise** [1] - 52:2
**bruised** [1] - 54:12
**brutal** [1] - 51:13
**brutally** [1] - 38:16
**Building** [14] - 29:10, 29:23, 30:9, 31:6, 46:19, 88:6, 91:22, 91:25, 92:1, 95:2, 95:6, 95:10, 101:25, 105:24
**building** [9] - 4:1, 9:22, 29:24, 40:9, 47:15, 87:8, 90:11, 92:20, 102:11
**buildings** [3] - 4:4, 69:21, 90:12
**bulletproof** [1] - 60:2
**bumped** [2] - 73:8, 74:7
**burden** [5] - 42:15, 44:5, 44:15, 88:13, 99:7
**Bureau** [3] - 103:13, 109:16, 109:21
**burned** [1] - 52:3
**burning** [1] - 52:14
**busted** [1] - 54:14

**C**

**calculated** [1] - 55:14
**calculating** [2] - 47:24, 56:15
**calculation** [7] - 8:15, 11:8, 12:23, 14:15, 20:22, 37:13, 77:17
**camera** [1] - 51:17
**cannot** [4] - 53:15, 80:15, 94:24, 95:25
**capability** [1] - 73:11
**capable** [3] - 28:24, 29:1, 29:15
**capacity** [1] - 45:4
**Capitol** [76] - 4:3,

4

9:21, 9:23, 10:3,
17:16, 25:23, 29:10,
29:23, 30:3, 30:5,
30:9, 30:14, 31:5,
36:22, 39:25, 40:5,
40:8, 41:11, 42:1,
42:20, 46:18, 51:8,
51:22, 53:1, 53:13,
54:10, 54:25, 55:2,
57:22, 58:14, 58:19,
58:20, 59:22, 60:21,
61:5, 65:9, 67:17,
67:19, 68:8, 68:10,
69:8, 69:14, 69:16,
69:18, 70:4, 70:5,
74:7, 82:3, 83:6,
86:3, 86:5, 88:2,
88:6, 88:23, 90:12,
90:17, 91:15, 91:16,
91:21, 91:24, 92:1,
92:9, 92:15, 93:3,
93:21, 94:2, 94:14,
94:23, 95:2, 95:6,
95:10, 99:13,
101:20, 101:25,
105:16, 105:23
**Capitol's** [1] - 20:9
**captured** [1] - 13:6
**cards** [1] - 34:8
**carefully** [3] - 42:5,
42:7, 65:24
**caring** [2] - 60:19,
60:20
**CAROLINA** [1] - 1:8
**Carolina** [1] - 2:11
**carolina.nevin@
usdoj.gov** [1] - 1:11
**carried** [2] - 94:25,
101:16
**cars** [3] - 61:22, 62:1,
89:22
**case** [43] - 4:12, 6:8,
6:19, 7:24, 8:2, 8:23,
10:20, 15:16, 15:22,
22:1, 22:4, 24:3,
24:24, 25:11, 27:13,
33:2, 34:14, 36:10,
36:12, 43:25, 44:2,
44:4, 45:12, 45:14,
58:13, 61:11, 62:25,
63:14, 72:8, 82:12,
82:19, 82:20, 84:1,
84:2, 84:19, 87:12,
88:3, 96:22, 97:3,
99:3, 100:21, 102:22
**Case** [1] - 2:3
**case-by-case** [1] -
36:10
**cases** [29] - 21:24,
21:25, 26:10, 26:20,

32:17, 32:24, 50:15,
56:11, 57:16, 63:21,
63:22, 64:9, 68:16,
68:18, 71:15, 71:19,
72:2, 81:21, 84:8,
95:15, 97:24, 99:16,
99:20, 99:22, 100:2,
100:25, 101:13
**cash** [3] - 62:8, 89:8,
89:13
**casually** [1] - 29:21
**catch** [1] - 94:14
**category** [1] - 82:2
**Category** [2] - 11:12,
48:19
**caught** [3] - 33:24,
39:8, 81:24
**caused** [4] - 59:7,
61:6, 61:7, 87:22
**causes** [2] - 30:23,
96:11
**causing** [1] - 52:2
**caution** [1] - 109:18
**cent** [1] - 62:15
**Central** [1] - 1:13
**ceremony** [1] - 67:25
**certain** [4] - 21:13,
48:5, 87:7, 106:15
**certainly** [20] - 3:17,
4:13, 17:18, 26:4,
34:21, 38:11, 42:14,
56:17, 57:14, 58:14,
62:20, 63:4, 63:14,
74:1, 77:21, 82:1,
84:2, 100:22, 103:4,
109:12
**CERTIFICATE** [1] -
111:1
**certificate** [1] - 111:8
**certification** [3] -
40:19, 41:10, 59:9
**certify** [1] - 111:4
**challenge** [1] - 106:23
**chambers** [1] - 58:25
**chance** [1] - 58:9
**change** [4] - 40:24,
59:20, 106:5, 106:6
**changed** [1] - 50:7
**chaos** [1] - 96:19
**Chapter** [2] - 48:12,
48:13
**characteristic** [2] -
35:23, 48:10
**characteristics** [7] -
59:13, 60:22, 63:17,
84:15, 84:17, 86:20,
95:13
**characterizes** [1] -
96:23
**charge** [8] - 25:20,

39:11, 74:10, 74:12,
82:14, 97:22, 97:23,
101:16
**charged** [2] - 27:12,
59:18
**charges** [4] - 3:21,
74:13, 88:5, 105:9
**charging** [1] - 48:5
**chemical** [1] - 54:12
**chemicals** [2] - 52:20,
53:16
**Chief** [1] - 105:23
**choice** [6] - 54:22,
69:7, 87:22, 91:22,
96:18
**choices** [1] - 69:3
**choose** [1] - 75:14
**Chrestman** [1] - 72:22
**CHRISTINE** [1] - 1:21
**Christine** [1] - 2:6
**chronologically** [1] -
57:17
**chutzpah** [1] - 65:6
**Circuit** [23] - 15:2,
15:7, 15:8, 15:15,
15:20, 15:22, 18:1,
18:3, 18:4, 18:9,
19:9, 19:21, 20:16,
40:25, 43:22, 43:25,
44:1, 44:2, 71:13,
98:24, 99:3, 106:13,
106:15
**Circuit's** [1] - 43:17
**circumstances** [5] -
22:5, 59:1, 86:19,
90:7, 106:16
**cite** [4] - 18:3, 44:3,
45:8, 57:16
**cited** [3] - 81:21,
99:16, 100:25
**cites** [2] - 26:11,
101:15
**citing** [1] - 15:22
**citizens** [1] - 66:17
**citywide** [1] - 54:7
**civil** [30] - 3:24, 12:13,
12:24, 21:14, 21:21,
22:7, 22:16, 23:12,
23:19, 23:22, 23:24,
24:1, 25:1, 25:2,
27:5, 27:11, 27:13,
29:20, 30:11, 30:19,
30:21, 33:21, 34:15,
84:21, 87:7, 90:9,
97:23, 99:21, 99:22
**claim** [4] - 21:15,
40:12, 46:12, 64:10
**claiming** [1] - 40:5
**claims** [2] - 60:6,
91:13

**clarification** [1] - 63:3
**clarified** [1] - 78:2
**Class** [3] - 48:22,
48:25, 90:11
**cleaning** [1] - 61:4
**clear** [16] - 13:23,
15:2, 17:9, 17:15,
21:21, 22:5, 25:16,
37:20, 43:14, 43:18,
43:22, 47:8, 62:19,
71:25, 75:11, 77:10
**clear-and-
convincing** [2] -
37:20, 43:18
**clearly** [9] - 16:1, 17:1,
17:15, 21:4, 21:20,
27:10, 45:21, 46:9,
47:2
**Clerk** [3] - 105:20,
106:3, 106:6
**client** [1] - 8:10
**clogged** [1] - 51:19
**close** [8] - 9:22, 15:3,
16:14, 21:11, 40:17,
90:2, 94:1, 94:19
**closed** [1] - 3:14
**closely** [1] - 29:2
**closer** [15] - 16:25,
25:22, 45:24, 57:25,
58:1, 58:2, 68:14,
69:5, 91:21, 91:24,
92:15, 96:16
**closing** [1] - 39:3
**coalesce** [1] - 22:8
**coconspirators** [1] -
15:24
**collection** [1] - 104:20
**college** [1] - 54:3
**College** [3] - 40:19,
41:11, 61:3
**Columbia** [2] - 80:14,
105:21
**COLUMBIA** [1] - 1:1
**combat** [6] - 51:22,
69:6, 73:13, 90:21,
96:21, 97:11
**combination** [2] -
43:2, 48:19
**coming** [9] - 4:10,
5:23, 53:12, 53:25,
56:9, 58:4, 72:17,
81:25, 82:25
**Commander** [1] - 70:3
**commensurate** [2] -
50:14, 66:23
**comment** [2] - 85:7
**Commission** [2] -
27:16, 40:23
**commit** [14] - 22:11,
22:15, 23:1, 25:1,

25:3, 27:10, 28:11,
28:21, 29:20, 34:15,
59:21, 64:2, 67:4,
104:10
**committed** [14] -
23:13, 24:7, 27:4,
28:16, 28:20, 35:4,
59:20, 64:3, 65:21,
67:12, 86:23,
103:13, 109:10,
110:7
**committing** [5] -
22:14, 23:7, 45:1,
53:18, 110:10
**common** [7] - 35:4,
35:5, 35:20, 35:21,
37:8, 71:15
**Commonwealth** [1] -
80:14
**community** [1] - 91:17
**comparable** [1] -
68:16
**comparative** [1] -
98:10
**comparator** [2] -
82:18, 99:16
**comparators** [6] -
82:11, 97:25, 98:5,
98:9, 99:25
**compare** [1] - 74:18
**compared** [1] - 19:17
**comparison** [1] -
32:21
**complete** [2] - 24:22,
111:6
**completely** [7] -
18:20, 26:11, 26:20,
34:11, 52:1, 58:21,
108:16
**complex** [2] - 41:2,
88:10
**compliance** [2] -
18:23, 18:24
**compliant** [5] - 60:10,
108:9, 108:16,
109:13, 110:17
**complicate** [1] - 88:11
**complicated** [1] -
27:23
**complied** [1] - 109:6
**comply** [4] - 19:3,
85:21, 104:25, 109:6
**comprehensive** [1] -
21:7
**computer** [1] - 1:25
**computer-aided** [1] -
1:25
**concentrated** [1] -
90:23
**concern** [3] - 8:14,

5

32:4, 99:18
**concerned** [1] - 109:2
**concert** [1] - 66:8
**conclude** [1] - 16:6
**concludes** [2] - 45:15, 110:25
**concurrent** [4] - 103:15, 103:17, 103:18, 103:19
**Condition** [2] - 78:3, 104:5
**condition** [5] - 78:9, 78:15, 79:10, 79:12, 79:21
**conditions** [11] - 78:7, 80:13, 104:2, 104:9, 105:1, 108:16, 108:19, 110:1, 110:2, 110:4, 110:18
**conduct** [52] - 6:9, 10:6, 10:8, 20:1, 28:3, 29:5, 33:14, 33:22, 34:17, 35:22, 36:15, 36:17, 40:22, 41:1, 41:4, 41:18, 44:17, 48:11, 59:25, 65:12, 68:20, 69:7, 73:4, 73:6, 73:9, 73:12, 73:18, 73:20, 75:2, 76:10, 76:12, 77:9, 77:19, 77:20, 77:21, 83:14, 83:15, 84:14, 86:9, 86:23, 87:3, 87:13, 90:18, 95:4, 96:1, 96:5, 99:10, 101:8, 102:14, 103:2, 109:11, 109:19
**conducted** [1] - 91:3
**confident** [1] - 14:5
**confine** [2] - 15:12, 20:10
**confined** [1] - 19:21
**confining** [1] - 19:23
**confused** [1] - 21:23
**confusing** [1] - 3:13
**confusion** [2] - 45:2, 71:1
**Congress** [4] - 58:25, 59:4, 85:19, 90:20
**conjunction** [2] - 58:4, 70:17
**connected** [2] - 35:20, 37:7
**connection** [2] - 4:8, 8:7
**consecutive** [2] - 109:25, 110:10
**consent** [1] - 62:10
**consented** [1] - 89:11

**consequence** [1] - 45:15
**consequences** [1] - 67:5
**consider** [6] - 75:8, 83:22, 85:18, 86:18, 89:16, 107:15
**consideration** [9] - 9:12, 18:7, 18:10, 18:15, 18:22, 19:7, 19:20, 103:6, 103:10
**considerations** [4] - 72:14, 95:24, 98:22, 99:14
**considered** [2] - 19:11, 111:8
**considering** [4] - 40:23, 43:19, 75:3, 85:14
**considers** [1] - 18:1
**consistent** [2] - 10:19, 39:7
**conspiracy** [1] - 59:18
**conspire** [1] - 59:16
**constantly** [1] - 83:1
**constituted** [1] - 28:3
**constitutes** [2] - 19:24, 111:4
**constituting** [3] - 35:5, 35:21, 37:8
**Constitution** [2] - 86:7, 106:4
**constitutional** [2] - 59:2, 59:5
**constitutionally** [1] - 86:7
**contact** [5] - 15:11, 15:18, 16:1, 17:11, 52:4
**contemplated** [1] - 26:18
**contempt** [1] - 110:6
**contend** [1] - 22:15
**contends** [1] - 26:7
**contesting** [3] - 80:3, 80:5, 80:24
**context** [3] - 10:5, 19:16, 27:4
**continual** [1] - 108:15
**continue** [2] - 109:6, 110:1
**continued** [2] - 42:10, 51:15
**continuous** [1] - 36:5
**contrary** [3] - 46:10, 46:24, 91:19
**contributed** [1] - 95:5
**contribution** [1] - 87:19
**contributions** [1] -

102:23
**control** [7] - 16:9, 16:22, 17:5, 17:16, 18:16, 18:19, 18:20
**controlled** [3] - 104:12, 104:14, 104:16
**controls** [1] - 81:5
**conversation** [2] - 83:25, 94:16
**convict** [1] - 41:16
**convicted** [21] - 24:3, 25:6, 25:9, 26:13, 33:4, 38:24, 44:20, 44:24, 82:13, 82:22, 84:20, 87:3, 88:20, 90:8, 98:10, 98:11, 98:12, 99:21, 100:3, 108:7, 110:7
**conviction** [11] - 3:21, 11:1, 12:24, 12:25, 30:11, 41:17, 42:3, 48:24, 79:4, 87:6, 106:23
**convictions** [10] - 11:4, 11:10, 12:25, 44:17, 44:19, 87:11, 95:14, 97:21, 106:12, 109:12
**convincing** [2] - 37:20, 43:18
**cooperate** [1] - 104:20
**cooperation** [1] - 59:6
**coordination** [1] - 72:10
**corporation** [1] - 81:8
**correct** [15] - 7:11, 7:12, 12:2, 22:25, 24:10, 26:1, 26:22, 28:5, 42:13, 50:21, 56:13, 63:13, 74:6, 80:6, 80:19
**correctly** [2] - 12:7, 36:16
**cost** [4] - 89:2, 89:16, 107:3, 107:4
**costs** [1] - 89:1
**counsel** [8] - 2:8, 2:13, 61:21, 63:11, 85:9, 96:10, 106:21, 107:5
**counsel's** [1] - 62:12
**Count** [31] - 3:22, 3:24, 3:25, 4:3, 11:1, 11:24, 12:12, 12:13, 12:23, 13:1, 31:19, 33:16, 33:18, 33:21, 35:6, 36:16, 36:17, 48:2, 48:5, 48:22, 48:25, 49:7, 49:8,

103:15, 103:16, 103:21, 103:24
**count** [5] - 26:1, 41:16, 41:18, 48:1, 82:23
**counted** [1] - 61:3
**country** [7] - 57:20, 59:10, 63:23, 86:11, 86:14, 102:18, 102:24
**country's** [1] - 66:15
**Counts** [14] - 11:4, 27:25, 31:19, 34:25, 35:9, 36:12, 36:15, 37:11, 47:23, 49:7, 87:6, 87:11, 103:21, 103:23
**counts** [16] - 31:20, 33:17, 35:13, 35:17, 35:19, 35:22, 35:25, 36:23, 36:25, 37:1, 37:2, 37:12, 47:22, 82:22, 107:9, 107:10
**couple** [5] - 2:17, 8:16, 12:13, 77:25, 82:11
**courage** [1] - 60:25
**course** [9] - 5:1, 17:21, 26:23, 32:18, 44:23, 68:20, 72:4, 82:12, 108:21
**Court** [62] - 1:23, 1:24, 2:2, 9:11, 10:15, 14:10, 17:25, 21:10, 23:4, 32:9, 32:15, 33:1, 33:2, 38:5, 38:9, 39:15, 44:23, 45:9, 45:15, 55:13, 55:14, 63:15, 71:10, 71:19, 72:4, 74:6, 75:2, 75:7, 75:11, 75:15, 76:9, 78:12, 79:6, 80:23, 81:23, 82:6, 83:22, 83:23, 87:15, 87:20, 88:9, 88:15, 89:15, 98:19, 102:15, 103:3, 103:12, 104:19, 105:17, 105:21, 106:3, 106:6, 106:11, 106:13, 107:4, 107:15, 108:17, 109:2, 109:7, 111:15
**COURT** [104] - 1:1, 1:7, 2:19, 2:23, 2:25, 3:7, 3:11, 5:6, 5:8, 5:10, 5:12, 5:15, 7:1, 7:7, 7:14, 7:17, 7:20, 8:4, 8:9, 8:13, 9:5,

9:16, 10:13, 12:3, 13:9, 14:7, 14:11, 21:18, 22:12, 23:12, 23:19, 24:2, 24:5, 24:19, 27:1, 27:18, 32:2, 32:10, 32:12, 32:20, 33:3, 33:7, 33:10, 33:12, 34:8, 34:10, 34:23, 37:24, 38:1, 39:16, 40:17, 41:15, 43:4, 43:9, 49:13, 49:15, 50:12, 50:22, 55:22, 56:7, 56:22, 61:8, 63:2, 63:12, 63:16, 64:17, 70:10, 70:20, 71:4, 72:20, 74:4, 74:10, 74:12, 75:18, 76:7, 76:17, 77:1, 77:7, 77:25, 78:18, 78:21, 79:9, 79:15, 79:19, 80:7, 80:10, 80:17, 80:20, 80:25, 81:4, 81:12, 81:19, 83:25, 85:2, 85:8, 85:11, 107:11, 107:18, 108:1, 108:18, 109:8, 110:15, 110:22, 110:24
**court** [9] - 3:5, 8:25, 41:3, 53:25, 62:13, 63:11, 70:12, 107:5, 110:6
**Court's** [2] - 38:5, 50:10
**court-appointed** [2] - 63:11, 107:5
**courthouse** [2] - 25:7, 63:22
**courthouses** [1] - 63:22
**COURTROOM** [1] - 2:2
**courtroom** [6] - 25:16, 38:11, 51:17, 52:8, 53:4, 53:22
**courts** [4] - 71:13, 72:14, 75:16, 82:6
**cover** [1] - 36:6
**covered** [1] - 54:12
**crammed** [1] - 31:4
**crazy** [1] - 79:7
**created** [2] - 29:3, 86:12
**credible** [2] - 46:11, 46:24
**credit** [7] - 19:15, 62:11, 89:11, 91:8, 98:15, 105:9, 105:10
**crime** [5] - 22:11,

6

24:12, 55:6, 104:11, 110:11

**crimes** [13] - 21:16, 25:10, 34:14, 53:18, 59:20, 59:21, 64:3, 66:23, 67:12, 86:17, 95:23, 99:19, 108:8

**Criminal** [4] - 1:2, 2:3, 11:11, 48:19

**criminal** [33] - 6:8, 11:5, 11:8, 11:10, 35:4, 35:5, 35:20, 37:8, 45:7, 62:18, 73:4, 73:11, 78:16, 78:22, 79:15, 84:16, 86:9, 86:22, 87:13, 88:24, 90:6, 90:18, 95:23, 96:1, 102:14, 105:12, 105:17, 106:1, 109:10, 109:11, 109:12, 109:23

**critical** [1] - 95:24

**cross** [4] - 23:3, 24:17, 28:2, 51:19

**cross-examination** [1] - 51:19

**cross-reference** [3] - 23:3, 24:17, 28:2

**crowd** [15] - 9:20, 10:2, 46:1, 46:4, 46:5, 46:6, 46:10, 53:5, 65:14, 77:3, 77:11, 77:14, 91:14, 92:2, 92:6

**crowded** [1] - 92:6

**crutch** [7] - 46:8, 52:2, 54:13, 58:11, 65:1, 65:3, 93:13

**Crypt** [1] - 69:19

**culpability** [1] - 90:16

**culpable** [1] - 83:19

**curious** [1] - 56:23

**current** [1] - 81:1

**custody** [3] - 60:12, 103:13, 108:11

## D

**D.C** [27] - 1:5, 15:2, 15:6, 15:20, 15:22, 20:16, 40:25, 41:23, 43:17, 43:22, 43:25, 44:1, 44:2, 62:3, 68:7, 71:13, 90:25, 91:5, 91:12, 98:24, 99:3, 101:17, 105:24, 106:4, 106:13, 106:15

**D.D.C** [1] - 44:4

**damage** [7] - 30:24, 31:5, 59:7, 59:10, 61:6, 87:24

**damaged** [2] - 59:7, 95:6

**damages** [4] - 61:8, 61:10, 88:6, 88:23

**danger** [2] - 30:23, 31:4

**dangerous** [9] - 28:8, 28:16, 28:24, 29:6, 29:18, 48:9, 64:4, 67:7, 100:15

**date** [1] - 91:4

**Dated** [1] - 111:13

**days** [6] - 15:25, 52:3, 104:17, 106:5, 106:25, 107:1

**DC** [1] - 1:10

**deal** [4] - 12:22, 21:2, 55:6, 84:18

**dealing** [1] - 72:22

**death** [2] - 28:25, 29:1

**debts** [2] - 62:10, 89:10

**decades** [1] - 59:10

**December** [2] - 3:21, 79:25

**decides** [1] - 75:9

**decision** [8] - 9:14, 34:5, 34:22, 39:9, 43:17, 72:22, 82:8, 96:20

**declare** [1] - 59:3

**declined** [2] - 62:9, 89:4

**decorated** [1] - 102:17

**dedicated** [1] - 38:21

**deem** [1] - 82:6

**deeming** [1] - 36:14

**deep** [3] - 47:6, 93:25, 94:3

**deeper** [5] - 46:14, 46:15, 91:22, 96:18

**default** [1] - 43:23

**defend** [2] - 55:8, 58:8

**Defendant** [10] - 1:5, 16:2, 20:22, 29:13, 34:16, 58:22, 60:1, 66:14, 66:22, 70:6

**defendant** [142] - 3:20, 11:18, 12:9, 12:14, 12:20, 13:2, 13:4, 14:20, 15:11, 15:16, 16:3, 16:18, 16:21, 16:23, 17:1, 17:9, 17:15, 18:12, 18:19, 18:25, 19:2, 19:3, 19:12, 20:4, 20:6, 20:18, 20:20, 20:24,

23:13, 23:23, 24:3, 24:7, 25:17, 26:1, 28:16, 29:3, 29:19, 29:21, 30:7, 30:10, 30:12, 30:16, 31:1, 31:17, 35:9, 36:12, 43:16, 44:9, 44:14, 44:20, 45:11, 45:18, 45:21, 46:1, 46:3, 46:6, 46:12, 46:14, 46:25, 47:2, 47:21, 48:16, 49:3, 50:6, 51:5, 51:10, 51:25, 53:7, 53:17, 53:20, 55:5, 58:7, 58:13, 59:8, 59:13, 60:4, 60:6, 61:17, 63:6, 63:9, 63:18, 63:20, 65:6, 65:12, 66:5, 70:7, 73:20, 76:23, 76:24, 77:8, 78:3, 78:6, 78:10, 84:9, 84:10, 84:20, 85:24, 87:18, 87:25, 89:4, 89:7, 89:12, 89:21, 89:25, 91:12, 91:13, 91:15, 92:24, 93:1, 93:6, 93:9, 93:14, 93:17, 93:23, 94:7, 94:9, 94:12, 94:13, 94:17, 94:22, 95:24, 96:3, 96:6, 99:8, 99:17, 99:20, 100:2, 100:4, 100:7, 101:2, 101:5, 101:7, 101:15, 101:23, 102:8, 102:12, 102:19, 103:1, 103:2, 103:3, 108:7

**DEFENDANT** [8] - 1:15, 3:10, 7:6, 8:3, 8:8, 85:7, 108:23, 110:13

**defendant's** [50] - 4:16, 5:2, 11:1, 11:5, 12:22, 13:14, 15:24, 16:13, 16:16, 16:20, 16:24, 17:4, 18:17, 19:18, 20:1, 20:9, 20:23, 24:15, 26:7, 28:2, 29:5, 29:17, 30:1, 31:9, 31:11, 36:19, 37:5, 37:10, 37:15, 43:20, 44:10, 44:11, 44:12, 44:18, 46:9, 47:16, 48:8, 53:12, 58:23, 65:19, 68:17, 84:13, 94:4, 96:23, 96:24, 98:19, 99:7, 100:23, 101:11, 101:14

**defendants** [25] - 5:21, 25:6, 63:24, 64:9, 72:1, 77:19, 77:24, 84:15, 86:22, 87:2, 87:13, 87:16, 88:20, 88:25, 89:2, 97:20, 98:11, 98:14, 98:20, 99:2, 99:4, 99:19, 99:21, 99:22, 100:3

**Defender** [3] - 1:17, 3:2, 3:4

**defense** [7] - 13:24, 26:11, 43:12, 45:5, 62:12, 91:9, 98:4

**defensively** [3] - 92:12, 92:16, 97:8

**defied** [1] - 65:20

**define** [1] - 19:22

**defined** [4] - 13:19, 16:7, 30:21, 35:16

**defines** [4] - 13:21, 14:24, 28:6, 28:23

**definitely** [2] - 63:14, 86:9

**definition** [12] - 13:18, 13:20, 14:22, 15:4, 15:10, 16:11, 16:13, 17:14, 17:23, 20:2, 30:20, 78:13

**deflect** [2] - 65:17, 67:19

**defray** [2] - 78:18, 88:25

**degree** [1] - 88:12

**delay** [1] - 59:8

**delve** [1] - 96:18

**democracy** [6] - 55:3, 55:7, 59:6, 61:2, 69:8, 86:14

**democratically** [1] - 66:18

**demonstrate** [1] - 60:22

**demonstrated** [2] - 89:14, 98:14

**demonstrates** [2] - 84:7, 103:3

**demonstrating** [1] - 65:16

**denial** [2] - 41:10, 42:11

**denied** [2] - 9:17, 40:18

**denying** [1] - 9:25

**department** [2] - 79:7, 108:14, 109:22

**department's** [1] - 85:15

**departure** [5] - 55:24,

56:1, 56:5, 57:7

**departures** [2] - 55:15, 57:9

**dependant** [1] - 95:19

**dependants** [1] - 95:19

**deprive** [1] - 16:10

**depth** [2] - 38:6, 75:10

**DEPUTY** [1] - 2:2

**Derrick** [1] - 2:15

**descended** [1] - 10:3

**describe** [3] - 51:5, 52:21, 60:19

**described** [5] - 9:7, 51:13, 51:18, 52:16, 96:10

**describes** [1] - 9:19

**describing** [2] - 22:2, 42:19

**description** [1] - 23:5

**deserves** [1] - 103:3

**deserving** [1] - 99:2

**designated** [1] - 109:15

**designed** [2] - 45:13, 56:11

**despite** [5] - 51:22, 84:10, 91:19, 91:22, 96:19

**detail** [2] - 71:20, 81:21

**detailed** [1] - 38:25

**details** [1] - 39:1

**detained** [1] - 15:24

**detective** [1] - 51:16

**Detective** [4] - 2:16, 55:1, 65:1, 69:9

**detention** [2] - 72:23, 73:1

**deter** [4] - 68:2, 86:9, 95:22, 96:3

**determination** [5] - 10:24, 11:14, 36:10, 49:11, 56:8

**determine** [3] - 6:7, 11:3, 105:3

**determined** [5] - 11:22, 36:1, 49:25, 104:19, 105:17

**determining** [4] - 18:2, 72:5, 88:9, 89:15

**deterrence** [7] - 66:22, 67:1, 67:8, 86:10, 96:2, 98:23, 99:15

**deterrents** [1] - 73:11

**detriment** [1] - 39:4

**developed** [3] - 18:1, 71:14, 83:1

**development** [1] -

7

16:10

**Dictionary** [1] - 16:12

**die** [1] - 93:7

**difference** [2] - 21:13, 76:18

**differences** [3] - 83:13, 101:12, 101:13

**different** [23] - 5:19, 5:20, 18:8, 21:16, 21:20, 22:1, 22:4, 22:5, 24:13, 24:16, 33:14, 34:1, 34:15, 35:7, 49:17, 50:23, 60:18, 72:18, 72:19, 73:10, 75:16, 83:16, 98:5

**differential** [1] - 81:24

**difficult** [1] - 56:4

**diligently** [1] - 70:12

**direct** [1] - 76:23

**directed** [5] - 15:17, 34:19, 89:16, 104:21, 109:21

**directions** [1] - 95:11

**directive** [1] - 19:4

**directly** [3] - 6:15, 66:10, 85:3

**disagree** [1] - 38:12

**disagrees** [1] - 73:12

**disappointed** [2] - 86:12, 96:4

**disassembled** [1] - 111:9

**disbursement** [1] - 105:22

**disclosure** [1] - 62:11

**discontent** [1] - 66:16

**discovery** [1] - 41:24

**discretion** [1] - 87:15

**discretionary** [1] - 87:9

**discuss** [1] - 12:8

**discussed** [3] - 8:11, 18:16, 34:13

**discussing** [2] - 5:23, 6:1

**discussion** [2] - 6:12, 27:20

**dislodge** [1] - 30:2

**dismiss** [1] - 107:10

**dismissed** [2] - 95:16, 107:10

**disobey** [1] - 66:17

**disorder** [30] - 3:24, 12:13, 12:24, 21:14, 21:21, 22:7, 22:16, 23:12, 23:19, 23:22, 23:24, 24:1, 25:1, 25:2, 27:5, 27:11,

27:13, 29:21, 30:11, 30:19, 30:21, 33:21, 34:15, 84:21, 87:7, 90:10, 97:23, 99:21, 99:22

**disparities** [5] - 68:6, 71:17, 86:22, 97:20, 98:7

**disparity** [6] - 57:16, 72:5, 76:6, 76:13, 99:6

**dispositive** [1] - 84:9

**disrespect** [1] - 86:6

**disrupt** [2] - 30:18, 37:9

**disrupted** [1] - 86:7

**disrupting** [2] - 55:25, 90:19

**Dissatisfaction** [1] - 66:15

**distinct** [4] - 24:25, 25:12, 34:18, 35:8

**distinguishable** [2] - 26:11, 26:21

**distracting** [1] - 93:20

**distress** [1] - 54:7

**DISTRICT** [3] - 1:1, 1:1, 1:7

**District** [9] - 1:17, 3:2, 3:4, 80:14, 91:7, 105:21, 106:3, 109:5

**district** [2] - 41:3, 106:10

**disturbance** [1] - 30:22

**DNA** [1] - 104:20

**docketed** [7] - 4:15, 4:18, 4:20, 4:22, 5:1, 10:1, 12:18

**documentation** [4] - 62:8, 62:9, 89:4, 89:9

**documents** [2] - 4:9, 4:10

**DOJ** [1] - 1:12

**DOJ-USAO** [1] - 1:12

**doled** [1] - 75:5

**dollars** [2] - 31:5, 61:6

**done** [5] - 53:19, 63:19, 77:18, 81:11, 94:19

**door** [3] - 30:3, 94:1, 102:1

**doors** [3] - 25:22, 46:24, 101:24

**doubt** [4] - 15:16, 24:7, 42:15, 82:8

**down** [9] - 7:7, 33:9, 33:10, 34:7, 38:21, 52:16, 82:3, 82:25,

83:24

**downward** [2] - 75:24, 75:25

**Dozier** [1] - 43:25

**drag** [1] - 18:25

**drawn** [4] - 58:2, 68:12, 68:13, 71:16

**dressed** [1] - 62:13

**Drew** [5] - 15:6, 15:20, 17:2, 18:9, 20:16

**drive** [1] - 83:7

**driven** [1] - 48:1

**driving** [1] - 79:6

**drove** [1] - 90:24

**drug** [4] - 79:20, 80:4, 104:17, 104:18

**drugs** [2] - 79:22, 80:1

**due** [2] - 45:2, 52:7

**Dunnigan** [1] - 45:8

**duration** [1] - 19:10

**duress** [1] - 45:4

**during** [12] - 17:10, 25:19, 30:19, 41:24, 42:4, 44:9, 47:19, 48:17, 93:5, 94:16, 102:20, 109:14

**duties** [4] - 30:18, 36:21, 36:22, 37:9

**duty** [2] - 59:2, 59:5

---

**E**

---

**early** [1] - 95:14

**earn** [3] - 38:18, 61:25, 107:19

**earned** [4] - 62:14, 95:16, 102:19, 107:22

**earning** [2] - 90:1, 107:21

**easily** [1] - 45:9

**eating** [1] - 76:21

**ECF** [7] - 4:15, 4:22, 4:23, 5:1, 10:1, 12:19, 39:18

**ECFs** [1] - 4:18

**education** [1] - 63:25

**educational** [1] - 41:20

**effect** [1] - 16:10

**effectiveness** [1] - 16:16

**effort** [2] - 33:6, 97:4

**efforts** [1] - 94:20

**ego** [1] - 64:19

**egregious** [1] - 40:3

**eight** [1] - 74:9

**either** [10] - 6:4, 15:11, 20:17, 25:7, 56:21, 57:19, 60:15, 77:20,

85:5, 93:16

**elaborate** [2] - 14:1, 21:7

**elaborated** [2] - 14:1, 15:15

**elected** [2] - 59:3, 66:18

**election** [10] - 40:10, 40:12, 82:25, 86:11, 91:20, 94:24, 96:4, 96:14, 97:10

**Electoral** [2] - 40:19, 41:10, 61:3

**ELIZABETH** [1] - 111:3

**Elizabeth** [2] - 1:23, 111:14

**Ellipse** [2] - 91:1, 91:10

**Email** [3] - 1:11, 1:14, 1:19

**embodies** [1] - 35:22

**emotion** [1] - 64:21

**emotional** [2] - 52:10, 52:15, 66:10

**emotionally** [1] - 52:25

**emphasize** [1] - 75:12

**employment** [2] - 78:5, 78:16

**empty** [3] - 40:5, 40:8, 101:3

**enclose** [1] - 20:3

**enclosing** [1] - 19:23

**encounter** [3] - 16:21, 93:6, 93:8

**encouraged** [1] - 75:6

**encouragement** [1] - 72:9

**end** [7] - 39:6, 50:2, 52:23, 60:24, 89:18, 90:4, 92:2

**endeavor** [1] - 88:16

**enforcement** [10] - 3:23, 10:4, 23:15, 24:9, 25:4, 30:14, 55:7, 90:9, 90:19, 93:5

**engage** [4] - 59:25, 69:7, 75:25, 83:19

**engaged** [5] - 22:19, 31:2, 73:12, 83:18, 109:10

**engaging** [4] - 4:1, 87:7, 90:10, 96:4

**enhanced** [1] - 44:25

**enhancement** [24] - 11:23, 13:3, 14:19, 16:5, 18:14, 18:21, 19:6, 19:19, 19:25,

20:12, 20:14, 20:19, 20:21, 21:1, 21:3, 31:10, 31:15, 37:16, 43:13, 43:16, 47:16, 47:18, 69:2

**enhancements** [1] - 42:16

**enjoyable** [3] - 51:4, 51:9, 55:5

**enormous** [1] - 86:6

**ensued** [1] - 60:24

**ensure** [2] - 61:1, 85:20

**enter** [1] - 95:2

**entered** [2] - 95:3, 106:23

**entering** [1] - 100:16

**entire** [3] - 19:17, 76:25, 88:24

**entirely** [1] - 97:18

**entity** [1] - 81:4

**entrance** [6] - 20:9, 51:23, 65:11, 69:24, 92:15, 93:3

**entry** [7] - 9:21, 46:23, 47:7, 69:13, 92:9, 102:2, 107:1

**equipment** [1] - 95:1

**Erik** [1] - 60:1

**error** [2] - 56:14, 56:16

**eschewing** [1] - 61:14

**esoteric** [1] - 31:23

**especially** [3] - 42:18, 64:4, 67:7

**essentially** [2] - 47:13, 79:1

**establish** [2] - 21:15, 104:2

**established** [2] - 44:5, 106:19

**estimate** [1] - 87:24

**estimated** [4] - 57:2, 57:4, 88:5, 89:17

**eternity** [4] - 17:13, 19:16, 53:8, 93:8

**ether** [1] - 27:21

**evaluate** [1] - 43:24

**evaluation** [1] - 74:5

**event** [1] - 59:1

**events** [2] - 51:6, 90:15

**eventually** [2] - 93:14, 94:1

**evidence** [16] - 10:2, 10:21, 22:17, 26:6, 41:7, 42:16, 43:23, 45:10, 55:20, 60:16, 70:17, 70:19, 82:2, 91:19, 97:2, 97:3

**evolve** [1] - 96:11

**exactly** [5] - 42:19, 56:7, 74:6, 80:22, 96:12
**examination** [1] - 51:19
**example** [4] - 15:5, 15:20, 43:25, 74:19
**examples** [2] - 39:23, 42:24
**excellent** [1] - 5:15
**except** [1] - 104:4
**exception** [1] - 37:21
**exciting** [1] - 51:4, 51:8, 55:5
**excluded** [1] - 36:9
**excuse** [3] - 45:6, 70:1, 82:5
**excused** [1] - 110:24
**excuses** [1] - 78:5
**execute** [1] - 106:11
**executed** [1] - 41:25
**exercise** [1] - 16:10
**exercised** [1] - 99:8
**exert** [1] - 18:20
**exerting** [1] - 18:16
**exhausted** [2] - 52:1, 66:12
**Exhibit** [7] - 16:18, 19:12, 45:21, 46:14, 51:18, 53:10, 70:2
**exhibit** [2] - 70:1, 101:18
**exhibiting** [1] - 16:8
**exhibits** [6] - 4:24, 5:1, 5:3, 10:20, 70:16, 70:18
**expect** [1] - 57:21
**expectations** [1] - 104:3
**expected** [1] - 89:16
**expecting** [1] - 2:17
**experience** [1] - 52:11
**expired** [2] - 108:23, 109:3
**explain** [5] - 6:20, 7:1, 28:22, 85:12, 110:16
**explained** [3] - 8:24, 18:11, 44:23
**expressed** [2] - 95:3, 102:14
**expressing** [1] - 16:8
**expression** [1] - 66:16
**extensive** [4] - 38:2, 43:11, 56:3, 85:18
**extensively** [2] - 14:5, 39:18
**extent** [7] - 9:13, 17:3, 20:11, 21:13, 22:1, 106:24, 107:9
**extinguisher** [4] -

52:20, 76:15, 76:19, 101:4
**extraordinary** [1] - 59:1
**extremely** [1] - 29:12
**eyes** [2] - 53:15, 67:25

## F

**F.3d** [2] - 15:6, 18:3
**F.Supp** [1] - 44:3
**face** [3] - 60:2, 92:7, 92:13
**facilitate** [1] - 90:18
**facility** [1] - 109:16
**facing** [1] - 74:13
**fact** [13] - 10:17, 17:3, 25:6, 34:13, 67:9, 69:22, 77:7, 78:9, 82:16, 83:17, 84:11, 88:10, 109:9
**factor** [13] - 18:5, 18:10, 18:15, 18:20, 18:22, 19:5, 19:7, 19:9, 19:19, 19:20, 20:11, 98:6, 98:7
**factors** [2] - 6:16, 18:1, 18:4, 18:6, 18:7, 20:13, 20:17, 55:11, 55:17, 56:20, 57:12, 57:15, 71:11, 73:5, 73:15, 76:8, 76:9, 85:19, 86:19, 98:23, 103:7
**facts** [12] - 7:13, 7:17, 8:16, 22:8, 24:24, 25:11, 26:11, 27:22, 31:21, 35:11, 36:11, 39:1
**factual** [7] - 6:4, 7:10, 8:17, 8:19, 9:1, 10:16, 10:18
**failure** [5] - 31:19, 32:25, 69:12, 69:25, 109:22
**fair** [1] - 88:3
**fairly** [9] - 6:11, 14:11, 16:21, 21:7, 33:19, 38:2, 75:23, 85:18, 88:21
**fairness** [1] - 98:8
**falls** [3] - 17:6, 82:1, 97:16
**false** [13] - 37:18, 39:22, 40:14, 43:1, 43:13, 44:9, 44:15, 44:22, 45:16, 45:18, 48:16, 66:3, 69:1
**familiar** [2] - 5:2, 84:1
**families** [1] - 53:23

**family** [5] - 4:18, 60:13, 63:25, 67:10, 95:19
**far** [6] - 9:14, 25:18, 81:18, 96:20, 97:4, 107:23
**fashion** [3] - 8:25, 13:11, 29:15
**fatigued** [1] - 51:15
**faulted** [1] - 71:22
**faulty** [1] - 45:3
**favor** [2] - 18:13, 60:8
**FBI** [4] - 1:21, 2:13, 2:15, 91:3
**FCRR** [3] - 1:23, 111:3, 111:14
**feared** [2] - 46:1, 53:6
**February** [1] - 54:17
**federal** [3] - 6:7, 80:20, 104:10
**Federal** [3] - 1:17, 3:2, 3:4
**federally** [1] - 104:14
**fee** [1] - 17:6
**fellow** [5] - 30:17, 45:22, 93:23, 94:18
**felonies** [1] - 26:7
**felonious** [5] - 22:18, 22:23, 28:7, 28:16, 28:20
**felony** [14] - 22:15, 23:2, 23:7, 23:9, 26:2, 28:12, 28:21, 29:20, 50:15, 87:3, 88:5, 88:20, 90:10
**felt** [12] - 15:16, 17:13, 17:18, 19:16, 34:20, 53:7, 64:18, 69:11, 84:6, 91:16, 93:6, 93:8
**feverish** [1] - 77:2
**few** [3] - 22:6, 91:1, 97:20
**fifteen** [2] - 74:3, 74:4
**fifth** [1] - 19:20
**fight** [3] - 18:17, 54:20, 75:7
**fighting** [5] - 52:17, 52:18, 58:5, 58:6, 66:12
**figure** [3] - 52:5, 61:9, 79:7
**figuring** [1] - 11:6
**file** [1] - 107:4
**filed** [4] - 4:23, 6:3, 6:10, 106:25
**filing** [5] - 4:20, 4:25, 32:16, 50:8, 107:1
**filings** [1] - 4:12
**filled** [1] - 39:1

**finally** [3] - 13:2, 19:20, 68:5
**financial** [10] - 61:17, 63:9, 78:18, 79:13, 104:7, 105:6, 105:7, 105:8, 106:1, 106:7
**Financial** [1] - 105:23
**financially** [1] - 95:17
**findings** [1] - 10:17
**fine** [33] - 43:10, 49:6, 49:19, 50:4, 50:17, 50:18, 61:11, 61:12, 62:5, 62:16, 62:18, 62:23, 62:24, 63:13, 70:8, 78:22, 79:16, 88:25, 89:6, 89:14, 89:15, 89:19, 89:24, 90:2, 90:3, 90:4, 90:6, 105:12, 105:17, 106:1, 106:7
**fire** [4] - 52:20, 76:15, 76:19, 101:4
**firearm** [3] - 23:6, 23:8, 101:19
**firm** [1] - 14:6
**first** [13] - 6:13, 7:18, 11:21, 18:10, 20:24, 24:23, 45:20, 46:2, 50:24, 54:8, 54:16, 82:2, 101:24
**fit** [2] - 16:13, 20:1
**fits** [1] - 30:20
**five** [8] - 18:1, 18:4, 20:13, 70:11, 89:22, 99:20, 107:17, 108:8
**five-minute** [1] - 70:11
**fix** [1] - 88:16
**flee** [1] - 58:25
**fleshed** [1] - 41:4
**flood** [2] - 30:8, 94:23
**flow** [4] - 4:12, 62:8, 89:9, 89:13
**flowing** [1] - 3:15
**focus** [1] - 19:9
**focused** [2] - 33:16, 110:14
**focusing** [1] - 19:8
**fodder** [1] - 39:2
**folder** [2] - 91:4, 91:5
**follow** [1] - 67:22
**followed** [1] - 95:11
**following** [6] - 5:24, 49:4, 97:21, 104:8, 104:25, 105:22
**foot** [1] - 89:5
**footage** [2] - 92:23, 97:8
**FOR** [3] - 1:1, 1:8, 1:15

**force** [10] - 16:10, 17:2, 18:11, 18:13, 19:3, 29:10, 46:23, 92:14, 93:25, 102:2
**forced** [2] - 9:21, 58:25
**forcible** [2] - 13:21, 14:24
**forcing** [2] - 20:7, 46:14
**Ford** [1] - 105:23
**foregoing** [1] - 111:4
**forget** [1] - 54:21
**form** [3] - 10:21, 93:24, 96:2
**formally** [1] - 70:16
**former** [2] - 68:9, 90:25
**forth** [2] - 11:16, 104:4
**forthright** [1] - 39:12
**forward** [4] - 2:8, 31:25, 61:2, 69:5
**fought** [2] - 19:1, 92:1
**Foulds** [1] - 4:21
**four** [7] - 3:21, 5:20, 20:13, 35:16, 48:8, 67:25, 74:8
**four-year** [1] - 67:25
**fourth** [1] - 19:7
**fraud** [1] - 97:11
**freedom** [1] - 17:3
**friend's** [1] - 91:22
**friends** [1] - 91:2
**friends'** [1] - 96:19
**frighten** [1] - 28:9
**front** [6] - 82:19, 85:9, 92:4, 92:7, 92:13, 96:21
**frugally** [4] - 61:22, 62:12, 89:21, 89:23
**fucking** [1] - 102:4
**full** [7] - 16:10, 16:22, 78:4, 87:17, 104:5, 106:7, 111:5
**full-time** [2] - 78:4, 104:5
**fully** [3] - 3:16, 7:23, 109:13
**fulsome** [1] - 10:19
**fun** [3] - 51:4, 51:7, 55:4
**function** [2] - 56:1, 86:8
**fundamental** [1] - 86:6
**furthered** [2] - 22:18, 24:1
**future** [8] - 42:22, 56:10, 56:18, 73:4, 73:11, 79:23, 86:16, 96:5

# G

**gain** [3] - 17:5, 92:9, 93:2
**gaining** [1] - 69:24
**gallery** [1] - 2:16
**game** [2] - 91:24, 96:15
**gaps** [1] - 39:1
**gathered** [1] - 9:20
**gavel** [1] - 83:6
**GAVITO** [1] - 1:20
**Gavito** [1] - 2:6
**Gazelle** [1] - 69:16
**gear** [7] - 59:19, 59:23, 72:12, 73:23, 76:1, 83:3, 95:1
**gears** [2] - 59:19, 59:25
**general** [5] - 10:10, 31:21, 66:22, 66:25, 86:10
**generally** [4] - 9:2, 78:15, 84:12, 84:13
**Gillespie** [53] - 2:4, 3:5, 3:9, 3:20, 5:16, 7:21, 8:21, 9:1, 9:10, 16:2, 22:19, 29:14, 34:16, 38:5, 38:12, 38:15, 40:5, 42:25, 50:25, 51:5, 57:24, 64:1, 64:6, 66:22, 67:7, 67:21, 68:2, 68:12, 69:3, 70:6, 71:2, 74:15, 74:22, 75:9, 76:14, 77:1, 77:12, 79:1, 82:1, 82:16, 82:21, 83:22, 85:2, 85:8, 86:17, 89:10, 103:8, 103:12, 107:16, 107:24, 108:4, 109:9, 109:18
**GILLESPIE** [1] - 1:4
**Gillespie's** [8] - 20:22, 37:17, 39:20, 39:22, 68:22, 72:8, 83:13, 83:17
**given** [12] - 19:16, 41:20, 41:21, 50:10, 56:2, 83:20, 84:8, 84:10, 96:6, 100:15, 105:16, 109:9
**goal** [5] - 30:2, 33:8, 39:9, 58:1, 83:17
**governed** [1] - 59:6
**government** [60] - 2:9, 5:4, 6:14, 7:10, 11:21, 13:25, 14:14, 14:18, 17:25, 20:4,

24:6, 14:20, 25:12, 26:4, 26:6, 26:14, 26:17, 26:22, 27:7, 33:12, 33:15, 34:20, 37:20, 39:3, 40:14, 43:1, 43:15, 44:7, 49:11, 49:16, 49:18, 50:16, 50:19, 50:24, 53:9, 55:9, 55:25, 56:1, 56:12, 61:11, 61:14, 62:17, 62:22, 62:24, 63:5, 64:8, 64:12, 66:1, 68:15, 75:19, 77:22, 83:8, 87:1, 87:20, 88:4, 88:17, 89:16, 107:2, 107:7, 110:20
**government's** [15] - 4:19, 4:24, 4:25, 12:1, 13:12, 13:17, 20:19, 24:23, 27:10, 39:1, 44:5, 49:23, 63:8, 100:18, 108:5
**governments** [1] - 66:18
**grab** [1] - 18:12
**grabbed** [2] - 20:4, 92:24
**grabbing** [1] - 16:3
**gradated** [1] - 75:3
**granted** [3] - 70:22, 98:12, 107:11
**grasp** [1] - 14:6
**gravamen** [1] - 39:11
**gravely** [1] - 95:5
**gravity** [3] - 59:11, 66:23, 67:13
**greater** [3] - 62:5, 85:21, 100:4
**Greenberg** [1] - 7:25
**grew** [1] - 52:10
**grip** [1] - 18:18
**gross** [1] - 97:1
**ground** [2] - 54:9, 92:11
**grounded** [1] - 37:3
**grounds** [7] - 4:2, 4:4, 9:10, 87:8, 90:12, 94:14, 101:20
**group** [6] - 31:19, 32:25, 35:7, 35:15, 37:13, 48:1
**grouped** [9] - 12:25, 32:6, 35:1, 35:10, 35:14, 36:8, 36:13, 37:11, 47:23
**grouping** [13] - 31:18, 31:22, 31:24, 32:3, 32:5, 32:25, 33:20, 34:20, 36:9, 36:11,

36:25, 37:10
**groupings** [1] - 34:1
**groups** [2] - 33:6, 91:6
**grown** [3] - 59:14, 67:19, 88:6
**guard** [1] - 20:8
**guarding** [5] - 30:2, 47:6, 51:7, 58:18, 93:3
**guess** [6] - 12:24, 27:7, 55:4, 79:5, 80:21, 102:1
**guidance** [2] - 18:9, 20:16
**Guideline** [5] - 13:19, 14:22, 14:23, 20:25, 31:12
**guideline** [75] - 11:25, 12:10, 12:11, 12:17, 12:23, 13:5, 13:15, 13:19, 14:15, 17:8, 17:20, 17:23, 20:22, 21:2, 21:5, 24:18, 26:23, 26:24, 27:14, 28:1, 28:4, 28:6, 28:14, 28:23, 29:16, 31:7, 31:8, 31:10, 31:15, 31:16, 31:18, 31:24, 35:1, 35:10, 35:13, 35:16, 35:24, 36:5, 36:7, 36:8, 36:9, 37:13, 37:16, 43:24, 44:8, 44:21, 47:24, 48:4, 48:6, 48:13, 48:18, 49:6, 49:11, 49:24, 50:2, 56:8, 56:16, 57:9, 61:12, 61:15, 62:5, 72:3, 75:20, 75:22, 89:3, 89:19, 97:13, 97:16, 98:17, 100:20, 100:22, 103:5, 106:19
**guidelines** [25] - 6:8, 6:9, 7:15, 8:15, 10:25, 11:2, 11:3, 21:19, 27:22, 39:15, 40:24, 43:21, 47:21, 47:22, 48:20, 55:12, 55:13, 65:24, 68:21, 68:22, 72:3, 98:16, 101:10, 103:11, 106:18
**guilt** [2] - 98:19, 106:12
**guilty** [13] - 82:17, 98:9, 98:11, 98:13, 99:2, 99:4, 99:17, 99:22, 100:6, 100:16, 101:1,

101:16, 102:12
**Gumiel** [1] - 3:12
**gunpoint** [1] - 15:17
**Gutierrez** [1] - 99:3
**guy** [1] - 61:25

# H

**H2-205B** [1] - 105:24
**half** [4] - 52:6, 74:25, 75:22, 108:9
**hammering** [1] - 74:20
**Hamner** [3] - 26:13, 27:6
**hand** [8] - 51:22, 73:13, 90:21, 97:11
**hand-to-hand** [4] - 51:22, 73:13, 90:21, 97:11
**hands** [5] - 18:12, 52:22, 53:14, 54:13, 92:24
**hang** [1] - 42:14
**happiness** [1] - 91:17
**hard** [5] - 16:3, 53:25, 57:20, 61:9, 83:7
**harder** [4] - 47:10, 58:8, 68:3
**harm** [7] - 29:16, 35:14, 35:16, 36:2, 36:4, 87:21, 90:22
**harms** [2] - 33:14, 35:8
**Harris** [1] - 15:22
**Hawthorne** [2] - 3:3, 7:25
**HAWTHORNE** [1] - 1:16
**head** [10] - 52:2, 54:12, 58:12, 64:22, 64:24, 65:1, 65:2, 74:20, 92:7, 94:4
**hear** [11] - 6:5, 6:13, 6:14, 6:15, 6:24, 21:6, 38:3, 53:20, 85:5, 85:24, 91:13
**heard** [6] - 10:7, 27:2, 27:9, 65:3, 108:17
**hearing** [10] - 5:17, 5:21, 6:2, 10:15, 10:22, 10:24, 12:6, 49:10, 49:16, 85:17
**hearings** [2] - 5:19, 5:20
**heave** [1] - 101:22
**heave-ho** [1] - 101:22
**heavy** [1] - 29:12
**hefty** [1] - 63:13
**heightened** [1] - 43:22
**held** [5] - 51:23, 53:7,

101:16, 102:12
69:22, 87:25, 100:9, 102:1
**helmet** [1] - 94:5
**help** [6] - 20:6, 44:11, 46:20, 46:21, 78:18, 102:2
**helped** [2] - 46:13, 90:18
**helping** [1] - 93:21
**helps** [2] - 16:15, 88:25
**Henry** [1] - 4:21
**hereby** [2] - 103:13, 111:3
**heroic** [1] - 69:23
**Herrera** [1] - 60:1
**hesitation** [1] - 17:22
**hid** [1] - 60:23
**hiding** [1] - 51:8
**higher** [3] - 54:8, 68:22, 90:15
**highest** [2] - 48:2, 50:2
**highlight** [1] - 40:2
**highlighted** [1] - 98:24
**highlights** [1] - 96:2
**himself** [7] - 46:14, 52:12, 58:11, 76:24, 92:16, 92:18, 95:17
**histories** [1] - 86:22
**History** [2] - 11:11, 48:19
**history** [15] - 6:8, 11:6, 11:8, 11:11, 61:16, 79:2, 79:8, 84:4, 84:5, 84:16, 86:20, 95:13, 102:23, 102:25, 109:12
**hit** [7] - 52:1, 54:13, 58:12, 65:4, 65:7, 93:12, 93:15
**hits** [1] - 47:5
**hitting** [2] - 46:8, 94:7
**ho** [1] - 101:22
**Hodgkin's** [1] - 58:23
**hold** [5] - 51:15, 52:16, 87:16, 87:18, 108:22
**holding** [1] - 53:14, 71:6, 81:10, 88:22, 93:9, 96:25, 97:5
**holdout** [4] - 41:17, 42:2, 42:9, 42:10
**home** [4] - 54:11, 80:23, 81:5, 91:3
**honest** [4] - 21:23, 38:16, 64:1, 110:13
**Honor** [43] - 2:5, 2:10, 3:1, 5:5, 5:9, 10:12, 12:2, 13:8, 14:3,

14:10, 23:17, 24:21,
25:14, 32:8, 34:5,
37:23, 39:17, 41:13,
42:13, 42:17, 43:8,
49:12, 49:14, 50:21,
51:3, 52:10, 53:4,
55:18, 56:6, 56:13,
57:11, 60:1, 62:19,
62:20, 63:5, 64:7,
66:14, 69:10, 69:15,
107:8, 108:6,
110:21, 110:23
**HONORABLE** [1] - 1:6
**hoped** [2] - 94:21,
94:23
**horrified** [1] - 68:13
**horror** [1] - 57:24
**hour** [5] - 5:22, 59:8,
84:12, 98:3
**hours** [10] - 51:22,
54:20, 58:6, 60:23,
61:1, 66:12, 73:24,
78:4, 104:6
**House** [1] - 83:5
**house** [7] - 41:25,
61:23, 62:1, 80:18,
102:4, 102:5
**HOWELL** [1] - 1:6
**humans** [1] - 54:1
**hundreds** [5] - 32:22,
55:1, 84:7, 90:16
**hung** [5] - 26:4, 40:20,
41:8, 41:18, 82:23
**hurt** [2] - 42:7, 60:15
**hurting** [1] - 54:13

### I

**i.e** [2] - 28:9, 28:18
**idea** [1] - 60:17
**ideal** [1] - 86:14
**identifiable** [1] - 88:1
**identified** [1] - 35:3
**identify** [2] - 33:23,
37:1
**illicit** [2] - 79:22, 80:1
**illustrates** [1] - 96:8
**illustrations** [1] - 15:3
**image** [1] - 52:12
**imagine** [2] - 86:10,
102:22
**immediate** [2] - 30:23,
31:3
**immediately** [1] -
106:2
**impacted** [1] - 95:20
**impair** [1] - 100:10
**impede** [2] - 25:4,
30:13
**impeded** [1] - 23:22

**impeding** [9] - 3:23,
12:11, 23:14, 24:8,
26:19, 27:9, 36:20,
48:5, 90:9
**impermissible** [1] -
99:6
**important** [10] - 10:5,
11:6, 72:14, 73:16,
98:7, 98:22, 99:14,
102:18
**impose** [13] - 6:21,
7:2, 39:15, 62:21,
85:13, 85:20, 89:24,
90:2, 90:4, 90:6
**imposed** [13] - 48:23,
49:1, 57:15, 81:13,
86:1, 95:22, 99:6,
103:7, 106:17,
106:24, 107:6,
107:13, 110:9
**imposing** [1] - 83:22
**imposition** [2] - 15:18,
59:12
**impression** [1] - 29:4
**imprisonment** [9] -
49:4, 82:10, 83:12,
89:17, 109:17,
109:24, 109:25,
110:10
**inability** [1] - 89:14
**inaccurate** [1] - 45:2
**inauguration** [1] -
67:24
**incapacitated** [1] -
77:11
**incarceration** [5] -
49:19, 49:23, 50:7,
89:2, 97:17
**inch** [1] - 92:14
**inclined** [1] - 67:22
**include** [5] - 36:18,
79:15, 79:16, 86:1,
100:25
**included** [1] - 35:7
**includes** [3] - 4:17,
104:13, 106:10
**including** [6] - 36:19,
56:17, 85:24, 95:4,
102:21, 106:16
**income** [6] - 61:25,
62:9, 89:10, 95:17,
102:19, 107:19,
107:21, 107:22
**incorrect** [2] - 14:18,
106:18
**increase** [7] - 13:14,
13:24, 14:16, 15:19,
44:7, 44:21, 58:9
**increased** [1] - 74:16
**incredible** [3] - 41:20,

41:25, 42:11
**incumbent** [1] - 4:11
**incur** [2] - 44:25,
105:9
**incurred** [1] - 78:19
**indeed** [3] - 29:5,
81:17, 83:5
**independent** [2] -
22:17, 96:18
**indicate** [1] - 47:2
**indicated** [3] - 9:6,
91:7, 99:9
**indicates** [1] - 15:10
**indication** [1] - 72:11
**indicia** [1] - 72:9
**indictment** [4] - 33:18,
36:24, 36:25, 37:4
**indignant** [6] - 64:14,
64:16, 65:7, 65:21,
67:8, 99:11
**indignation** [2] -
64:21, 95:9
**individual** [8] - 10:5,
10:6, 10:8, 30:25,
46:7, 46:22, 87:19,
104:3
**individually** [2] -
33:24, 92:22
**individuals** [3] - 9:20,
29:13, 60:16
**ineffective** [1] -
106:21
**inexpensive** [1] - 62:2
**inflict** [1] - 66:8
**inflicting** [3] - 28:24,
29:1, 29:16
**information** [5] - 9:12,
41:23, 105:6, 105:7,
105:8
**informational** [1] - 9:7
**informed** [2] - 55:4,
84:24
**inheritance** [1] - 61:21
**inheritances** [3] -
61:19, 95:18
**initial** [1] - 63:10
**injured** [3] - 46:13,
51:14, 76:22
**injuries** [6] - 52:5,
52:7, 66:6, 66:9,
66:12, 102:20
**injuring** [1] - 95:6
**injury** [9] - 28:8,
28:10, 28:17, 28:25,
29:2, 29:6, 30:24,
72:19, 77:14
**insanity** [1] - 45:4
**inside** [9] - 9:21,
46:18, 51:9, 55:3,
58:14, 58:20, 68:11,

69:8, 91:5
**instances** [1] - 45:3
**instead** [3] - 29:14,
67:11, 68:13
**instruction** [1] - 26:15
**Instructions** [1] -
30:15
**instructions** [2] -
24:2, 24:5
**instrument** [4] -
28:24, 29:1, 29:2,
29:4
**insufficient** [1] - 45:6
**intelligent** [1] - 42:18
**intend** [2] - 23:8,
23:25
**intended** [8] - 17:9,
17:15, 22:18, 23:14,
24:8, 29:11, 30:13,
77:9
**intent** [27] - 17:17,
22:11, 22:15, 22:16,
22:22, 22:23, 23:1,
23:6, 23:11, 23:13,
23:20, 23:21, 24:11,
24:12, 24:14, 25:3,
28:8, 28:17, 28:20,
29:6, 29:9, 29:20,
30:11, 30:18, 45:7,
46:9
**intention** [2] - 77:13,
83:3
**intentionally** [1] -
38:15
**interest** [6] - 41:23,
105:13, 105:18,
107:15, 107:19,
107:20
**interested** [3] - 41:22,
62:17, 86:10
**interests** [1] - 105:18
**interfere** [2] - 25:4,
30:13
**interfering** [4] - 23:15,
24:8, 26:19, 36:20
**interrelated** [1] - 12:21
**interruption** [1] -
70:23
**interview** [2] - 47:11,
94:16
**intimidating** [1] -
26:19
**investigation** [13] -
4:14, 6:3, 6:6, 7:9,
8:6, 8:11, 10:16,
11:9, 12:15, 13:13,
27:24, 85:16, 106:9
**involve** [4] - 35:2,
35:17, 35:19, 37:6
**involved** [4] - 28:7,

29:5, 36:3, 99:17
**involves** [2] - 35:7,
87:12
**involving** [3] - 9:20,
30:22, 35:14
**irrelevant** [2] - 9:8,
9:25
**IRS** [2] - 80:24, 81:16
**Irving** [1] - 44:3
**isolate** [1] - 33:20
**isolation** [1] - 58:3
**issue** [11] - 14:13,
14:14, 16:4, 21:11,
34:23, 41:7, 44:6,
78:25, 107:14,
107:24, 108:3
**issued** [1] - 98:25
**issues** [4] - 21:8, 71:7,
72:21, 88:10
**itself** [5] - 31:6, 73:6,
73:18, 75:2, 97:6

### J

**Jackson** [6] - 21:12,
26:9, 82:20, 83:12,
84:2, 84:6
**Jackson's** [1] - 23:5
**JACQUELINE** [1] -
1:12
**Jacqueline** [1] - 2:11
**jacqueline.schesnol
@usdoj.gov** [1] -
1:14
**jail** [1] - 109:15
**janitorial** [1] - 61:4
**January** [54] - 10:3,
30:12, 30:20, 31:1,
32:17, 36:23, 41:11,
51:6, 52:11, 53:2,
54:6, 55:4, 55:8,
56:11, 59:9, 60:20,
63:21, 64:3, 64:9,
64:15, 65:20, 67:12,
67:17, 68:7, 69:4,
69:23, 71:15, 72:2,
72:11, 73:25, 77:24,
82:25, 84:8, 84:10,
84:12, 86:4, 86:5,
87:4, 88:21, 88:24,
90:15, 91:1, 91:4,
95:1, 96:1, 96:8,
96:9, 96:12, 96:15,
99:11, 99:13, 99:24,
101:6, 109:11
**Jason** [2] - 2:16, 4:21
**JDs** [1] - 73:3
**job** [2] - 79:4, 95:19
**joined** [2] - 93:24,
94:20

11

**jointly** [1] - 87:16
**JOSEPHINE** [1] - 1:22
**Josephine** [1] - 2:14
**JUDGE** [1] - 1:7
**Judge** [9] - 8:21, 23:4, 25:8, 26:9, 32:1, 82:19, 83:11, 84:2, 84:6
**judge** [8] - 21:9, 21:12, 38:4, 58:22, 81:20, 84:3, 102:22, 108:14
**judges** [3] - 5:19, 40:25, 41:3
**judgment** [4] - 79:13, 103:12, 104:7, 107:1
**jump** [3] - 18:3, 44:3, 45:8
**juncture** [1] - 108:6
**June** [2] - 82:20, 111:13
**jurors** [1] - 41:16
**Jury** [1] - 30:15
**jury** [24] - 3:21, 24:2, 24:3, 24:5, 25:8, 26:15, 30:10, 38:11, 38:19, 38:24, 39:5, 40:20, 41:8, 41:18, 42:2, 42:9, 42:10, 42:14, 45:5, 82:22, 97:21, 98:12, 99:7, 99:8
**justice** [5] - 13:3, 43:19, 44:8, 47:18, 48:15
**justifying** [1] - 31:22

## K

**keep** [6] - 11:15, 16:9, 60:12, 78:1, 91:25, 92:19
**keeping** [1] - 65:11
**kept** [4] - 69:5, 69:23, 94:9
**kicking** [1] - 52:19
**kill** [2] - 83:4, 84:22
**killed** [1] - 53:6
**kind** [12] - 23:10, 60:19, 60:20, 72:9, 72:12, 75:4, 77:14, 78:16, 79:4, 96:4, 110:13
**kinds** [7] - 65:4, 67:10, 71:7, 72:15, 74:13, 75:16, 83:15
**knocking** [1] - 74:16
**knowing** [1] - 65:10
**knowingly** [3] - 23:13, 24:7, 30:12

**knowledge** [1] - 98:20
**knows** [5] - 53:15, 55:18, 59:14, 84:4
**Kyle** [1] - 70:3

## L

**lack** [6] - 45:4, 45:7, 58:14, 70:5, 95:2, 96:6
**lacked** [2] - 15:17, 22:14
**laid** [5] - 14:4, 39:18, 39:21, 40:1, 42:24
**land** [1] - 11:19
**landmark** [1] - 58:1
**landmarks** [1] - 96:16
**language** [2] - 15:13, 73:10
**lapse** [1] - 73:19
**large** [5] - 9:20, 29:12, 52:2, 108:24, 108:25
**largely** [2] - 36:2, 68:18
**larger** [4] - 22:17, 24:12, 24:15, 30:2
**last** [6] - 6:20, 6:24, 7:3, 30:4, 56:9, 65:11
**lasted** [2] - 25:16, 93:8
**late** [1] - 60:25
**latest** [1] - 12:18
**law** [13] - 3:23, 10:3, 23:15, 24:9, 25:4, 30:14, 55:7, 59:4, 65:19, 65:20, 66:3, 66:17, 71:15, 86:4, 86:6, 90:9, 90:19, 93:5, 106:17
**lawful** [4] - 36:20, 36:22, 37:9, 78:4
**lawfully** [1] - 44:13
**lawmakers** [2] - 51:8, 60:23
**lawmakers'** [1] - 58:21
**lawyer** [1] - 6:14
**lawyers** [1] - 63:12
**lay** [3] - 11:19, 49:17, 50:23
**lead** [2] - 43:2, 69:20
**leading** [2] - 94:2, 101:24
**leads** [2] - 27:5, 69:18
**learned** [1] - 56:18
**least** [6] - 62:16, 78:4, 93:1, 97:6, 104:5, 104:18
**leave** [2] - 54:10, 99:25
**lectern** [1] - 85:10

**led** [1] - 97:11
**left** [4] - 62:11, 88:22, 92:10, 95:11
**legal** [3] - 5:24, 27:21, 80:15
**legitimate** [1] - 66:15
**length** [1] - 19:18
**lengthy** [1] - 6:11
**leniency** [2] - 98:12, 99:1
**lenses** [1] - 52:4
**less** [6] - 17:4, 49:20, 62:20, 63:1, 68:1, 74:24
**lesson** [1] - 56:17
**lethal** [1] - 72:16
**letters** [3] - 4:17, 60:13, 60:19
**level** [33] - 11:14, 11:22, 11:23, 11:24, 12:12, 13:14, 13:24, 14:16, 14:19, 15:19, 19:25, 20:25, 21:3, 28:5, 31:8, 31:12, 31:14, 34:13, 36:1, 37:16, 41:21, 43:13, 44:7, 44:21, 47:18, 47:25, 48:2, 48:6, 48:18, 69:2, 90:15, 98:16
**levels** [6] - 32:6, 45:17, 48:8, 48:11, 48:15, 68:24
**levied** [1] - 50:14
**liabilities** [2] - 62:10, 89:10
**liability** [3] - 23:8, 23:20, 45:7
**liable** [1] - 87:16
**liberty** [1] - 16:11
**license** [2] - 66:17, 101:17
**lied** [1] - 40:18
**lien** [1] - 81:17
**liens** [5] - 80:18, 80:20, 80:23, 81:13, 81:14
**life** [1] - 46:2
**light** [2] - 100:9, 100:11
**limine** [1] - 10:1
**limit** [3] - 16:8, 16:9, 17:2
**limitation** [1] - 15:6
**limited** [3] - 18:19, 19:5, 88:2
**line** [19] - 19:4, 30:17, 45:22, 46:18, 47:6, 47:14, 51:15, 57:14, 76:3, 77:10, 92:14,

92:23, 93:11, 93:12, 93:25, 94:13, 96:21, 101:22
**line's** [1] - 47:1
**lined** [1] - 30:2
**lines** [2] - 72:1, 105:10
**linked** [1] - 76:9
**liquids** [1] - 52:19
**list** [1] - 12:7
**listed** [4] - 5:6, 15:3, 15:5, 36:8
**lists** [2] - 99:20, 100:2
**literally** [1] - 98:4
**litigating** [1] - 61:20
**live** [1] - 62:2
**lived** [1] - 61:19
**lives** [3] - 61:22, 62:12, 89:21
**living** [4] - 61:19, 64:1, 89:23, 90:1
**LLC** [3] - 81:2, 81:6, 81:13
**loaded** [1] - 101:19
**local** [1] - 104:11
**location** [7] - 20:8, 47:1, 47:3, 47:9, 51:21, 84:13, 100:8
**locations** [1] - 91:6
**locked** [3] - 13:22, 15:1, 15:9
**look** [14] - 27:22, 32:18, 32:19, 55:25, 61:16, 68:20, 68:21, 73:6, 73:16, 73:18, 73:19, 73:24, 79:24
**looked** [4] - 32:24, 33:1, 70:22, 82:11
**looking** [3] - 53:9, 81:22, 82:16, 82:18
**looks** [1] - 62:14
**Lopesierra** [1] - 99:3
**Lopesierra-Gutierrez** [1] - 99:3
**losing** [1] - 70:3
**loss** [1] - 36:2
**losses** [2] - 87:19, 88:11
**lost** [1] - 101:20
**LOTH** [1] - 111:3
**Loth** [2] - 1:23, 111:14
**low** [3] - 79:22, 88:21, 101:12
**lower** [22] - 19:18, 20:5, 22:19, 25:17, 25:18, 31:2, 36:18, 46:23, 51:12, 58:2, 58:19, 69:12, 69:17, 73:20, 74:1, 90:20, 92:3, 96:16, 98:17, 100:9, 101:3, 101:21

**lowest** [2] - 89:18, 90:4
**luckily** [1] - 16:14
**lying** [1] - 38:15

## M

**MA** [1] - 1:18
**machine** [1] - 1:25
**magnitude** [1] - 10:2
**man** [10] - 38:20, 42:8, 42:18, 59:14, 65:24, 67:19, 71:9, 79:8, 96:11
**mandated** [1] - 86:8
**mandatory** [8] - 49:20, 50:4, 70:8, 79:20, 80:4, 87:4, 88:14, 104:8
**Mandatory** [1] - 87:5
**manner** [2] - 29:3, 111:10
**maps** [1] - 91:5
**March** [2] - 25:8, 98:25
**marijuana** [3] - 79:25, 80:8, 104:13
**Marine** [1] - 54:4
**Mark** [1] - 69:16
**mask** [3] - 3:11, 3:12, 60:2
**masks** [2] - 3:14, 3:18
**Massachusetts** [7] - 1:17, 3:3, 3:4, 62:2, 80:15, 90:24, 109:5
**Mastony** [6] - 2:16, 4:22, 51:16, 51:24, 55:1, 65:2
**Mastony's** [1] - 69:9
**material** [2] - 45:11, 45:13
**materially** [5] - 37:18, 44:9, 44:22, 45:18, 48:16
**mathematical** [1] - 77:17
**matter** [3] - 2:2, 25:6, 78:11
**matters** [4] - 45:4, 45:12, 45:13, 73:12
**maximum** [5] - 48:23, 49:1, 75:21, 90:3, 106:19
**Mazza** [6] - 101:15, 102:1, 102:6, 102:12, 102:19, 103:1
**McCoy** [1] - 44:2
**mean** [19] - 13:21, 14:24, 21:19, 33:13, 38:1, 40:20, 40:22,

41:15, 41:19, 41:20, 41:21, 42:21, 44:19, 56:23, 74:4, 76:18, 84:1, 107:19
**means** [1] - 36:23
**meant** [2] - 42:20, 42:21
**measure** [5] - 16:15, 17:11, 17:14, 17:19, 36:4
**media** [7] - 60:5, 60:7, 60:9, 71:23, 72:23, 73:21, 76:2
**medieval** [1] - 51:14
**meet** [3] - 37:20, 43:15, 44:15
**melee** [1] - 91:23
**member** [1] - 58:7
**members** [5] - 2:17, 4:18, 58:24, 67:9, 95:19
**memo** [15] - 4:20, 4:25, 12:18, 14:4, 40:1, 59:16, 60:4, 63:8, 65:13, 66:5, 67:14, 68:15, 71:25, 96:10, 96:23
**memoranda** [3] - 32:18, 71:23, 85:15
**memorandum** [2] - 42:24, 68:17
**memory** [1] - 45:3
**memos** [1] - 4:17
**mental/physical** [1] - 84:5
**mention** [1] - 72:13
**mentioned** [3] - 5:13, 34:12, 56:3
**mere** [1] - 73:3
**merely** [1] - 28:9
**merge** [1] - 21:14
**meriting** [1] - 19:25
**Merriam** [1] - 16:12
**Merriam-Webster** [1] - 16:12
**mess** [1] - 61:5
**message** [4] - 66:24, 66:25, 67:2
**met** [4] - 17:14, 45:10, 54:16, 59:11
**metal** [1] - 52:21
**meted** [1] - 95:21
**methods** [1] - 105:4
**Metro** [1] - 91:6
**microphone** [1] - 85:6
**midnight** [1] - 54:11
**midpoint** [2] - 57:2, 57:10
**midst** [2] - 16:25, 77:2
**might** [5] - 42:7, 52:9,

74:8, 78:17, 79:6
**mild** [1] - 67:4
**mildly** [1] - 99:1
**military** [2] - 102:20, 102:24
**million** [3] - 9:23, 68:8, 88:7
**millions** [2] - 31:5, 61:6
**mimicking** [2] - 65:13, 67:15
**mind** [8] - 13:17, 16:14, 17:6, 24:16, 38:15, 42:7, 67:22, 72:18
**minimize** [1] - 65:12
**minimum** [4] - 62:6, 62:16, 75:22, 89:6
**minute** [2] - 70:11, 74:25
**minutes** [7] - 25:19, 34:17, 74:2, 74:3, 74:4, 74:23, 94:10
**miracle** [3] - 68:1, 68:3, 68:4
**mischaracterization** [1] - 97:1
**misdemeanor** [5] - 48:22, 49:1, 88:20, 90:11, 90:13
**missed** [3] - 4:11, 5:4, 5:10
**misspeak** [1] - 23:16
**mistake** [1] - 45:2
**mitigated** [1] - 99:20
**mob** [24] - 10:7, 16:19, 16:25, 19:1, 19:5, 30:5, 30:17, 45:23, 45:24, 47:10, 51:11, 58:7, 59:3, 59:7, 66:8, 84:11, 86:12, 88:24, 92:1, 92:4, 92:7, 92:25, 93:21, 95:5
**mob's** [1] - 59:2
**models** [1] - 63:25
**moderate** [1] - 16:9
**moment** [5] - 2:18, 39:9, 57:13, 81:24, 94:15
**momentary** [3] - 19:10, 73:19, 74:5
**Montague** [2] - 37:19, 43:17
**month** [1] - 89:17
**monthly** [3] - 62:8, 89:8, 89:13
**months** [48] - 48:21, 48:23, 49:2, 49:24, 49:25, 50:1, 50:9,

50:11, 55:10, 56:19, 57:1, 57:10, 57:12, 66:19, 70:9, 71:10, 74:8, 75:12, 75:22, 78:12, 78:13, 84:22, 89:19, 98:1, 98:2, 100:7, 100:17, 101:2, 101:10, 101:18, 103:2, 103:4, 103:5, 103:14, 103:15, 103:16, 103:20, 103:21
**months'** [4] - 49:19, 49:22, 50:6, 83:12
**moot** [1] - 31:10
**morning** [6] - 2:10, 3:1, 3:7, 3:19, 54:15, 61:1
**Moss** [1] - 58:22
**most** [20] - 8:14, 32:2, 40:3, 40:4, 40:13, 50:8, 56:21, 57:18, 60:18, 64:7, 72:6, 72:10, 72:16, 77:23, 88:3, 90:21, 90:22, 107:20, 108:9, 108:24
**mostly** [1] - 21:9
**motion** [4] - 9:16, 10:1, 70:22, 107:11
**move** [5] - 15:17, 17:6, 19:4, 70:16, 107:10
**moved** [1] - 70:19
**movement** [1] - 17:3
**MPD** [5] - 2:17, 4:21, 54:4, 54:8, 100:12
**MR** [66] - 3:1, 5:9, 5:11, 5:14, 6:24, 8:12, 8:21, 9:7, 10:12, 13:8, 14:9, 21:9, 22:4, 22:25, 23:16, 23:21, 24:4, 24:10, 27:2, 32:1, 32:8, 32:11, 32:14, 32:23, 33:4, 33:8, 33:11, 37:23, 37:25, 38:4, 43:7, 49:14, 50:10, 70:24, 71:6, 74:3, 74:6, 74:11, 74:14, 76:5, 76:8, 76:20, 77:6, 77:12, 78:11, 78:20, 78:23, 79:14, 79:18, 80:5, 80:8, 80:11, 80:19, 80:22, 81:3, 81:7, 81:15, 81:20, 85:1, 85:10, 107:14, 107:23, 108:14, 108:20, 109:2,

110:23
**MS** [32] - 2:10, 2:21, 2:24, 5:5, 5:7, 7:12, 7:16, 7:19, 12:2, 14:3, 24:21, 34:5, 34:9, 34:11, 39:17, 41:13, 42:12, 49:12, 50:21, 51:3, 56:6, 56:13, 57:11, 62:19, 63:4, 63:13, 63:17, 64:18, 70:15, 107:8, 108:6, 110:21
**multiple** [4] - 33:19, 62:1, 87:13, 95:18
**must** [19] - 15:13, 19:11, 24:6, 36:8, 43:15, 77:18, 85:18, 104:8, 104:10, 104:12, 104:15, 104:17, 104:20, 104:22, 105:2, 105:3, 105:5, 105:9, 106:25
**Mustafa** [1] - 52:8
**MVPA** [1] - 87:14

**N**

**name** [2] - 61:24, 81:8
**named** [1] - 33:17
**namely** [1] - 29:20
**names** [1] - 2:8
**Nancy** [2] - 83:4, 84:22
**nature** [7] - 36:5, 55:17, 56:20, 57:18, 86:19, 90:7, 98:21
**near** [2] - 46:21, 47:3
**nearly** [1] - 69:11
**necessarily** [1] - 72:14
**necessary** [2] - 17:7, 85:21
**neck** [1] - 52:14
**need** [24] - 13:7, 21:25, 39:4, 41:19, 42:11, 42:12, 71:17, 73:11, 73:17, 73:21, 73:22, 73:23, 76:6, 82:9, 86:2, 86:21, 86:23, 88:12, 88:15, 95:22, 96:2, 97:19, 99:14, 109:18
**needle** [3] - 42:8, 42:18, 65:25
**needs** [3] - 67:7, 75:3, 75:7
**neglected** [1] - 70:15
**net** [3] - 62:7, 89:8, 89:13
**never** [7] - 16:21, 17:5,

40:9, 54:21, 60:14, 60:15, 63:24
**nevertheless** [2] - 8:25, 83:11
**Nevin** [1] - 2:11
**NEVIN** [1] - 1:8
**new** [4] - 57:10, 105:9, 110:7, 110:11
**news** [1] - 47:12
**next** [8] - 5:22, 6:23, 8:15, 46:21, 52:5, 54:14, 61:1, 107:17
**night** [3] - 56:9, 60:25, 90:24
**none** [5] - 2:21, 54:6, 56:11, 91:7, 95:11
**nonetheless** [1] - 45:6
**normal** [1] - 68:1
**normally** [1] - 4:6
**North** [1] - 1:13
**Northwest** [1] - 106:4
**Nos** [1] - 4:15
**note** [1] - 13:20
**Note** [7] - 13:20, 14:24, 15:5, 28:6, 28:15, 28:20, 28:23
**noted** [8] - 15:8, 39:18, 42:17, 49:10, 53:4, 58:22, 107:7, 107:13
**notes** [1] - 111:5
**nothing** [8] - 9:4, 14:6, 39:24, 43:7, 43:10, 51:13, 57:8, 68:1
**notice** [7] - 4:25, 32:24, 37:4, 55:23, 56:2, 106:25, 107:2
**noticed** [1] - 57:8
**notify** [1] - 106:5
**notwithstanding** [1] - 82:16
**nowhere** [1] - 46:4
**null** [1] - 111:8
**number** [6] - 6:10, 8:14, 43:2, 97:25
**NW** [1] - 1:9

**O**

**O'Neill** [1] - 7:25
**O'Neill-Greenberg** [1] - 7:25
**oath** [2] - 48:17, 51:18
**object** [5] - 9:1, 28:25, 29:3, 29:4, 78:3
**objected** [3] - 8:17, 9:6, 79:20
**objection** [40] - 9:17, 10:9, 10:10, 11:8, 11:22, 12:3, 12:4,

13

12:14, 12:18, 12:21, 12:22, 13:12, 20:19, 31:9, 31:11, 31:17, 37:11, 37:16, 37:22, 43:5, 43:13, 47:16, 70:21, 78:8

**objections** [18] - 6:3, 6:10, 7:10, 8:14, 8:17, 8:19, 10:11, 10:15, 11:14, 11:17, 13:7, 20:24, 47:20, 49:10, 107:6, 107:8, 107:12

**objective** [4] - 35:4, 35:21, 37:8, 59:2

**objects** [6] - 12:9, 13:2, 20:24, 31:18, 52:21, 65:4

**obligation** [3] - 79:11, 104:7, 106:7

**obligations** [4] - 62:4, 78:19, 79:13, 106:1

**observed** [1] - 45:1

**obsessed** [2] - 82:24, 96:13

**obsession** [1] - 97:10

**obsessions** [1] - 96:11

**obsessive** [1] - 41:22

**obstruct** [3] - 25:4, 30:13, 105:4

**obstructing** [5] - 12:11, 23:14, 24:8, 27:9, 36:20

**obstruction** [7] - 13:3, 26:8, 43:19, 44:8, 44:22, 47:18, 48:15

**obtains** [1] - 16:21

**obviously** [5] - 8:22, 27:3, 38:23, 75:13, 82:5

**OC** [3] - 47:5, 92:18, 94:8

**occasion** [3] - 25:21, 39:10, 80:9

**occasionally** [1] - 96:11

**occupy** [1] - 29:24

**occupying** [1] - 42:20

**occurred** [8] - 16:15, 59:9, 84:11, 88:23, 90:22, 95:12, 96:7, 96:12

**occurring** [2] - 30:19, 40:20

**OF** [3] - 1:1, 1:2, 1:6

**offense** [64] - 6:9, 9:19, 11:2, 11:14, 11:22, 11:24, 12:12, 13:14, 13:24, 14:16,

14:19, 15:19, 17:21, 19:25, 20:25, 26:23, 28:5, 31:8, 31:12, 31:14, 32:5, 33:13, 34:13, 35:23, 36:1, 36:4, 36:5, 44:7, 44:21, 47:25, 48:2, 48:6, 48:8, 48:9, 48:11, 48:15, 48:18, 48:25, 55:18, 56:20, 57:18, 59:11, 65:18, 73:6, 73:18, 73:20, 74:10, 74:12, 76:10, 76:12, 84:13, 86:2, 86:3, 86:9, 86:20, 86:24, 90:8, 90:13, 98:16, 99:10, 109:23, 110:7, 110:9

**offense-level** [1] - 44:21

**offenses** [6] - 37:13, 50:15, 82:13, 87:3, 88:21, 90:14

**offensive** [1] - 40:13

**offensively** [4] - 29:8, 92:12, 97:7, 102:9

**Office** [10] - 1:9, 1:17, 1:22, 1:22, 3:2, 3:4, 105:9, 105:23, 106:10

**office** [11] - 28:13, 34:2, 49:22, 57:3, 69:20, 83:6, 83:7, 85:17, 89:5, 105:7, 106:8

**office's** [2] - 4:14, 50:1

**Officer** [8] - 2:5, 4:21, 54:25, 65:3, 66:10, 69:16, 77:2, 105:23

**officer** [29] - 21:14, 22:14, 23:22, 23:25, 25:2, 44:12, 46:2, 46:13, 46:16, 46:21, 48:3, 50:3, 52:8, 54:17, 56:15, 73:8, 74:8, 74:17, 74:20, 76:16, 76:22, 78:5, 79:25, 100:12, 100:13, 102:3, 104:21, 105:5, 105:11

**officer's** [4] - 16:3, 30:18, 37:9, 102:8

**officers** [80] - 3:23, 12:11, 19:5, 22:19, 23:15, 24:9, 25:5, 25:20, 29:8, 29:9, 29:11, 29:22, 30:2, 30:14, 30:17, 31:4, 33:19, 36:17, 36:21,

37:6, 40:7, 45:22, 46:3, 46:10, 46:15, 46:17, 46:23, 47:6, 47:11, 48:6, 51:7, 51:12, 51:14, 52:16, 52:19, 53:21, 53:22, 54:22, 55:2, 55:7, 58:8, 60:3, 65:4, 66:6, 66:8, 66:9, 66:11, 67:18, 68:10, 69:22, 73:13, 77:3, 83:18, 87:7, 90:9, 90:23, 91:25, 92:7, 92:14, 92:16, 92:18, 92:22, 93:16, 93:18, 93:19, 93:25, 94:7, 94:11, 94:19, 94:22, 95:6, 96:17, 96:25, 97:12, 100:8, 100:10, 101:4, 102:3, 102:9, 102:11

**official** [10] - 20:25, 21:1, 21:4, 26:8, 26:24, 30:18, 31:9, 31:15, 48:12, 111:15

**Official** [1] - 1:24

**often** [3] - 40:3, 53:20, 68:24

**older** [1] - 79:8

**once** [7] - 59:20, 64:15, 80:13, 82:4, 82:7, 94:12, 95:9

**one** [43] - 6:2, 7:8, 13:11, 18:5, 18:8, 18:19, 23:6, 23:8, 25:21, 25:24, 26:7, 33:23, 33:24, 35:22, 39:10, 39:23, 40:2, 41:17, 42:2, 42:9, 42:10, 42:13, 43:1, 49:4, 57:15, 60:13, 61:18, 62:25, 65:15, 71:1, 78:6, 80:8, 94:3, 96:23, 97:7, 104:17, 107:14, 108:19, 108:21, 108:22

**ongoing** [2] - 36:5, 53:18

**open** [2] - 102:1, 105:9

**operating** [1] - 10:6

**opportunities** [2] - 67:11, 79:4

**opportunity** [6] - 43:5, 51:1, 63:25, 64:1, 72:19, 85:3

**opposing** [1] - 26:18

**options** [1] - 55:14

**orally** [2] - 22:22, 34:4

**order** [8] - 23:2, 27:4, 29:22, 50:14, 81:14, 88:7, 106:11, 108:15

**ordered** [3] - 103:22, 105:12, 105:15

**ordering** [1] - 87:21

**ordinarily** [2] - 82:15, 108:21

**organized** [1] - 13:11

**original** [2] - 37:4, 80:12

**originally** [2] - 37:19, 56:24

**Otunyo** [1] - 98:25

**outcome** [2] - 40:11, 45:14

**outset** [1] - 49:18

**outside** [2] - 9:21, 95:7

**outstanding** [3] - 79:12, 104:7, 107:9

**outweighed** [1] - 88:13

**overcome** [2] - 17:17, 17:19

**overcoming** [1] - 94:19

**overexplained** [1] - 39:3

**overpower** [1] - 96:17

**overpowered** [1] - 94:22

**overruled** [5] - 9:18, 10:9, 20:20, 31:13, 47:17

**overshared** [1] - 42:6

**overstate** [1] - 95:25

**overthrow** [1] - 66:17

**overturn** [1] - 86:13

**overwhelmed** [2] - 10:4, 90:19

**overwhelming** [1] - 32:20

**owed** [3] - 86:25, 87:17, 105:20

**own** [8] - 10:7, 21:24, 58:15, 67:23, 84:14, 102:4

**owned** [1] - 81:2

**ownership** [3] - 81:5, 81:12

**owns** [1] - 62:1

# P

**p.m** [2] - 54:11, 110:25

**page** [2] - 9:5, 30:15

**pages** [1] - 39:19

**paid** [2] - 88:20, 106:7

**pain** [2] - 32:22, 52:24

**Palmer** [2] - 101:1, 101:7

**Palmer's** [1] - 101:9

**pamphlets** [1] - 91:6

**pantheon** [1] - 77:23

**paper** [2] - 11:16, 52:13

**papers** [2] - 8:6, 14:1

**parading** [2] - 74:10, 74:12

**paragraph** [8] - 8:18, 9:6, 9:19, 10:9, 34:25, 35:6, 89:7, 104:4

**paragraphs** [2] - 12:15, 27:25

**Paralegals** [1] - 2:14

**parameters** [1] - 21:22

**paraphrasing** [1] - 47:13

**parents** [1] - 61:20

**part** [17] - 9:14, 10:21, 10:23, 11:6, 23:21, 25:24, 25:25, 30:1, 35:5, 35:21, 37:8, 62:22, 65:8, 69:19, 71:2, 78:19, 108:9

**Part** [1] - 48:13

**participant's** [1] - 10:5

**participate** [1] - 91:10

**participated** [4] - 90:17, 100:7, 100:12, 101:21

**particular** [2] - 14:10, 76:23

**particularly** [4] - 33:1, 44:18, 71:16, 89:24

**parties** [5] - 4:12, 6:18, 85:17, 97:24, 100:25

**parties'** [1] - 85:14

**parts** [1] - 7:11

**party** [1] - 111:10

**passively** [1] - 18:25

**passport** [4] - 108:18, 108:23, 109:3, 109:4

**past** [3] - 51:21, 81:23, 90:1

**path** [3] - 17:15, 67:23, 77:11

**Paul** [1] - 58:23

**pause** [2] - 56:22, 61:8

**pay** [9] - 62:4, 62:16, 78:24, 87:21, 88:25, 89:14, 103:22, 105:12, 105:18

**payable** [1] - 106:2

**payment** [3] - 87:23, 88:4, 88:24

**payments** [1] - 105:20

14

**peaceful** [2] - 38:22, 66:16
**Pelosi** [2] - 83:4, 84:22
**penalized** [1] - 77:9
**penalties** [3] - 105:13, 105:19, 110:2
**pending** [3] - 109:15, 109:19, 110:8
**people** [31] - 3:13, 3:14, 6:5, 9:15, 32:2, 47:14, 55:3, 59:22, 59:24, 60:6, 61:2, 64:19, 67:16, 68:6, 68:8, 68:23, 68:25, 69:8, 69:24, 74:18, 75:5, 75:13, 78:14, 81:24, 83:9, 86:12, 90:16, 92:19, 97:25, 107:20
**pepper** [1] - 47:5
**per** [3] - 78:4, 89:17, 104:6
**perfected** [1] - 81:17
**perfectly** [3] - 43:9, 98:25, 99:5
**perform** [1] - 33:6
**performing** [1] - 59:5
**perhaps** [8] - 38:4, 72:16, 74:8, 80:1, 81:9, 81:10, 91:18, 96:12
**period** [7] - 19:8, 73:14, 74:2, 84:12, 94:10, 98:13, 110:16
**periodic** [1] - 104:18
**perjurious** [3] - 13:3, 39:14, 47:19
**perjury** [2] - 45:1, 101:14
**permission** [1] - 107:3
**permitted** [5] - 9:11, 47:1, 47:3, 47:8, 106:24
**perpetrator's** [1] - 19:22
**persist** [1] - 59:10
**persistent** [1] - 94:9
**person** [11] - 30:24, 33:23, 38:21, 59:3, 67:22, 72:17, 73:7, 73:10, 74:7, 74:19, 100:5
**personal** [6] - 61:16, 84:4, 84:17, 95:13, 102:23, 102:25
**personalized** [1] - 53:21
**personally** [1] - 84:15
**persons** [2] - 30:23,

53:23
**persuaded** [2] - 34:1, 34:3
**petty** [5] - 11:2, 48:25, 74:10, 74:12, 90:13
**Phoenix** [1] - 1:13
**photocopied** [1] - 111:9
**phrase** [3] - 14:24, 15:8, 19:22
**physical** [26] - 4:1, 4:3, 11:24, 13:14, 14:16, 15:3, 15:10, 15:14, 15:18, 16:1, 16:5, 17:1, 17:7, 17:11, 18:11, 18:13, 19:4, 20:21, 29:16, 34:19, 44:19, 66:9, 73:9, 87:8, 90:10, 90:12
**physically** [10] - 13:18, 14:20, 14:23, 15:4, 15:23, 17:21, 17:24, 20:18, 52:17, 54:19
**picked** [2] - 75:12, 97:6
**pictures** [1] - 92:4
**pieces** [1] - 52:22
**piggy** [1] - 57:8
**piggy-back** [1] - 57:8
**pipe** [1] - 74:19
**pistol** [1] - 101:17
**pivotal** [1] - 69:18
**place** [5] - 40:11, 62:2, 90:15, 90:20, 102:6
**placement** [2] - 19:21, 104:18
**plain** [3] - 17:23, 18:9, 20:15
**plainly** [1] - 15:13
**plan** [5] - 35:5, 35:21, 37:9, 83:1, 90:6
**plank** [1] - 101:3
**planned** [4] - 39:7, 39:24, 75:6, 91:2
**planning** [9] - 2:19, 72:7, 72:15, 72:23, 84:21, 91:7, 91:8, 91:9, 101:18
**platoon** [1] - 52:6
**players** [1] - 72:11
**plaza** [1] - 54:8
**plea** [5] - 25:7, 55:19, 68:18, 88:4, 100:16
**pleaded** [5] - 99:22, 100:5, 101:1, 101:15, 102:12
**pleas** [4] - 98:11, 98:13, 99:2, 99:17

**pled** [4] - 68:23, 82:17, 98:9, 99:4
**plus** [1] - 4:22
**poignant** [1] - 17:13
**point** [9] - 22:9, 31:10, 32:7, 34:11, 42:22, 69:13, 94:3, 96:23, 98:8
**pointed** [4] - 25:14, 56:15, 72:22, 100:9
**pointing** [2] - 57:1, 93:19
**points** [6] - 38:19, 59:16, 59:18, 60:4, 60:10, 72:21
**pole** [1] - 101:4
**Police** [1] - 69:16
**police** [60] - 19:5, 25:2, 28:18, 28:19, 29:7, 29:9, 29:12, 29:18, 30:16, 33:18, 40:7, 45:22, 46:18, 47:1, 47:5, 47:7, 51:20, 51:23, 58:5, 58:6, 58:15, 58:16, 58:18, 65:7, 65:9, 65:15, 67:18, 68:10, 69:7, 73:8, 73:13, 74:17, 74:20, 76:19, 77:10, 83:10, 90:22, 91:25, 92:7, 92:8, 92:10, 92:13, 92:16, 92:23, 93:11, 94:8, 94:13, 95:11, 96:17, 97:7, 97:12, 101:6, 101:22, 102:7, 102:9, 102:10
**policeman** [1] - 94:4
**policy** [1] - 41:2
**portion** [2] - 74:23, 74:24
**portions** [3] - 6:4, 8:20, 10:16
**poses** [1] - 73:22
**position** [6] - 12:1, 14:5, 34:16, 53:6, 71:14, 108:5
**positions** [1] - 98:10
**possess** [1] - 104:12
**possible** [1] - 59:21
**possibly** [1] - 96:13
**post** [2] - 60:5, 60:8
**posted** [2] - 82:25, 94:16
**posts** [1] - 71:23
**posture** [1] - 101:13
**potential** [1] - 73:4
**practical** [2] - 78:25, 79:5
**precautions** [1] - 3:15

**precisely** [1] - 88:16
**predicated** [1] - 56:25
**preparation** [4] - 72:7, 72:12, 82:19, 83:15
**prepared** [4] - 27:19, 43:12, 59:4, 82:3
**preplanning** [2] - 73:23, 76:1
**preponderance** [5] - 26:6, 41:7, 42:16, 43:23, 45:10
**preposterous** [3] - 40:4, 40:12, 42:23
**PRESENT** [1] - 1:20
**presentation** [1] - 70:25
**presented** [4] - 38:12, 38:20, 60:17, 88:2
**presentence** [16] - 4:14, 6:3, 6:5, 7:9, 7:11, 8:5, 8:11, 8:24, 10:16, 11:9, 12:15, 13:13, 27:24, 63:8, 85:15, 106:8
**presentencing** [1] - 55:23
**presided** [2] - 5:1, 55:18
**President** [2] - 67:24, 68:9
**president** [1] - 59:3
**President's** [1] - 90:25
**Press** [2] - 94:15, 94:17
**pretrial** [12] - 9:17, 9:25, 60:11, 60:12, 72:23, 73:1, 107:25, 108:4, 108:10, 109:9, 109:14, 110:17
**Pretrial** [2] - 1:21, 2:6
**pretty** [2] - 14:9, 31:23
**prevent** [2] - 16:7, 59:4
**previously** [2] - 18:11, 97:21
**prison** [2] - 70:9, 79:3
**Prisons** [3] - 103:13, 109:16, 109:21
**Probation** [3] - 1:20, 2:5, 106:10
**probation** [23] - 4:13, 13:23, 28:13, 34:2, 49:22, 49:25, 50:3, 56:15, 57:3, 71:2, 78:5, 79:7, 79:24, 85:15, 85:17, 89:5, 104:21, 105:5, 105:7, 105:11, 106:8, 108:14,

109:22
**procedures** [1] - 87:13
**proceed** [3] - 5:17, 5:22, 81:19
**proceeded** [1] - 26:17
**proceeding** [2] - 26:8, 110:25
**proceedings** [1] - 111:6
**Proceedings** [1] - 1:25
**proceeds** [1] - 90:20
**process** [2] - 88:12, 88:14
**produced** [1] - 1:25
**produces** [1] - 48:20
**prohibited** [1] - 105:3
**prolong** [1] - 88:11
**promote** [3] - 65:18, 86:4, 86:17
**proof** [3] - 43:15, 43:23, 76:20
**property** [3] - 30:24, 81:10, 81:12
**prosecution** [1] - 110:6
**protect** [7] - 29:13, 30:14, 58:11, 86:16, 92:16, 92:17, 95:23
**protected** [2] - 55:2, 55:3
**protecting** [3] - 36:22, 58:20, 99:18
**Protection** [2] - 87:10, 87:15
**protective** [4] - 59:19, 59:23, 59:24
**protest** [3] - 39:10, 40:8, 77:16
**protested** [1] - 40:9
**protests** [2] - 38:22, 54:6
**prove** [2] - 24:6, 45:7
**proved** [2] - 92:21, 93:22
**provide** [9] - 31:12, 62:9, 66:21, 69:1, 86:8, 86:23, 88:12, 89:4, 105:5
**provided** [9] - 13:4, 15:20, 31:14, 39:2, 44:9, 44:15, 48:16, 62:8, 97:24
**provides** [5] - 10:4, 28:4, 31:8, 48:6, 99:5
**providing** [3] - 18:23, 43:13, 44:22
**provisions** [2] - 88:14, 103:10

**PSR** [20] - 6:4, 6:6, 8:14, 8:20, 9:5, 9:19, 10:18, 11:23, 34:25, 35:2, 35:6, 36:16, 37:3, 44:6, 57:1, 61:16, 80:17, 89:7, 89:12, 104:4

**PSR's** [6] - 11:8, 12:22, 13:3, 14:15, 31:19, 36:25

**PSRs** [1] - 32:19

**psychological** [1] - 84:5

**psychologists** [1] - 73:3

**PTSD** [1] - 102:21

**public** [5] - 30:22, 86:16, 95:23, 99:19, 102:18

**publicly** [1] - 94:17

**pudding** [1] - 76:20

**pugnacious** [1] - 93:20

**pull** [8] - 17:16, 18:18, 40:7, 46:9, 58:17, 77:9, 92:22, 92:25

**pulled** [6] - 17:19, 19:2, 30:16, 46:1, 46:7, 53:5

**pulling** [16] - 14:20, 16:18, 16:20, 16:22, 16:24, 18:17, 19:13, 19:17, 20:2, 44:10, 45:20, 45:21, 45:23, 46:4, 77:2, 77:13

**punching** [1] - 52:19

**punishment** [3] - 74:16, 86:8, 95:20

**purpose** [7] - 22:18, 23:14, 24:8, 24:15, 29:25, 30:13, 47:24

**purposes** [6] - 14:13, 21:15, 71:16, 85:21, 85:25, 86:1

**pursuant** [8] - 35:1, 56:20, 86:18, 88:7, 88:18, 103:9, 106:13, 106:22

**push** [7] - 29:10, 40:6, 47:10, 58:15, 92:17, 93:24, 101:22

**pushed** [1] - 94:12

**pushing** [5] - 25:22, 46:17, 46:22, 92:8, 94:5

**put** [7] - 34:8, 38:9, 52:3, 77:22, 81:12, 81:17, 83:8

**puts** [2] - 77:22, 100:22

**putting** [2] - 11:11, 92:12

**puzzle** [1] - 92:5

**puzzled** [1] - 22:2

**PVC** [1] - 74:19

**Q**

**qualify** [2] - 15:21, 23:2

**qualities** [1] - 60:23

**quantity** [1] - 36:3

**questioned** [1] - 21:12

**questions** [6] - 6:22, 14:10, 40:25, 77:25, 78:2, 83:23

**quietly** [1] - 18:25

**quite** [11] - 10:19, 16:23, 17:12, 21:23, 39:12, 71:20, 72:2, 79:2, 100:14, 102:6, 103:2

**quote** [8] - 15:2, 15:3, 15:16, 16:7, 19:22, 44:23, 58:23, 99:12

**R**

**raised** [1] - 40:25

**raising** [1] - 72:20

**rallies** [1] - 54:6

**rally** [4] - 68:9, 91:1, 91:13, 101:19

**ram** [3] - 29:9, 92:12, 102:10

**Ramey** [1] - 70:3

**ramifications** [1] - 41:2

**ramming** [1] - 29:14

**randomly** [1] - 29:22

**range** [26] - 11:7, 12:23, 48:20, 49:4, 49:6, 49:25, 56:25, 57:2, 57:3, 57:5, 57:6, 57:10, 61:15, 75:20, 75:23, 89:3, 89:6, 89:19, 97:13, 97:16, 98:17, 100:20, 100:22, 101:12, 103:5, 106:20

**ranges** [1] - 99:18

**rare** [2] - 81:9, 81:10

**rarely** [1] - 62:24

**rather** [6] - 12:10, 15:5, 20:7, 46:16, 46:21, 100:1

**Raymond** [1] - 2:13

**RAYMOND** [1] - 1:21

**reaction** [1] - 73:19

**read** [4] - 8:10, 21:10, 21:25, 69:11

**reading** [1] - 85:18

**ready** [2] - 81:22, 82:12

**Reagan** [1] - 67:24

**real** [1] - 92:5

**realize** [2] - 55:22, 69:14

**realizes** [1] - 47:9

**really** [19] - 4:11, 13:17, 20:5, 21:18, 21:21, 21:22, 32:3, 32:16, 33:13, 34:14, 34:17, 53:24, 57:19, 61:9, 72:8, 78:25, 81:20, 84:19, 109:12

**realm** [1] - 100:22

**realtime** [1] - 57:19

**reason** [7] - 34:20, 62:22, 71:24, 75:24, 80:2, 89:23, 107:22

**reasonable** [6] - 24:6, 42:15, 75:14, 75:17, 97:14, 97:18

**reasonableness** [1] - 100:23

**reasons** [5] - 10:2, 12:13, 26:22, 28:15, 39:13

**reasserted** [1] - 12:17

**receive** [4] - 47:18, 63:10, 69:1, 100:5

**received** [2] - 68:23, 106:21

**recent** [1] - 50:8

**recently** [1] - 98:24

**recess** [1] - 70:14

**recitations** [1] - 9:2

**recites** [1] - 15:13

**recognized** [1] - 42:6

**recommend** [1] - 44:7

**recommendation** [5] - 4:15, 49:22, 49:24, 50:1, 56:24

**recommendations** [4] - 6:17, 49:17, 50:23, 85:16

**recommended** [2] - 66:21, 108:15

**recommending** [1] - 57:4

**recommends** [6] - 34:25, 49:18, 50:3, 50:6, 61:12, 97:17

**reconvene** [1] - 60:25

**record** [20] - 2:5, 2:9, 5:3, 10:18, 10:19, 10:20, 10:22, 13:23, 14:14, 24:22, 25:15,

32:13, 38:3, 49:11, 69:15, 87:23, 88:2, 90:5, 107:7, 107:13

**recorded** [1] - 94:15

**recycled** [1] - 102:10

**reduced** [1] - 99:18

**reduction** [1] - 98:17

**refer** [1] - 6:5

**reference** [5] - 23:3, 24:17, 28:2, 56:10, 56:18

**refers** [1] - 14:22

**reflect** [1] - 86:2

**Reform** [1] - 103:9

**refrain** [1] - 104:15

**regard** [5] - 26:9, 40:11, 62:23, 63:15, 65:25

**regarding** [5] - 7:10, 7:12, 44:18, 90:7, 97:19

**regards** [1] - 42:23

**registered** [1] - 89:22

**regretful** [1] - 64:11

**regularly** [1] - 79:23

**rehabilitation** [1] - 86:17

**reimburse** [1] - 89:1

**reiterate** [1] - 77:13

**related** [7] - 12:16, 21:20, 31:22, 35:12, 44:17, 87:12, 88:10

**relaxed** [1] - 62:14

**release** [26] - 49:4, 49:19, 50:4, 50:13, 60:11, 70:9, 79:21, 80:12, 89:11, 103:20, 105:7, 106:8, 107:25, 108:4, 108:10, 108:15, 108:17, 108:19, 109:7, 109:9, 109:14, 109:19, 110:5, 110:11, 110:17

**released** [2] - 110:1, 110:8

**relevant** [2] - 47:25, 85:19

**reliance** [1] - 43:17

**relocate** [1] - 54:8

**rely** [4] - 21:9, 42:11, 55:24, 56:4

**relying** [1] - 9:2

**remain** [5] - 80:21, 99:11, 108:4, 109:9, 109:15

**remember** [3] - 17:12, 60:1, 64:17

**remorse** [7] - 65:16,

95:4, 96:7, 99:9, 100:16, 101:9, 102:14

**remorseful** [1] - 64:11

**remove** [1] - 3:17

**renewal** [1] - 11:17

**repairs** [1] - 9:23

**repeatedly** [6] - 29:8, 74:20, 75:15, 93:12, 93:15, 93:18

**reply** [2] - 43:5, 96:23

**report** [14] - 4:14, 6:3, 6:6, 7:9, 7:11, 8:6, 8:11, 10:17, 13:13, 27:24, 85:16, 89:11, 106:9, 108:15

**report's** [1] - 12:15

**reported** [2] - 1:25, 79:24

**reporter** [3] - 29:23, 70:12, 94:15

**Reporter** [3] - 1:23, 1:24, 111:15

**reports** [3] - 8:24, 47:11, 62:11

**representation** [1] - 62:12

**represented** [1] - 64:8

**representing** [1] - 2:11

**republic** [1] - 57:22

**request** [2] - 100:18, 107:3

**requested** [1] - 105:6

**requesting** [2] - 50:16, 71:10

**require** [4] - 22:16, 23:10, 23:11, 23:13

**required** [10] - 15:12, 15:18, 23:6, 27:3, 60:11, 78:14, 88:4, 109:20, 109:22

**requirement** [1] - 23:20

**requires** [10] - 6:20, 15:10, 17:2, 18:10, 18:15, 18:22, 19:7, 19:20, 59:6, 96:6

**requiring** [1] - 104:5

**requisite** [1] - 30:10

**resembles** [1] - 29:2

**Reserves** [1] - 54:4

**residence** [2] - 81:1, 106:11

**resist** [1] - 83:10

**resisting** [5] - 3:22, 16:20, 26:18, 48:5, 90:9

**resists** [1] - 16:24

**resolved** [2] - 47:20,

16

68:18
**resources** [1] - 89:25
**respect** [7] - 34:5,
34:22, 45:11, 65:18,
66:2, 86:4, 97:15
**respective** [1] - 58:25
**respirator** [1] - 60:2
**respond** [2] - 24:20,
27:1
**responded** [1] - 54:7
**responding** [2] - 31:4,
95:6
**response** [1] - 39:19
**responsibility** [10] -
65:16, 65:17, 67:20,
68:24, 98:14, 99:23,
100:15, 101:7,
102:13, 103:1
**responsible** [2] -
87:18, 87:25
**rest** [1] - 75:1
**Restitution** [1] - 87:5
**restitution** [26] -
50:14, 50:19, 61:10,
78:22, 79:17, 86:24,
86:25, 87:2, 87:4,
87:9, 87:14, 87:17,
87:18, 87:23, 88:1,
88:12, 88:14, 88:16,
88:19, 104:22,
104:24, 105:15,
105:18, 105:19,
105:20, 106:2
**restrain** [6] - 15:11,
16:7, 16:11, 17:21,
17:24, 20:18
**restrained** [6] - 13:18,
14:21, 14:23, 15:4,
15:16, 15:23
**restraining** [2] - 93:9,
100:12
**Restraint** [1] - 14:17
**restraint** [11] - 11:24,
13:15, 13:21, 14:16,
14:25, 15:3, 15:10,
15:13, 16:5, 16:16,
17:4, 17:7, 19:10,
19:11, 20:21
**restrict** [2] - 16:9, 17:2
**restricted** [4] - 4:1,
87:8, 90:11, 109:5
**result** [4] - 11:10,
18:8, 76:22, 106:17
**resulted** [1] - 31:3
**resulting** [2] - 9:22,
48:18
**results** [6] - 30:24,
36:10, 40:19, 48:1,
86:12, 96:4
**retirement** [1] - 78:13

**return** [1] - 99:2
**returned** [1] - 54:15
**review** [4] - 6:2, 11:13,
18:6, 47:21
**reviewed** [4] - 4:8,
4:13, 4:16, 4:19
**revocation** [1] - 110:5
**rights** [1] - 99:7
**riled** [1] - 94:9
**Riley** [59] - 13:15,
16:2, 16:17, 16:19,
16:22, 16:25, 17:16,
17:18, 18:16, 18:20,
18:24, 19:3, 20:3,
20:7, 20:8, 20:10,
20:18, 25:15, 29:19,
30:1, 30:16, 33:16,
33:17, 34:18, 34:19,
35:3, 36:14, 36:18,
37:5, 45:22, 45:23,
45:25, 46:5, 46:7,
46:8, 46:9, 51:9,
53:3, 53:11, 53:12,
53:16, 54:3, 54:16,
55:1, 58:10, 64:25,
74:24, 77:2, 77:5,
77:10, 77:13, 82:20,
93:2, 93:3, 93:4,
93:12, 93:16, 97:6
**Riley's** [16] - 14:20,
16:19, 17:3, 17:5,
17:12, 18:12, 18:19,
19:13, 19:15, 20:2,
20:4, 36:22, 44:11,
45:20, 92:24, 93:10
**riot** [6] - 25:20, 29:7,
60:24, 90:18, 92:10,
96:25
**rioter** [2] - 93:12,
100:11
**rioters** [22] - 29:13,
31:3, 46:22, 51:21,
52:18, 52:21, 58:4,
58:6, 58:9, 61:5,
65:5, 65:8, 65:11,
66:7, 90:22, 93:23,
94:18, 94:20, 94:22,
99:13, 101:22
**riots** [1] - 72:11
**rise** [1] - 35:11
**risk** [3] - 73:4, 73:22,
79:22
**risked** [1] - 55:8
**ROBERTS** [1] - 1:22
**Roberts** [1] - 2:14
**robust** [1] - 71:14
**role** [2] - 63:25, 90:14
**room** [1] - 3:14
**Room** [1] - 105:24
**Rotunda** [1] - 69:20

**ROUHI** [1] - 1:22
**Rouhi** [1] - 2:14
**RPR** [3] - 1:23, 111:3,
111:14
**Rubenacker** [5] -
33:1, 33:4, 66:15,
82:12, 82:13
**rule** [2] - 27:19, 43:12
**ruling** [2] - 14:13,
34:24
**rulings** [1] - 50:10
**running** [1] - 92:13
**rush** [3] - 40:7, 58:16,
96:24

## S

**safety** [1] - 93:11
**Saint** [2] - 1:23,
111:14
**SAINT** [1] - 111:3
**Saint-Loth** [2] - 1:23,
111:14
**SAINT-LOTH** [1] -
111:3
**satisfied** [2] - 7:23,
8:1
**saved** [1] - 70:5
**saw** [8] - 10:7, 10:18,
38:5, 52:12, 70:1,
77:3, 80:17, 107:22
**say-so** [1] - 89:23
**scared** [1] - 53:1
**scheme** [4] - 35:5,
35:21, 37:9, 74:17
**SCHESNOL** [33] -
1:12, 2:10, 2:21,
2:24, 5:5, 5:7, 7:12,
7:16, 7:19, 12:2,
14:3, 24:21, 34:5,
34:9, 34:11, 39:17,
41:13, 42:12, 49:12,
50:21, 51:3, 56:6,
56:13, 57:11, 62:19,
63:4, 63:13, 63:17,
64:18, 70:15, 107:8,
108:6, 110:21
**Schesnol** [4] - 2:11,
27:2, 51:2, 71:22
**Schesnol's** [1] - 70:25
**Schuck** [1] - 2:6
**SCHUCK** [1] - 1:21
**science** [2] - 73:2
**score** [1] - 11:11
**scrum** [1] - 75:1
**search** [2] - 41:25,
91:3
**seat** [1] - 27:19
**seated** [3] - 8:9, 10:14,
108:1

**second** [9] - 6:7, 7:15,
10:23, 12:9, 18:15,
29:19, 46:12, 96:24,
108:22
**seconds** [12] - 16:4,
17:4, 19:14, 19:17,
22:6, 25:17, 25:18,
53:11, 93:1, 93:7,
97:5, 97:6
**Section** [33] - 3:24,
3:25, 4:2, 4:4, 6:17,
13:16, 14:17, 18:2,
20:20, 28:4, 28:14,
28:15, 29:17, 30:21,
44:25, 47:17, 48:4,
48:14, 48:24, 49:2,
49:5, 85:19, 86:18,
87:5, 87:10, 88:8,
88:15, 88:18,
103:11, 103:25,
104:23, 106:14,
106:22
**section** [2] - 28:2,
31:23
**security** [1] - 102:24
**see** [27] - 15:6, 16:11,
16:16, 18:2, 27:15,
30:15, 32:25, 34:3,
34:11, 43:25, 45:7,
53:11, 53:12, 57:21,
60:7, 62:17, 63:22,
63:24, 72:6, 72:10,
73:24, 76:24, 80:18,
80:25, 94:3, 94:4,
99:2
**seeing** [1] - 91:17
**seem** [4] - 22:15,
67:13, 93:7, 101:12
**seemingly** [1] - 29:12
**sees** [2] - 47:6, 47:7
**segregated** [1] - 33:14
**self** [2] - 45:5, 108:15
**self-defense** [1] - 45:5
**self-report** [1] -
108:15
**selfie** [1] - 52:13
**send** [3] - 66:24, 66:25
**sense** [3] - 64:20,
64:21, 91:17
**sensible** [1] - 79:18
**sensitive** [2] - 38:9,
110:16
**sentence** [58] - 6:18,
6:21, 7:1, 7:2, 44:25,
48:23, 49:1, 55:10,
59:12, 66:19, 66:21,
68:2, 71:9, 71:11,
75:3, 75:5, 75:19,
75:20, 76:13, 76:14,
77:21, 82:7, 82:15,

83:21, 84:6, 84:8,
84:9, 85:12, 85:13,
85:20, 86:1, 86:21,
95:22, 96:3, 96:6,
97:17, 97:19, 98:6,
100:17, 100:19,
101:10, 103:4,
103:7, 104:24,
106:11, 106:15,
106:16, 106:20,
106:23, 107:6,
107:12, 107:16,
107:24, 108:12,
109:21, 110:8
**sentenced** [16] -
66:23, 70:7, 72:2,
77:19, 82:9, 83:11,
97:21, 97:25, 100:6,
101:2, 101:17,
103:17, 103:19,
108:8, 109:23, 110:9
**sentences** [10] -
57:14, 72:3, 72:7,
75:8, 75:14, 75:17,
78:12, 86:21, 97:15,
100:4
**Sentencing** [7] -
11:12, 27:16, 40:23,
53:10, 70:2, 97:16,
103:9
**SENTENCING** [1] -
1:6
**sentencing** [77] - 3:20,
4:8, 4:14, 4:16, 4:19,
4:24, 5:17, 5:19,
5:20, 8:7, 10:17,
10:21, 10:22, 11:7,
11:20, 14:4, 21:25,
26:5, 26:16, 26:24,
32:18, 40:1, 41:1,
42:16, 42:24, 43:15,
49:17, 56:16, 56:25,
57:2, 57:3, 57:16,
58:22, 60:4, 62:14,
63:8, 64:9, 64:10,
65:13, 65:23, 66:5,
66:14, 67:14, 68:5,
68:15, 68:16, 68:21,
68:22, 70:17, 71:15,
71:22, 72:25, 75:13,
78:21, 83:8, 85:14,
85:16, 85:22, 85:25,
88:11, 88:13, 89:18,
95:25, 96:10, 97:9,
97:13, 98:3, 98:4,
98:8, 98:17, 99:5,
99:17, 100:20,
101:11, 103:11,
106:18, 106:21
**sentencings** [5] - 4:7,

17

53:19, 63:19, 64:8, 81:23

**separate** [14] - 12:23, 13:19, 22:22, 23:1, 24:25, 25:10, 25:12, 33:6, 34:18, 35:8, 36:25, 109:23, 110:6

**separated** [1] - 33:15

**separately** [1] - 32:6

**sergeant** [1] - 54:5

**Sergeant** [69] - 2:16, 4:21, 13:15, 14:20, 16:2, 16:17, 16:19, 16:22, 16:25, 17:2, 17:5, 17:12, 17:16, 17:17, 17:18, 18:24, 19:13, 19:14, 20:2, 20:8, 20:10, 20:18, 25:15, 29:19, 30:1, 30:16, 33:16, 33:17, 34:18, 34:19, 35:3, 36:14, 36:18, 36:22, 37:5, 44:11, 45:20, 45:21, 45:23, 45:25, 46:5, 46:7, 46:8, 46:9, 51:9, 51:16, 51:24, 53:3, 53:11, 53:12, 53:16, 54:3, 54:16, 54:25, 55:1, 58:10, 64:25, 65:2, 69:9, 74:24, 77:5, 77:10, 77:13, 92:24, 93:4, 93:10, 93:12, 93:16, 97:5

**sergeant's** [1] - 93:15

**seriatim** [1] - 97:7

**series** [2] - 22:6, 69:3

**serious** [16] - 28:9, 28:25, 29:1, 29:16, 67:4, 72:7, 72:10, 74:21, 77:23, 82:8, 86:3, 90:14, 90:21, 96:9, 96:22, 108:7

**seriously** [1] - 77:19

**seriousness** [3] - 65:18, 86:2, 95:25

**serve** [3] - 103:17, 103:19, 109:17

**served** [2] - 41:3, 60:12

**service** [4] - 102:18, 102:21, 102:25, 109:20

**serving** [4] - 30:14, 102:17, 107:16, 108:12

**set** [8] - 4:9, 7:17, 14:23, 56:25, 68:18, 85:19, 101:24, 104:3

**sets** [1] - 68:15

**seven** [8] - 15:25, 16:4, 19:13, 19:17, 25:16, 25:18, 93:7, 97:6

**several** [7] - 4:17, 28:18, 54:18, 59:8, 65:10, 81:7, 81:21

**several-hour** [1] - 59:8

**severally** [1] - 87:16

**severe** [3] - 82:15, 106:19, 110:3

**shall** [7] - 35:14, 104:1, 104:25, 105:20, 106:5, 106:8, 111:8

**share** [3] - 31:21, 35:11, 105:8

**shared** [1] - 91:18

**sharply** [1] - 79:4

**shield** [13] - 25:20, 28:18, 29:9, 29:14, 29:15, 33:19, 74:24, 76:19, 92:15, 96:25, 97:7, 102:7, 102:9

**shields** [9] - 28:19, 29:8, 29:12, 29:18, 47:7, 52:22, 92:10, 92:11, 101:6

**SHIRINE** [1] - 1:22

**Shirine** [1] - 2:14

**shocking** [1] - 55:20

**short** [5] - 17:6, 19:17, 51:13, 98:2

**shorthand** [1] - 1:25

**shoulder** [4] - 51:20, 92:2

**shoulder-to-shoulder** [1] - 92:2

**show** [6] - 46:16, 52:6, 89:5, 92:23, 99:1, 101:5

**showed** [4] - 26:16, 86:5, 100:10, 101:6

**showing** [2] - 45:24, 66:2

**shown** [2] - 100:17, 101:9

**shows** [8] - 16:18, 19:12, 45:21, 46:14, 46:16, 97:3, 97:9, 98:19

**sic** [2] - 2:15, 53:17

**sic]** [1] - 81:2

**side** [2] - 6:4, 93:16

**sides** [1] - 6:11

**siege** [1] - 58:21

**sightseeing** [1] - 91:10

**sign** [1] - 47:8

**signatory** [1] - 111:10

**significant** [6] - 10:4, 70:7, 71:9, 75:23, 77:21, 82:6

**similar** [7] - 50:14, 77:20, 82:21, 86:22, 86:23, 101:5, 103:2

**simplicity** [2] - 33:7, 33:8

**simply** [8] - 20:1, 46:11, 64:13, 66:6, 72:7, 74:16, 79:2, 80:15

**single** [4] - 35:15, 37:12, 37:13, 84:8

**sirens** [2] - 47:4, 94:6

**sit** [9] - 7:7, 11:19, 18:25, 33:9, 33:10, 34:7, 54:24, 57:22, 83:24

**sitting** [1] - 53:21

**situation** [2] - 24:13, 84:5

**six** [6] - 21:3, 47:6, 48:11, 49:1, 76:8, 84:12

**six-hour** [1] - 84:12

**six-level** [1] - 21:3

**skin** [2] - 52:2, 52:14

**slamming** [1] - 29:15

**Sleeper** [1] - 1:18

**smart** [4] - 5:25, 42:8, 59:14, 65:24

**smartly** [1] - 42:5

**Smith** [1] - 44:1

**social** [7] - 60:5, 60:7, 60:9, 71:23, 72:23, 73:21, 76:2

**society** [1] - 78:14

**sociologists** [1] - 73:3

**someone** [5] - 25:1, 34:15, 42:21, 58:11, 72:15

**sometime** [1] - 54:11

**sometimes** [1] - 6:5

**somewhat** [3] - 71:13, 91:2, 99:19

**somewhere** [1] - 108:24

**sore** [1] - 52:24

**sorry** [7] - 23:16, 24:2, 32:11, 63:8, 70:15, 70:23, 74:11

**sort** [7] - 22:12, 22:24, 41:3, 50:23, 53:13, 76:3, 102:8

**space** [6] - 19:21, 19:23, 20:3, 20:5, 20:10, 108:25

**spare** [1] - 77:8

**Speaker** [2] - 83:4,

83:5

**Speaker's** [2] - 83:6, 83:7

**speakers** [1] - 91:14

**speaking** [3] - 3:17, 5:18, 78:15

**spear** [1] - 101:4

**spear-like** [1] - 101:4

**Special** [1] - 1:21

**special** [9] - 49:6, 49:20, 50:5, 70:8, 78:22, 79:16, 103:22, 104:25, 106:2

**specific** [12] - 9:15, 10:11, 24:14, 31:21, 35:11, 35:23, 37:1, 48:9, 66:22, 67:8, 76:5, 86:19

**specifically** [6] - 24:5, 25:11, 26:18, 55:15, 85:24, 100:1

**specifying** [1] - 12:16

**spectrum** [1] - 75:8

**spent** [2] - 21:24, 102:17

**spiders** [1] - 69:20

**spray** [5] - 47:5, 47:6, 54:12, 92:18, 94:8

**spraying** [2] - 52:20, 94:8

**sprays** [1] - 47:5

**spur** [1] - 39:9

**spurious** [1] - 46:12

**squarely** [1] - 82:2

**staff** [3] - 58:21, 60:23, 61:4

**stage** [1] - 6:1

**staggering** [1] - 53:14

**stairs** [2] - 69:19, 92:3

**stake** [1] - 81:6

**stand** [12] - 5:17, 7:21, 30:4, 40:14, 42:21, 43:1, 52:10, 65:11, 66:3, 69:1, 85:8, 94:24

**standard** [15] - 26:5, 37:20, 41:8, 43:14, 43:18, 43:22, 43:24, 45:10, 50:16, 78:6, 78:9, 78:15, 79:11, 88:4, 104:2

**standing** [4] - 46:3, 46:20, 93:16, 108:2

**start** [7] - 4:6, 7:8, 11:5, 13:12, 22:7, 49:16, 108:12

**starting** [1] - 2:9

**starts** [1] - 61:13

**state** [6] - 2:8, 24:6,

27:25, 72:18, 103:7, 104:10

**statement** [5] - 62:7, 63:9, 89:8, 89:13, 102:15

**statements** [4] - 2:20, 2:22, 48:17, 89:9

**states** [4] - 35:13, 36:16, 89:7, 99:4

**STATES** [4] - 1:1, 1:2, 1:7, 1:8

**States** [7] - 1:9, 2:3, 2:12, 58:24, 60:21, 67:17, 69:16

**station** [1] - 20:8

**statute** [9] - 6:16, 21:21, 23:10, 23:12, 23:20, 25:2, 48:24, 104:23, 106:24

**statutes** [1] - 21:20

**statutory** [3] - 21:15, 59:2, 106:14

**stay** [5] - 20:7, 41:3, 96:20, 107:25, 110:17

**stayed** [1] - 51:21

**Steal** [2] - 91:1, 101:19

**stenographic** [1] - 111:5

**step** [11] - 6:2, 6:7, 6:13, 6:20, 7:3, 7:8, 7:15, 31:25, 49:9, 49:16, 57:25

**stepmother** [1] - 61:21

**steps** [5] - 5:20, 54:25, 57:22

**stick** [1] - 93:11

**still** [16] - 3:15, 12:1, 15:17, 26:6, 53:17, 55:9, 55:20, 56:19, 57:12, 57:20, 60:24, 72:4, 88:22, 99:11, 104:13

**stole** [2] - 83:6, 83:7

**stolen** [6] - 28:18, 28:19, 29:7, 29:18, 91:20, 96:14

**stomped** [1] - 77:4

**stop** [1] - 59:2

**Stop** [2] - 90:25, 101:18

**stopped** [1] - 94:13

**storage** [1] - 108:25

**story** [1] - 38:10

**strange** [1] - 61:23

**strangle** [1] - 28:11

**strangling** [1] - 28:10

**Street** [2] - 1:9, 1:18

**strict** [2] - 23:7, 23:19

**strike** [3] - 67:21, 102:3, 102:8
**strobe** [2] - 100:9, 100:11
**strong** [1] - 64:21
**struck** [1] - 95:8
**structure** [1] - 11:15
**struggling** [1] - 93:10
**student** [1] - 54:4
**studies** [1] - 71:19
**stuff** [1] - 5:24
**subject** [4] - 11:2, 49:3, 51:19, 110:5
**subjected** [1] - 33:22
**submit** [3] - 64:12, 104:17, 105:2
**submits** [1] - 66:1
**submitted** [11] - 4:24, 8:6, 10:21, 53:9, 62:7, 69:10, 70:16, 89:8, 89:13, 97:9, 102:15
**subparagraph** [1] - 13:20
**substance** [7] - 36:3, 79:23, 104:13, 104:14, 104:16, 105:2, 105:3
**substantial** [1] - 83:21
**substantially** [3] - 35:14, 35:15, 45:13
**succeed** [2] - 58:9, 67:3
**succeeded** [2] - 77:1, 90:19
**successful** [1] - 81:18
**successfully** [4] - 16:24, 18:18, 19:2, 42:9
**suffer** [1] - 67:4
**suffered** [1] - 102:20
**sufficient** [6] - 16:5, 17:5, 23:23, 71:11, 85:20, 96:3
**suffocate** [1] - 28:11
**suffocating** [1] - 28:10
**suggest** [1] - 39:13
**suggesting** [1] - 57:9
**suggestion** [1] - 79:6
**suggests** [1] - 17:25
**suit** [1] - 62:13
**summarize** [1] - 11:18
**summary** [1] - 12:6
**supervised** [6] - 49:3, 49:19, 50:4, 50:13, 70:9, 103:20
**supervision** [5] - 78:7, 104:1, 104:2, 104:3, 104:18
**supplement** [3] - 4:22,

32:13, 38:3
**supplemental** [2] - 4:20, 12:18
**supplemented** [1] - 10:17
**supplements** [1] - 4:17
**supplied** [1] - 31:16
**support** [10] - 4:18, 4:24, 30:11, 36:24, 60:13, 63:24, 67:10, 76:4, 76:5, 100:18
**supported** [2] - 69:15, 97:1
**supporting** [1] - 89:9
**supports** [2] - 37:10, 95:17
**Supreme** [2] - 44:23, 75:15
**surprised** [1] - 79:10
**surrender** [4] - 109:15, 109:19, 109:20, 110:8
**surrounded** [1] - 46:22
**suspend** [3] - 79:10, 79:23, 80:4
**sustain** [1] - 66:6
**sustained** [8] - 37:12, 73:13, 73:25, 74:2, 94:10, 97:4, 100:23, 102:20
**sustains** [1] - 47:4
**system** [2] - 91:6, 98:8

## T

**table** [2] - 2:13, 34:8
**Table** [2] - 11:12, 97:16
**tactical** [5] - 72:12, 73:23, 76:1, 83:3, 94:25
**takeaways** [1] - 70:25
**talks** [1] - 25:3
**tamper** [1] - 105:4
**targeted** [2] - 33:24, 33:25
**tarnished** [1] - 68:4
**Tasered** [1] - 77:4
**task** [1] - 32:21
**tax** [4] - 80:20, 81:13, 81:14, 81:17
**taxpayers** [3] - 88:21, 89:1
**tears** [1] - 69:11
**technically** [1] - 65:8
**temporally** [2] - 31:22, 35:12
**ten** [1] - 74:2

**term** [10] - 13:21, 41:22, 82:9, 102:24, 103:14, 103:20, 109:17, 109:24, 109:25, 110:10
**terms** [10] - 42:5, 73:10, 73:16, 79:13, 84:16, 98:1, 103:15, 103:18
**terrace** [8] - 22:20, 25:17, 25:19, 51:12, 58:3, 58:19, 69:13, 69:17
**test** [2] - 17:25, 104:17
**testified** [18] - 45:12, 45:25, 51:25, 52:4, 52:9, 52:11, 52:23, 52:25, 53:4, 53:7, 54:3, 54:5, 66:10, 69:17, 91:11, 91:15, 93:1, 93:4
**testifies** [1] - 44:24
**testify** [2] - 38:6, 45:3
**testimony** [35] - 4:21, 13:4, 17:13, 19:15, 37:17, 39:6, 39:14, 39:22, 40:15, 42:5, 43:14, 43:20, 44:6, 44:9, 44:14, 44:16, 44:22, 45:2, 45:5, 45:6, 45:16, 45:19, 46:10, 46:24, 47:19, 48:17, 58:15, 65:1, 65:25, 66:4, 69:1, 69:9, 70:1, 97:9, 99:9
**testing** [4] - 79:21, 80:4, 105:2, 105:4
**tests** [1] - 104:19
**text** [3] - 17:23, 18:9, 20:15
**thankfully** [3] - 16:23, 19:1, 77:8
**THE** [114] - 1:1, 1:6, 1:8, 1:15, 2:2, 2:19, 2:23, 2:25, 3:7, 3:10, 3:11, 5:6, 5:8, 5:10, 5:12, 5:15, 7:1, 7:6, 7:7, 7:14, 7:17, 7:20, 8:3, 8:4, 8:8, 8:9, 8:13, 9:5, 9:16, 10:13, 12:3, 13:9, 14:7, 14:11, 21:18, 22:12, 23:12, 23:19, 24:2, 24:5, 24:19, 27:1, 27:18, 32:2, 32:10, 32:12, 32:20, 33:3, 33:7, 33:10, 33:12, 34:8, 34:10, 34:23, 37:24, 38:1,

39:16, 40:17, 41:15, 43:4, 43:9, 49:13, 49:15, 50:12, 50:22, 55:22, 56:7, 56:22, 61:8, 63:2, 63:12, 63:16, 64:17, 70:10, 70:20, 71:4, 72:20, 74:4, 74:10, 74:12, 75:18, 76:7, 76:17, 77:1, 77:7, 77:25, 78:18, 78:21, 79:9, 79:15, 79:19, 80:7, 80:10, 80:17, 80:20, 80:25, 81:4, 81:12, 81:19, 83:25, 85:2, 85:7, 85:8, 85:11, 107:11, 107:18, 108:1, 108:18, 108:23, 109:8, 110:13, 110:15, 110:22, 110:24
**themes** [2] - 72:1, 72:6
**themselves** [2] - 54:1, 58:8
**theories** [2] - 27:21, 31:24
**theory** [3] - 26:14, 26:15, 27:10
**thereafter** [1] - 104:19
**thereby** [1] - 28:3
**therefore** [2] - 31:11, 37:10
**thick** [1] - 69:6
**thinking** [1] - 73:22
**Third** [5] - 18:1, 18:3, 18:4, 19:8, 19:21
**third** [7] - 12:20, 12:21, 18:22, 46:25, 49:9, 49:15, 57:21
**third-world** [1] - 57:21
**thousands** [2] - 68:6, 69:24
**thread** [2] - 42:8, 42:18
**threaded** [1] - 65:25
**threatened** [1] - 19:24
**three** [21] - 4:16, 6:13, 7:24, 11:3, 30:23, 31:20, 44:10, 44:14, 45:17, 47:22, 49:4, 63:12, 64:22, 68:24, 82:13, 96:24, 97:5, 98:3, 98:16
**three-hour** [2] - 98:3
**three-offense** [1] - 98:16
**threw** [1] - 101:3
**throughout** [1] - 16:20
**throwing** [1] - 52:19

**tied** [3] - 13:22, 14:25, 15:9
**tight** [2] - 20:5, 20:7
**tightly** [1] - 92:6
**Tim** [1] - 3:2
**TIMOTHY** [1] - 1:16
timothy_watkins@fd.org [1] - 1:19
**tip** [1] - 94:4
**tired** [1] - 52:24
**title** [1] - 91:4
**titled** [1] - 14:17
**today** [19] - 3:6, 11:19, 41:6, 42:21, 51:17, 52:9, 53:4, 53:22, 55:6, 62:13, 70:4, 81:22, 82:12, 82:19, 95:21, 99:11, 100:5, 101:9, 110:19
**together** [7] - 12:25, 35:1, 35:10, 35:15, 37:11, 47:23, 93:24
**toll** [1] - 66:10
**took** [6] - 30:12, 58:19, 76:15, 90:20, 94:14, 102:2
**tool** [1] - 102:10
**topics** [3] - 44:10, 44:15, 45:17
**total** [8] - 11:22, 17:5, 36:2, 48:18, 49:8, 74:23, 87:19, 103:24
**totally** [9] - 22:1, 29:25, 73:2, 90:5, 97:13, 98:18, 100:16, 110:17
**touch** [1] - 53:15
**towards** [9] - 16:19, 30:17, 37:5, 45:23, 46:1, 46:5, 48:12, 96:24, 100:10
**towels** [1] - 52:13
**track** [1] - 11:15
**traitor** [1] - 25:21
**traitors** [1] - 93:18
**transaction** [1] - 35:18
**transactions** [3] - 35:4, 35:20, 37:7
**transcript** [5] - 1:25, 26:16, 111:5, 111:6, 111:9
**TRANSCRIPT** [1] - 1:6
**transcription** [1] - 1:25
**transcripts** [1] - 21:25
**trashed** [1] - 83:7
**travel** [2] - 62:3, 109:4
**treason** [1] - 25:21, 93:19
**treated** [7] - 35:23,

64:15, 65:22, 67:9,
95:9, 95:10, 96:15
**treating** [1] - 99:1
**treatment** [2] - 99:12
**trend** [1] - 72:1
**trends** [1] - 72:6
**trial** [52] - 4:20, 5:2,
7:24, 8:23, 9:3, 9:9,
10:18, 10:20, 13:4,
16:18, 19:15, 25:8,
37:18, 39:22, 42:14,
43:14, 44:10, 44:20,
44:24, 45:11, 45:16,
45:19, 45:25, 47:19,
48:17, 51:5, 51:18,
52:1, 52:9, 53:10,
57:25, 60:17, 63:12,
64:14, 67:9, 68:25,
69:10, 70:2, 70:18,
82:21, 93:4, 95:8,
97:8, 97:21, 98:10,
98:13, 99:7, 99:9,
101:14
**Trial** [3] - 19:12, 45:20,
46:13
**trials** [1] - 55:19
**tried** [8] - 51:10,
58:15, 58:16, 58:17,
92:8, 92:22, 92:25,
96:17
**tries** [1] - 65:12
**trigger** [2] - 16:5,
22:10
**trip** [2] - 83:2, 91:2
**true** [7] - 23:9, 24:10,
64:13, 66:6, 67:15,
111:4, 111:5
**Trump's** [1] - 88:9
**truthful** [2] - 45:5,
56:14
**try** [5] - 34:4, 68:11,
79:7, 84:18, 109:3
**trying** [20] - 23:18,
32:16, 33:20, 46:18,
52:4, 52:14, 52:16,
58:14, 65:9, 65:17,
67:19, 70:6, 73:1,
82:7, 83:16, 91:25,
92:19, 93:21, 95:2,
96:16
**tunnel** [71] - 19:18,
20:5, 20:7, 22:20,
25:18, 25:19, 29:11,
31:2, 31:4, 33:25,
34:17, 36:18, 36:19,
36:21, 37:6, 44:12,
44:13, 46:13, 46:23,
47:1, 47:3, 47:7,
51:10, 51:13, 51:19,
51:24, 52:11, 52:17,

53:17, 53:22, 54:9,
58:3, 58:5, 58:19,
65:8, 66:11, 68:12,
69:13, 69:17, 69:19,
69:22, 69:24, 73:20,
74:1, 74:23, 90:21,
92:3, 92:11, 92:17,
92:19, 92:23, 93:17,
94:1, 94:3, 94:6,
94:12, 94:13, 94:18,
95:5, 95:7, 96:17,
96:20, 97:4, 97:12,
100:9, 100:24,
101:3, 101:21,
101:24, 102:11
**tunnels** [1] - 69:20
**turn** [5] - 20:23, 33:12,
45:19, 49:9, 50:25
**turned** [3] - 69:4,
91:23, 108:18
**turning** [1] - 22:4,
37:15, 55:17
**turns** [1] - 13:17
**twists** [1] - 84:14
**two** [39] - 11:23,
13:14, 13:24, 14:16,
14:19, 15:19, 21:15,
21:20, 24:25, 25:10,
25:25, 26:10, 28:15,
28:19, 32:5, 34:14,
35:3, 35:19, 37:7,
37:16, 43:13, 44:7,
45:17, 47:18, 48:15,
50:3, 50:13, 54:24,
68:23, 69:2, 70:18,
70:25, 89:22, 92:24,
93:1, 93:15, 96:24,
97:5, 104:18
**two-level** [5] - 11:23,
37:16, 43:13, 47:18,
69:2
**two-offense** [1] -
13:14
**two-offense-level** [5] -
13:24, 14:16, 14:19,
15:19, 44:7
**two-to-three-second**
[1] - 96:24
**tying** [1] - 65:7
**type** [2] - 67:21, 78:4
**types** [2] - 86:20,
97:15
**typical** [1] - 63:20

**U**

**U.S** [26] - 1:20, 1:22,
1:22, 9:21, 15:6,
15:22, 18:2, 43:17,
43:25, 44:1, 44:2,

45:7, 45:8, 54:4,
61:5, 86:5, 98:24,
99:3, 99:13, 101:1,
105:8, 105:21,
106:3, 106:10,
106:13
**U.S.C** [19] - 3:23, 3:25,
4:2, 4:4, 6:16, 30:20,
48:24, 49:2, 49:5,
85:19, 87:5, 87:10,
88:8, 88:18, 103:10,
103:25, 104:23,
106:14, 106:22
**ultimately** [1] - 16:23
**Ultra** [2] - 81:2, 81:6
**unable** [2] - 89:5,
107:2
**unbelievable** [2] -
41:12, 41:14
**uncalled** [1] - 64:23
**under** [6] - 6:16,
11:24, 12:16, 13:1,
13:4, 13:15, 14:16,
16:9, 20:17, 24:24,
25:11, 26:8, 26:15,
26:17, 27:8, 27:9,
27:10, 28:15, 28:19,
31:10, 31:14, 31:18,
31:22, 35:10, 36:9,
36:13, 37:10, 37:12,
37:16, 44:7, 44:21,
44:25, 47:23, 48:7,
48:9, 48:13, 48:17,
49:2, 49:5, 51:18,
55:11, 55:12, 55:15,
57:11, 57:23, 58:21,
59:1, 71:11, 79:13,
87:4, 87:9, 87:14,
98:16, 98:23,
101:16, 104:3,
104:7, 106:15
**underlying** [1] - 36:16
**understandably** [1] -
52:15
**understood** [5] -
32:10, 32:12, 38:22,
39:14, 76:2
**unemployable** [1] -
79:1
**unemployed** [1] -
95:16
**unique** [2] - 71:14,
84:14
**UNITED** [4] - 1:1, 1:2,
1:7, 1:8
**United** [7] - 1:9, 2:3,
2:12, 58:24, 60:21,
67:17, 69:16
**unknown** [2] - 52:19,
52:20

**unlawful** [3] - 29:25,
98:21, 104:15
**unlawfully** [1] -
104:12
**unlawfulness** [1] -
101:8
**unless** [3] - 14:10,
78:5, 83:23
**unlike** [2] - 101:7,
102:18
**unpaid** [1] - 80:21
**unsteady** [1] - 53:13
**unsuccessful** [2] -
92:21, 93:22
**untruthful** [1] - 45:11
**untruthfully** [1] -
45:12
**unusual** [2] - 81:9,
81:10
**unwarranted** [9] -
57:15, 68:5, 71:17,
72:5, 76:6, 76:13,
86:21, 97:19, 98:6
**up** [25] - 12:4, 13:22,
15:1, 15:9, 30:2,
32:25, 39:8, 52:6,
53:14, 54:14, 56:9,
56:12, 61:4, 64:6,
69:19, 81:24, 85:4,
92:2, 92:13, 94:9,
97:6, 101:8, 108:3,
110:1, 110:18
**upbringing** [1] - 67:3
**upper** [1] - 49:24
**upward** [6] - 15:21,
45:16, 55:15, 56:1,
56:5, 57:7
**upwards** [1] - 62:21
**urging** [3] - 83:9,
83:10
**USAO** [1] - 1:12
**useful** [1] - 85:23
**uses** [1] - 17:1
**usual** [1] - 98:16

**V**

**vaccinated** [2] - 3:9,
3:16
**vain** [1] - 34:7
**valiantly** [2] - 92:18,
93:19
**valid** [1] - 99:5
**variance** [4] - 55:22,
75:24, 75:25, 76:4
**various** [4] - 52:5,
68:17, 91:6, 98:1
**Various** [1] - 71:3
**varying** [1] - 37:2
**versus** [6] - 2:3, 31:13,

33:16, 42:15, 81:24,
98:9
**vest** [1] - 60:2
**Veteran** [1] - 102:17
**via** [1] - 2:7
**Victim** [1] - 14:17
**victim** [30] - 12:16,
13:22, 14:25, 15:11,
15:12, 15:15, 15:23,
15:24, 17:10, 17:21,
18:16, 18:23, 19:8,
19:23, 21:1, 21:4,
26:24, 31:9, 31:15,
35:2, 35:17, 35:19,
36:15, 37:7, 48:12,
54:1, 88:1, 88:13,
105:22
**victim's** [1] - 88:11
**victim-related** [1] -
12:16
**Victims** [3] - 87:5,
87:9, 87:15
**victims** [10] - 31:21,
33:20, 35:7, 35:12,
36:17, 36:23, 37:1,
37:2, 86:24, 87:17
**victims'** [1] - 87:19
**victorious** [1] - 69:23
**video** [11] - 2:7, 4:23,
4:25, 16:15, 42:19,
46:16, 54:18, 93:13,
94:2, 97:2, 97:3
**videos** [1] - 54:18
**videotape** [1] - 33:24
**view** [7] - 12:20,
34:12, 38:10, 38:12,
38:17, 39:20, 86:15
**viewed** [1] - 91:18
**views** [2] - 91:18,
91:19
**vigorously** [1] - 16:23
**Vincent** [5] - 2:4, 3:5,
3:20, 103:8, 103:12
**VINCENT** [1] - 1:4
**violate** [1] - 110:4
**violating** [1] - 110:2
**violation** [5] - 3:23,
3:25, 4:2, 4:4,
106:17
**violations** [1] - 97:22
**violence** [19] - 4:1,
4:3, 30:22, 31:2,
34:19, 44:19, 58:2,
67:4, 68:13, 69:6,
83:10, 87:8, 90:10,
90:12, 91:8, 96:19,
96:24, 100:8, 101:5
**violent** [8] - 30:17,
46:7, 55:6, 60:15,
60:17, 93:6, 100:14,

102:6
**violently** [1] - 92:25
**virtue** [1] - 98:13
**visible** [1] - 66:13
**vision** [1] - 100:10
**void** [1] - 111:8
**voluntary** [1] - 65:20
**vote** [1] - 41:11
**voted** [1] - 41:16
**votes** [1] - 61:3
**vs** [1] - 1:3
**VWPA** [1] - 87:14

## W

**waive** [2] - 107:18, 107:20
**waives** [1] - 105:18
**waiving** [1] - 107:15
**walking** [2] - 53:13, 73:8
**wall** [1] - 46:15
**wants** [4] - 8:22, 9:12, 53:14, 64:24
**warrant** [1] - 41:25
**warranted** [1] - 84:6
**warrants** [1] - 45:16
**Washington** [8] - 1:5, 1:10, 41:23, 68:7, 90:25, 91:5, 105:24, 106:4
**watched** [4] - 54:18, 56:21, 57:18, 57:24
**Watkins** [20] - 3:2, 5:8, 7:25, 8:10, 12:5, 13:6, 14:7, 21:6, 22:13, 31:25, 37:19, 41:21, 43:4, 49:13, 50:25, 70:23, 73:21, 107:12, 110:15, 110:22
**WATKINS** [67] - 1:16, 3:1, 5:9, 5:11, 5:14, 6:24, 8:12, 8:21, 9:7, 10:12, 13:8, 14:9, 21:9, 22:4, 22:25, 23:16, 23:21, 24:4, 24:10, 27:2, 32:1, 32:8, 32:11, 32:14, 32:23, 33:4, 33:8, 33:11, 37:23, 37:25, 38:4, 43:7, 49:14, 50:10, 70:24, 71:6, 74:3, 74:6, 74:11, 74:14, 76:5, 76:8, 76:20, 77:6, 77:12, 78:11, 78:20, 78:23, 79:14, 79:18, 80:5, 80:8, 80:11, 80:19, 80:22, 81:3, 81:7,

81:15, 81:20, 85:1, 85:10, 107:14, 107:23, 108:14, 108:20, 109:2, 110:23
**waves** [1] - 93:24
**ways** [2] - 5:19, 35:16
**weapon** [12] - 24:14, 28:8, 28:9, 28:17, 28:24, 29:6, 29:7, 29:18, 48:9, 72:17, 102:10
**weapons** [8] - 59:19, 59:23, 59:24, 72:12, 73:23, 75:6, 76:1, 94:25
**wear** [1] - 3:13
**website** [1] - 94:17
**Webster** [1] - 16:12
**wee** [1] - 60:25
**week** [2] - 78:4, 104:6
**weigh** [1] - 20:14
**weighing** [1] - 18:5
**weighs** [7] - 18:13, 18:21, 19:5, 19:19, 20:11, 20:12, 60:8
**weight** [1] - 46:22
**west** [22] - 19:18, 20:5, 22:20, 25:17, 25:19, 31:2, 36:18, 46:23, 51:12, 54:8, 58:2, 58:19, 69:13, 69:17, 73:20, 74:1, 90:21, 92:3, 96:17, 100:9, 101:3, 101:21
**wet** [1] - 52:13
**whacked** [4] - 64:21, 64:24, 64:25, 65:2
**whatsoever** [2] - 72:9, 82:3
**White** [2] - 81:2, 81:6
**whole** [1] - 74:25
**Williams** [8] - 26:14, 27:6, 82:20, 82:24, 84:1, 84:2, 84:19, 100:21
**Williams'** [1] - 83:14
**willing** [1] - 40:6
**winning** [1] - 33:9
**wisely** [1] - 42:17
**wish** [3] - 6:15, 51:1, 85:3
**withdrawal** [1] - 11:17
**withdrawn** [3] - 12:14, 37:21, 43:16
**Witness** [2] - 87:10, 87:15
**witness** [3] - 42:21, 52:10, 66:3
**witnessed** [3] - 47:2,

91:16, 96:1
**wondered** [1] - 55:24
**wooden** [2] - 52:21, 101:3
**word** [7] - 40:3, 42:23, 53:25, 54:14, 64:15, 64:16
**words** [2] - 30:8, 51:5
**works** [1] - 54:5
**world** [7] - 25:25, 38:10, 38:12, 38:17, 39:20, 57:21, 67:25
**worn** [1] - 51:17
**worried** [1] - 53:1
**worry** [1] - 38:8
**worth** [4] - 31:5, 62:7, 89:8, 89:13
**wrestle** [1] - 17:6
**written** [4] - 17:20, 36:6, 38:3, 102:15
**wrongful** [1] - 98:21
**wrongfulness** [1] - 99:10

## Y

**yank** [1] - 51:10
**year** [2] - 67:25, 103:16
**years** [24] - 46:2, 49:4, 49:19, 50:3, 50:13, 54:5, 54:24, 61:18, 61:20, 62:1, 62:15, 70:8, 78:10, 81:7, 83:12, 90:1, 93:5, 95:17, 102:19, 103:14, 103:15, 103:20, 107:17, 108:9
**yelling** [5] - 25:21, 46:20, 46:21, 93:18, 102:4
**yesterday** [2] - 4:23, 98:3
**Young** [2] - 100:5, 100:7
**Young's** [2] - 100:14, 100:17

## Z

**zenith** [1] - 38:5
**zero** [1] - 11:11
**Zone** [1] - 97:16